IN THE UNITED STATES
COURT OF APPEALS FOR THE
SEVENTH CIRCUIT

SHORT RECORD
Appeal No. 19-1708
Filed 4/15/19

SHERMAN LAMONT FIELDS,
               Petitioner,


v.


WARDEN USP TERRE HAUTE,
               Respondent.


On Appeal from the Southern District of Indiana

---

CAPITAL CASE
(DEATH PENALTY)


Sherman Lamont Fields
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
          47808

QUESTION(S) PRESENTED

Ineffective Assistance of Habeas Counsel is still an Open question... But when Counsel is forced on a Petitioner in violation of Price v Johnson, 334 U.S. 266, 68 S.Ct. 1049, 72 L.Ed .2d 1356 (1948) and Faretta v. California, 422 U.S. 806, 807 (1975) and petitioner might be murdered ( as an innocent death sentenced inmate ) because § 2255 Counsel neglected to file the right issues and present the evidence that exonerates petitioner; Can that same ineffective § 2255 Counsel be forced on petitioner where petitioner filed a § 2241 as a Pro se defendant and have repeatedly expressed his objection to Counsel?

i

PARTIE(S) TO THE PROCEEDING(S)

ii

PETITIONER

SHERMAN LAMONT FIELDS
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana, 47808
                                    Pro Se

RESPONDENT(S)

Zachary C. Richter
Special Ass't U.S. Attorney
816 Congress Ave., Suite 1000
Austin, Texas 78701
(512) 916-5858
zachary.richter@usdoj.gov

James R. Wood
Ass't U.S. Attorney
10 W. Market St., Suite 2100
Indianapolis, Indiana 46204-3048
(317) 226-6333
Bob.wood@usdoj.gov

Jeffrey E. Ellis
Attorney
Law Office of Alsept & Ellis
621 SW Morrison St., Ste. 1025
(503) 222-9830
JeffreyErwinEllis@gmail.com

# TABLE OF CONTENTS

QUESTION(S) PRESENTED..................................i

PARTIE(S) TO THE PROCEEDINGS..........................ii

TABLE OF CONTENTS....................................iii

TABLE OF AUTHORITIES...............................iv-vi

JURISDICTION...........................................1

STATEMENT..............................................2

REASON(S) FOR GRANTING THE PETITION:

    I. This Court should grant this petition because
    the Western District of Texas (Waco Division );
    The 5th Circuit Court of Appeals; The Southern
    District of Indiana ( Terre Haute Division );
    And the 7th Circuit Court of Appeals have all
    forced  ineffective and deficient counsel on
    petitioner and as a direct result petitioner is
    in danger of being murdered by the U.S. government.....3-15

    II. This Court should grant this petition because
    Petitioner is actually and factually innocent...........15-19

        (A). LAW ENFORCEMENT KNEW ALL ALONG
        WHO THE REAL MURDERER(S) WERE..................16,17

        (B). LAW ENFORCEMENT KNOWINGLY, WILLFULLY,
        INTENTIONALLY, WITH MALICE AFORETHOUGHT
        FRAMED FIELDS FOR THE CRIME(S) OF
        CONVICTION.....................................17,18

        (C). THE GOVERNMENT KNEW ALL ALONG THAT
        PETITIONER FIELDS WAS INNOCENT.................18,19

    III. ARGUMENT...........................................19-25

        (D). PETITIONER'S INCARCERATION VIOLATES
        THE FOURTEENTH AMENDMENT.........................22

        ( EQUAL PROTECTION OF THE LAWS )............22

        (E). PETITIONER'S INCARCERATION VIOLATES
        THE EIGHTH AMENDMENT.............................23

        (F). THE SCHLUP  GATEWAY..........................23-25

    IV. THE HIGH BAR ON ACTUAL INNOCENCE IS UNCONSTITUTIONAL....25,26

CONCLUSION...........................................26,27

# TABLE OF AUTHORITIES

Case 19-1708  Document 1-1  Filed 04/15/2019  Pages 155

Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001 )....23,

Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995)...................4,

Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369,
101 L.Ed .2d 228 (1988).......13

Bass v. Perrin. 170 F.3d 1312. 1316 (11th Cir.).........................21

Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed .2d 215 (1963).5,19

Buck v. Davis, 137 S.Ct. 759, 777 (2017).........................26

Calderon v. Thompson, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed
.2d 728 (1998)...................25

Cargle v. Mullins. 317 F.3d 1196, 1202-03 (10th Cir. 2003 )...........6

Chandler v. Crosby, 379 F.3d 1278, 1288 (11th Cir. 2004)..............21

Chicago Tribune Co., v. Bridgestone/Firestone Inc., 263 F.3d 1304,
1309 (11th Cir. 2001).........14

Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012)............24

Coleman v. Thompson, 501 U.S. 722 (1991)..............................4

Cuyler v. Sullivan, at 346, 64 L.Ed .2d 333, 100 S.Ct. 1708...........7,10

Duest v. Singletary, 967 F.2d 472, 482, (11th Cir. 1992), vacated on
other grounds, 507 U.S. 113 S.Ct. 1940, 123 L.ED
.2d 647 (1993)...................... 21

Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116..........................15

Estelle v. Gamble, 429 U.S. 97, 102-103, 97 S.Ct. 285, 290, 50 L.Ed
.2d 251 (1976)..................... 21

Faretta v. California, 422 U.S. 806, 807 (1975)..........................i,4

Fields v. Warden USP Terre Haute, 2:16-cv-418-JMS-MJD................ 22

Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018)................. 24

Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending, 5th Cir.
(8/2/13)............... 21,22,

Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003).................. 24

Gomez v. Jaimet, 350 F.3d 673, 679-80 (7th Cir. 2003)..................23

Ha Van Nguyen v. Curry, 736 F.3d 1287, 1295-96 (9th Cir. 2013)........6

In Re Davis, No. CV-409-130 (8/24/10)..................................21

In Re Kemmler. 136 U.S. 436, 10 S.Ct. 930, 34 L.Ed 519.................21

Johnson v. United States, 576 U.S.,__ (2015)..........................6

Kuhlman v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n. 17...21

Lee v. Davis, 328 F.3d 896, 900-01 (7th Cir. 2003)......................6

Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863-864,
108 S.Ct. 2194, 100 L.Ed .2d 855...............26

Lonchar v. Thomas, 517 U.S. 314, 324, 134 L.Ed .2d 440, 116 S.Ct.
1293 (1996)...................11

Makiel v. Butler, 782 F.3d 882, 898 (7th Cir. 2015).....................5,

Maples v. Thomas, 565 U.S.__,__n.8, 132 S.Ct. 912, 925, 181 L.Ed
.2d 807, 824 (2012)...........6,

Martinez v. Ryan,__U.S.__, 132 S.Ct. 1309, 182 L.Ed .2d 272 (2012)......6

Mooney v. Holohan, 294 U.S. 103, 113 (1935)........................ 21

Napue v. Illinois, 360 U.S. 264, 269, 3L.Ed .2d 1217, 79 S.Ct. 1173 (1959)............5,20

People v. Owens, 564 N.E. 2d 1184, 139 ILL.2d 351, 151 ILL. Dec. 522 (1990)..............3

Perry v. Brooks, 175 GA. APP. 77, 332 S.E. 2d 375 (1985)...............12

Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 72 L.Ed .2d 1356 (1948)....................i,2

Reeves v. Fayette SCI, No. 17-1043 (2018)............................26

Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015)......................24

Rivas v, Fischer, 687 F.3d 514, 543, 546-47 (2d Cir. 2012)..........24

Roberts v. South Carolina, 36, S.C.1; 602 S.E. 2d 768; 2004 S.C. LEXIS 218..................8

Rozzelle v. Sec'y dep't of Corr., 672 F.3d 1000, 1018 n.21 (11th cir. 2012)..........24

Sanders v. Cotton, 398 F.3d 572, 585 (7th Cir. 2005).................5,14

Sandstrom v. Montana, (1979) 442 US 510, 61 L.Ed .2d 39, 99 S.Ct. 2450......................11

Satterfields v. Dis't Att'y Phila., 872 F.3d 152, 154 (3d Cir. 2017)...25

Sawyer v. Whitley, 505 US 333, 120 L.Ed .2d 269, 112 S.Ct. 2514 (1992).........27

Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed .2d 808, 115 S.Ct. 851 (1995)...............passim

Shaw v. Wilson, 7th Cir. No. 12-1628 7/24/13.........................6

Slack v. Mcdaniels, 529 U.S. 473, 483, 146 L.Ed .2d 542, 120 S.Ct. 1595 (2000)...................11

Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 145 :L.Ed .2d 756 (2000)·················6

Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed .2d 674 (1984)...............10

United States v. Agurs, 472 U.S. 97, 103, 49 L.Ed .2d 342, 96 S.Ct. 2392 (1976)...................14

United States v. Cathey, 591 F.2d 268, 271-72 (1979).................13

United States v. Greer, 137 F.3d 247, 251 (5th Cir. 1978)...........13

United States v. Harlow, 444 F.3d 1255 (10th Cir. 2006).............11

United States v. Hyder, 732 F.2d 841, 845 (11th Cir. 1984)..........13

United States v, Mechanik, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed .2d 50 (1986)...............13

United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1349 (5th Cir. 1994)..13

United States v. Payner, 447 U.S. 712, 734 (1980)...................13

United States v. Roger LaPage, 231 F.3d 488 (2000)..................14

United States v. Sullivan. 578 F.2d 121, 124 (5th Cir. 1988)..........13

Case: 19-1708    Document: 1-1    Filed: 04/15/2019    Pages: 155

United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed
.2d 352 (1992)..................12

Winters v. Miller, 274 F.3d 1161, 1167 (7th Cir. 2001 )............6


## OTHER AUTHORITIE(S)


GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL
IN DEATH PENALTY CASES (February 2003) GUIDELINE 10.15.1(c).........6


www.innocenceproject.org/content/Cameron_Todd_Willingham_Posthumous
_Pardon_Filing_Document.php..................................... 26


## RULES

RULE 18 U.S.C. § 1623...............12
RULE 18 U.S.C. § 1622...............13
 28 U.S.C. § 2241.................... passim
 28 U.S.C. § 2255....................passim

JURISDICTION

This is an Appeal from the Southern District of Indiana
( Terre Haute, Division )  ( See App. 1 ).

1

## STATEMENT

Under Price v. Johnson, " Counsel can't be _forced_ upon a criminal defendant " whether at trial or on appeal ", and under Faretta v. California a defendant have the right to proceed without counsel when he voluntarily and intelligently elects to do so; But counsel have been _forced_ upon Plaintiff repeatedly and that Counsel have been ineffective and deficient, and as a direct result Plaintiff will be murdered by the United states government, when in fact if the Courts had not violated petitioners Constitutional rights and _forced_ ineffective Counsel upon petitioner, the evidence ( that counsel neglected to present) and the issues ( that counsel neglected to file ) would have proved Petitioner's innocence; Despite this, and petitioner repeated attempts to relieve counsel of their duty, the Court(s) is still forcing the same ineffective Counsel on Petitioner in violation of the United States Constitution. Petitioner is actually and factually innocent and not withstanding Counsels deficient performance, the Court(s) is also forcing conflicting counsel on petitioner, all in violation of the United States Constitution.

2

HABEAS COUNSEL RENDERED INEFFECTIVE
IN MULTIPLE RESPECTS.

 

Ineffective Assistance of Habeas Counsel is still an open question, but when Post Conviction Counsel is forced Upon a criminal defendant in violation of Price v. Johnson, 334 U.S. 266, 68 S.Ct. 1049, 72 L.Ed .2d 1356 (1948) (holding that whether at trial or on appeal counsel cannot be forced upon a defendant), then Post Conviction Counsel " Must give a reasonable level of assistance to the Petitioner." See People v. Owens, 564 N.E. 2d 1184, 139 Ill.2d 351, 151 ILL. Dec. 522 (1990). What makes this case equally baffling is that " the assistance of counsel in Post-conviction proceedings is a matter of Legislative grace and favor which may be altered by the legislature at will." ( citation omitted)(internal quotation marks omitted). Thus forcing counsel that's deficient and ineffective on plaintiff not only harmed plaintiff, but it goes against established precedent. In Fields' case petitioner tried " on numerous occasions " to file meritorious and material issues as a Pro Se defendant that Counsel neglected to file, starting from the very moment Counsel filed a Habeas petition so lacking in substance it defies reason. ( See App. 2 ). The District Court denied Petitioner his right to proceed pro Se. ( See App. 3 ). Petitioner tried to file in the 5th Circuit Court of Appeals and that Court too denied petitioner his right to proceed Pro Se. ( See App. 4 ) Petitioner spent the next several years trying to file in the Supreme Court to no avail; Finally the Supreme Court asked Petitioner " Why can't he file in the District of Incarceration?" Petitioner then filed a § 2241 here in the Southern District of Indiana (District of Incarceration) and Petitioners ineffective § 2255 Counsel ( whom petitioner have constantly attempted to relieve of their duty ) went against Petitioners expressed wishes and attached to Petitioners Pro Se § 2241. Petitioner objected to their attachment, and counsel responded as they did in the 5th Circuit insinuating that " petitioner is mentally ill " and the Court once again forced ineffective Counsel on Petitioner, ( See. 5 ), and restricted petitioner from filing an IAC claim by Ordering that Petitioner cannot file to the Court. ( See App. 6 ).

    Petitioner then filed a " Writ of Mandamus " to the 7th Circuit Court of Appeals, this time petitioner made clear that he's not " mentally ill." The Court Ordered Counsel to respond. ( See App. 7 ).

3

Counsel responded, claiming that he " supports Petitioners innocence " and he's been on Petitioner's case for a decade. ( See App. 8 ). However, counsel did not mention that petitioner have been trying to get him off his case from the very moment he filed his § 2255 Petition and proved himself to be deficient, and for eight years of that " decade" Petitioner have been filing Pro Se issues that Counsel neglected to file.

Nor did Counsel mention that the only reason Petitioners case was in the Southern District of Indiana is because petitioner filed the issues and the evidence as a Pro Se plaintiff, Counsel DID NOT file the issues, even after admitting that he'd " messed up " on § 2255. Furthermore Counsels attachment to issues that he himself neglected to file is an obvious conflict of interest.

In addition to that the Court had Ordered Counsel to tell them about " any settlement negotiations in the District Court." But Counsel DID NOT address any " settlement negotiations." Despite this, and the obvious Conflict of interest Counsel was forced on Petitioner once again. ( See App. 9 ).

In Faretta v. California, 422 U.S. 806, 807 (1975), the Court held that the Sixth and the Fourteenth Amendments include a " right to proceed without counsel when " a criminal defendant " voluntarily and intelligently elects to do so." And despite Fields' " many motions " to proceed pro Se ineffective and conflicting Counsel was still forced on Petitioner, even on § 2241 where Counsel is not mandated and is not a Constitutional requirement. In Coleman v. Thompson, 501 U.S. 722 (1991) the Supreme Court reasoned that " there can be no 6th Amendment violation because there is no Constitutional right to an attorney in state post-conviction proceedings " and " petitioner must bear the risk of attorney error." But here in Fields' case, petitioner shouldn't have to bear attorney error since Fields DID NOT want counsel to file any additional pleadings after they showed that they were deficient; Counsel was " forced " on Fields after petitioner elected to file his own brief and Motions and did indeed file that brief and Motions in a timely manner, so forcing counsel on Fields whose performance was objectively unreasonable is not Fields' fault and he should not be held accountable for it. Counsel failed to raise the Brady claim or, in the alternative, an IAC claim when trial counsel had failed to challenge the prosecutions failure to disclose exculpatory material. See Banks v. Reynolds, 54 F.3d 1508 (10th Cir. 1995); Counsel failed to raise the " Napue " claim

4

for the prosecution lying and saying that there are no fingerprints ( See App. 10     ), when in fact there were fingerprints, ( See App. 11     ) And those prints don't match Fields. ( See App. 12     ); Counsel failed to raise the issue that the jury " DID NOT BELIEVE " the jailhouse testimony that the prosecution claim is " overwhelming evidence of Fields' guilt; Counsel failed to raise the issue that the District Judge propeled Petitioners conviction by telling a juror that " the prosecution would dismiss the case if they thought Petitioners rights were being violated. ( See App. 13     ). Counsel failed to raise the issue that Petitioners conviction and Death Sentence was influenced by passion,prejudice and other arbitrary factors; And after the Courts Unconstitutionally denied Fields' § 2255 Counsel failed to raise the issue(s) that the Court(s) denied the Petition based on an Unreasonable Determination of the facts, and the District Judge and a 5th Circuit Court of appeals Judge's abject bias, racial and otherwise is cause for the Unconstitutional denial of the appeal; " Appellate counsels failure to bring these claims cannot be considered " objectively reasonable performance ". See Sanders v. Cotton, 398 F.3d 572, 585 (7th Cir. 2005)(Failure to make " an obvious and clearly stronger argument " was deficient performance ( citation omitted)). " Appellate counsel is not required to raise every non-frivolous issue and his performance " is deficient under Strickland only if he fails to argue an issue that is both " obvious " and ' clearly stronger ' than the issues actually raised." Makiel v. Butler, 782 F.3d 882, 898 (7th Cir. 2015).. The Brady v. Maryland and Napue v. Illinois issues was " obvious " from the trial record itself and " clearly stronger " than the issues that counsel presented. The question of whether the perjured testimony prejudiced Fields' defense was also " clearly stronger " than the claims that counsel raised. In one claim counsel argued that " trial counsel was ineffective for not  talking to a woman ( pre-trial ) whom counsel claim is Petitioners sister on his fathers side of the family. Mind you, Petitioner don't even know his father and didn't even know that he had " a sister "; Nor did " the sister " know about Fields. The prosecution successfully defeated this frivolous argument by saying " Why would Fields' trial counsel go talk to this woman when in fact she nor Fields don't know each other and didn't even know that each other exist?" Having said that, no court can reason that this obviously frivolous issue was a stronger argument than the Brady or Napue  claims that prove Petitioners innocence.

5

"...Prevailing professional norms require appellate counsel in Capital cases to raise all arguably meritorious claims." See ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES ( February 2003 ) GUIDELINE 10.15.1(c). See also Id. Commentary to Guideline 10.15.1 ("[W]innowing " issues in a capital appeal can have fatal consequences...when a client will be killed if the case is lost, counsel should not let any possible ground for relief go unexplored or unexploited.") " Appellate Counsel's poor choice of claims justifies habeas relief; Shaw v. Wilson, 7th Cir. No. 12-1628 7/24/13. Fields believes that because Counsel's performance was so unreasonable in this case this court should follow the 9th Circuit in finding the reasoning in Martinez v. Ryan,__U.S.__,132 S.Ct. 1309, 182 L.Ed .2d 272 (2012) applies equally to a claim of IAC of Appellate Counsel. See Ha Van Nguyen v. Curry, 736 F.3d 1287, 1295-96 (9th Cir. 2013). Counsel abandoned " numerous nonfrivolous " issues that was both " obvious " and " clearly stronger " than the claim(s) he actually presented, thus his performance was deficient. See Smith v. Robbins, 528 U.S. 259, 288, 120 S.Ct. 746, 145 L.Ed .2d 756 (2000) (approving the Court's " clearly stronger " inquiry ); Lee v. Davis, 328 F.3d 896, 900-01 (7th Cir. 2003); Cargle v. Mullins, ,317 F.3d 1196, 1202-03 (10th Cir. 2003); Winters v. Miller, 274 F.3d 1161, 1167 (7th Cir. 2001). Then to avoid damage to his own reputation counsel " unconstitutionally " took over " Petitioners Pro Se § 2241 so he can control Petitioner and prevent an IAC amendment. This obvious and significant conflict harms petitioner; Maples v. Thomas, 565 U.S. __,__ n.8, 132 S.Ct. 912, 925, 181 L.Ed .2d 807, 824 (2012). It allows counsel to control what petitioner can or can't file in order to hinder, obstruct and impede petitioner until Petitioner can be executed due to Counsel's deficient performance. When counsel " unconstitutionally " took over " petitioner's Pro Se § 2241 Actual Innocence petition, counsel amended the petition with a " Johnson issue ", pursuant to Johnson v. United States, 576 U.S.__(2015) and then asked the Court to " Stay " the proceedings. These actions make no sense because, (1). When a petitioner is innocent and deserves to be " set free " then " Johnson " is irrelevant where relief isn't freedom, but a number of years incarcerated. Where Fields is entitled to dismissal of his charges ( due to Actual Innocence ) A " stay " is Unconstitutional. Counsel amending an Actual Innocence petition with a " Johnson Issue " is self serving and a major conflict of interest; The " Johnson issue " is nothing more than a " distraction " from counsels

6

obvious ineffectivenes;  There is no " middle ground " when the Plaintiff is saying " I'm innocent, set me free," and Counsel is on the other side saying " Here's a Johnson issue, give him Life."

" In representation counsel owes the client a duty to avoid conflicts of interest, a duty to advocate the defendants cause, a duty to consult with the defendant on important decisions. Cuyler v. Sullivan at 346, 64 L.Ed .2d 333, 100 S.Ct. 1708. Counsel's conduct so undermined the proper functioning of the adversarial process that the appellate process cannot be relied on as having produced a just result; If you look at the issues that counsel neglected to file and the evidence that counsel neglected to present, in relation to the Courts reasoning for denying § 2255 it's clear and undeniable that  counsel deprived Plaintiff of the right to effective assistance of counsel ( especially in light of the fact that counsel was forced on petitioner ); (i.e) (A). The 5th Circuit denied § 2255 ( See App.  14    ) and quoted Detective Morris " Bubba " Colyers false and perjured testimony that the car that petitioner was driving on the night of the murder " looked detailed or wiped down, " and erroneously said that Fields didn't acknowledge it. Yet Fields did acknowledge it on Page 18 of the timely Freestanding Actual Innocence Brief that the 5th Circuit refused to consider " because petitioner had attorney's."

(B). The 5th Circuit also denied § 2255 and quoted " a portion " of Detective James Blair's testimony that there was " suspicious stains " that could possibly be blood. But (1) The evidence resolving that issue was also in the Freestanding Actual Innocence brief that the 5th Circuit refused to consider " because petitioner had attorney's."; (2). If counsel would have presented the forensics reports the 5th Circuits denial of Fields' innocence claim as denied would have been impossible because the forensics reports show that the car " DID NOT " look detailed or wiped down " as Detective Colyer defrauded the Court to believe, and as referenced by the 5th Circuit. And the alleged " stain " was tested and it was " not blood ". Also the carpet was cut out and sent for further testing and those tests also proved that the " stain " was not blood; (3). In addition to that the prosecution withheld and suppressed the forensics photo's that would have shown that the car was not clean, Yet counsel neglected to file the " Brady issue " for the photo's.

(C). The 5th Circuit denied § 2255 because the prosecution claim that " jailhouse testimony " ( that they sought and procured ) is " over-whelming evidence " of Petitioner's guilt. However, the jury DID NOT

7

even believe the " jailhouse testimony ". In closing the prosecution summed up that " jailhouse testimony " and implored the jury to find " Premeditation " because of it, ( See App. 15 ). The jury listened, weighed the " jailhouse testimony " and found that it was not " premeditated. ( See App. 16 ) Officially choosing not to believe the " jailhouse testimony ;" With good reason: Petitioner was a segregated inmate in a cell all alone, the officer's desk was right there about five feet from his cell door, and there was an observation sheet on his door that the officer's had to sign every 15-minutes and write down everything petitioner said and/or did; Those observation sheets was on the cell door from the moment petitioner went to jail until several days after petitioner got to Death Row. And in addition to that the inmates stories was downright ridiculous and noticeably false. Inmate Homero Deleon first claimed that he was petitioners cell mate, then later said that he was in another cell and petitioner yelled out to him: " Since you're not on the governments witness list to testify I'm going to confess to you." Inmate Kevin Burton " came forward " two years after the fact, right before trial while he was in Three Rivers federal prison with Christian " Chae " Walker, another " government witness " that was writing both Edward Lee " Treyboy " Outley and Shalaykea " Lakie " Scroggins ( The real murderers ); Kevin Burton claimed that petitioner confessed to him at a drug house on November 16, 2001 and petitioner was in a four door Grand Am and Outley was in a Jaguar. First of all the Grand Am was a two-door, not a four door and it went to the forensics lab on the 14th. And it's a proven fact that the Grand Am and the Jaguar was no longer in the picture after the night of the murder which was almost two weeks prior. Also there is no way Burton saw Outley in the Jaguar on the 16th because Outley went to jail on the 13th, where he remained for years afterward. So again, the jury " not finding premeditation " after the prosecution implored them to do so " because of the jailhouse testimony " proves that the jury DID NOT factor in that false testimony in their verdict; yet counsel did not present that evidence. In Roberts v. South Carolina, 361 S.C.1; 602 S.E. 2d 768; 2004 S.C. LEXIS 218, the Court held that it was impossible for a segregated inmate to confess to jailhouse snitches; Counsel should have presented the evidence.

(D). The 5th Circuit denied § 2255 because a Tammy Edwards claimed that plaintiff " carjacked " her car. Tammy Edwards first said that an

8

" unknown black male " jacked her car. ( See App. 17        ). Two years
later she said that she knew it was Fields the moment she saw him. ( See
App. 18      ).

Tammy Edwards was married to a guy that robbed an elderly couple and
murdered the woman, and there is evidence suggesting that she could
have dated Christian Chae Walker, another government witness. In any
event, at trial the prosecution procured a Detective Steve January to lie
and say  that there were no " fingerprints " or nothing " this thing
was clean " ( referring to the alleged carjacking vehicle).( See App. 10  ).
But there were fingerprints. ( See App. 11        ). And those prints don't
match Fields. ( See App. 12     ). Yet again, Counsel neglected to
present the evidence.

   (E). Prior to filing § 2255 Counsel did file to Recuse 5th Circuit
Judge Edith Jones for her bias', both racial and otherwise. ( See App. 19    ).
But after Judge Jones Unconstitutionally denied § 2255 based on an
unreasonable Determination of the facts Counsel did not challenge it; (i.e)
When she quoted Detective James Blair's testimony about the " stains '
that could possibly be blood that was only " a portion " of his
testimony, she deliberately and willfully neglected to mention that
James Blair was the governments expert that Fields was forced to call to
the stand because the prosecution did not call him; Instead the prosecution
called Morris " Bubba " Colyer, a sheriff detective with no forensics
knowledge to lie and defraud the Court. And where Judge Jones utilized
Detective Blair's testimony about the " stain " to deny § 2255, she
willfully neglected the other part of Detective Blair's testimony where
he said that even if a vehicle is " detailed or wiped down " they have
technology that would have still found blood. ( See App. 20      ). In
addition to that Judge Jones is a Ronald Reagan appointee, thus she has been
on the bench for years and have seen countless cases of this nature so  she
knew, or should have known that forensics would have still determined
that the " stain " was or was not blood definitively, so her conclusion
only could have came from the fact that Judge Jones believes that " Black
males are violent "; " Black people are predisposed to violence "; And
" No one  is innocent," everything that petitioner Fields is, he's black,
he's a black male, and he's innocent; Yet counsel neglected to challenge
the denial of Fields' § 2255 based on these material facts.

   (F). Counsel challenged Outley's false testimony at trial where
he claimed that the prosecution had not made him any promises. The
prosecution knew he was lying and failed to correct him. In denying

9

Fields' § 2255 Judge Jones and the 5th Circuit said that " It is unclear whether Outley understood the general question posed to him." However the evidence show that Outley did indeed understand the question; Outley wrote a letter stating that he could have got 5K1 which in fact is the governments promise of leniency/immunity/time reduction. ( See App. 21   ). That letter is what spurred the question about the government making Outley any promises. When Outley lied and said that the government hadn't made him any promises, the Court falsely claimed that Fields did not follow up with questions. But Fields did follow up asking questions in regards to 5K1 and Outley responded. " Okay. A 5K1 supposed to be a down--some type of form of a downward departure for testimony."

The letter about 5K1 and Fields' questions about 5k1 along with Outley's testimony clearly show that Outley did indeed understand that Fields was asking him if he'd received a deal for his testimony. But even more important is that the prosecution knew | that they had made a deal with Outley and they failed to correct him, in violation of Napue v. Illinois. So after the Court denied § 2255 based on this unreasonable determination of the facts Counsel failed to challenge it.

(G). When the 5th Circuit violated Fields' Constitutional rights by refusing to allow his briefs and Motions the 5th Circuit did considerable harm to Fields. Counsel then did not file the evidence that petitioner had attempted to file in the brief ... Counsel's conflict of interest impeded them from filing against the 5th Circuit for not allowing the Brief and Motions. But the 5th Circuits denial of § 2255 based on an Unreasonable determination of the facts ( when the evidence that counsel did not file would have made the denial impossible ) proves that counsel was ineffective and deficient.

" Counsel can deprive a defendant of the right to effective assistance of counsel simply  by failing to render " adequate legal assistance ", Cuyler v. Sullivan, 446 US, at 344, 64 L.Ed .2d 333, 100 S.Ct. 1708 .Id., at 345-350, 64 L.Ed .2d 333, 100 S.Ct. 1708 (Actual conflict of interest adversely affecting Lawyer's performance renders assistance ineffective ). Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed .2d 674 (1984) " Counsel cannot be found to be Constitutionally ineffective unless (1). His performance was deficient, meaning that it fell below an " objective standard of reasonableness ", informed by " prevailing professional norms ", and (2) his deficient performance prejudiced the defendant, meaning that there is " a reasonable probability that, but for Counsel's unprofessional errors, the result of the proceeding would

have been different." 466 U.S. at 688, 694. Counsel's deficient performance led to the Unconstitutional denial of Petitioner's first Habeas Petition. " [d]ismissal of a first Federal Habeas Petition is particularly serious ", as the courts have stressed. " For that dismissal denies the Petitioner the protections of the Great Writ entirely, risking injury to an important interest in human liberty. Lonchar v. Thomas, 517 U.S. 314, 324, 134 L.Ed .2d 440, 116 S.Ct. 1293 (1996); See also Slack v. Mcdaniels 529 U.S. 473, 483, 146 L.Ed .2d 542 , 120 S.Ct. 1595 (2000) (" The Writ of habeas Corpus plays a vital role in protecting Constitutional rights.") When a Habeas Petition has been dismissed on a clearly defective procedural ground, the state can hardly claim a legitimate interest in the finality of Judgment. Indeed the state has experienced a windfall, while the prisoner has been deprived-contrary to congressional intent-of his valuable right to one full round of federal habeas review."

(G). When District Judge Walter Smith told a juror that the prosecution would dismiss the case if they thought Fields' rights were being violated. ( See App. 13    ), it Unconstitutionally shifted the burden of proof to Fields in violation of Sandstrom v. Montana, (1979) 442 US 510, 61 L.Ed .2d 39,  99 S.Ct. 2450. This was not an error so basic to a fair trial that it could never be considered harmless. It harmed Fields severely, being that the prosecution willfully violated Fields' rights in every way imaginable; They " made up " and " presented false evidence ", hired " jailhouse testimony " to lie and frame Fields, while suppressing, withholding and lying about evidence that exonerates Fields. Under Sandstrom , " It is prohibited to shift the burden of proof to the defendant by means of a presumption." The juror might have interpreted the presumption as a conclusive presumption, which would conflict with the overriding presumption of innocence which is endowed upon an accused by law and extends to every element of a crime, and which would invade the fact finding function assigned to the jury, and since the jury might have interpreted the presumption \ as being one shifting, impermissibly, the burden of persuasion to the defendant to prove that the prosecution possessed the required " mental state " reminiscent of their intent to violate Fields' rights. Judge Smith's words to the juror is the equivalent of improper vouching for the prosecution; " A judge should not say or do anything that will give the jury the impression that he's improperly vouching for the prosecution." See United States v. Harlow, 444 F.3d 1255 (10th Cir. 2006). It is more than likely that Judge Smith's comment to Ms. Williams coerced Fields' conviction; Yet again Counsel did not present the issue.

11

(H). The prosecution knew there was no issue between Fields and the victim, Suncerey Coleman that would lead to murder; The day before the murder Fields and the victim called the phone company together and told them that Shalaykea " Lakie " Scroggins had an illegal phone in Fields' name and she was calling Coleman threatening her. ( See App. 22    ). Also four months prior to the murder Scroggins wrote several letters expounding upon her obsession for Fields, stating, " I lost you once to " that girl ", ( Coleman ), " I'm not going to let it happen again." And if it were to happen again she would be " killing bitches." ( See App.23    ). Then a week before the murder Scroggins accosted Coleman at an apartment complex in a " very heated " argument that almost turned physical. ( See App. 24    ).

When denying Fields' § 2255 the Courts credited Scroggins' false testimony that " she never threatened Coleman "; Again Counsel did not challenge it.

(I). Most importantly, the prosecution willfully and deliberately set out to frame Fields for the crime by intentionally making the case into something that it wasn't. In the Grand Jury the Prosecutor, Greg Gloff procured Sheriff Detective Johnny Spillman to lie and say that Fields became " Irate " when he came into contact with Coleman. ( See App. 25    ). Greg Gloff then procured U.S. Marshal Chris Casson to lie and say that the victim's cousin, Tanesha Hilliard said that Fields became " angry ". ( See App. 26    ). Tanesha Hilliard had always maintained that Fields was " never mad ". ( See App. 27    ). And as a matter of fact Fields and Coleman were " Hugging and kissing." ( See App. 28    ). The indictment was procured on knowingly false testimony. Perry v. Brooks, 175 GA. App. 77, 332 S.E. 2d 375 (1985) (and multiple other authorities ). Had it not been for the prosecutions willfull disregard for the truth the Grand jury likely would have never indicted Fields, the Grand jury knew that Shalaykea " Lakie " Scroggins was lying and voiced their skepticism. ( See App. 29    ). So to circumvent the way the Grand jury was thinking prosecutor Gloff procured Sheriff Detective Spillman and U.S. Marshal Chris Casson to lie and say that Fields became " Angry " and/or " Irate " when he came into contact with Coleman while all along knowing that this was false; These willful and purposeful lies was specifically meant to defraud the Grand jury into Indicting an innocent man.

In the United States v. Williams, 504 U.S. 36, 112 S.Ct. 1735, 118 L.Ed .2d 352 (1992) the Williams Court specifically identified RULE 18 U.S.C. § 1623 which prohibits perjury before a Grand jury, and

12

18 U.S.C. § 1622 which criminalizes the subornation of perjury. Id. Thus Williams establishes that the prohibition of perjury is among " the few clear rules " that a Court may enforce using its supervisory powers. And by listing " standards of behavior for prosecutors (and others)" the Court intimated that misconduct independent of the government, if precluded by an established standard of behavior, could provide a basis for overturning an indictment. Id. (emphasis added). In the Bank of Nova Scotia v. United States, 487 U.S. 250, 108 S.Ct. 2369, 101 L.Ed .2d 228 (1988) the Court held that " the supervisory power can be used to dismiss an Indictment because of misconduct before the Grand jury, at least where that misconduct amounts to a violation of one of those " few clear rules " which were carefully drafted and approved by the Court and by Congress to ensure the integrity of the Grand Jury's functions." Id. (citing United States v. Mechanik, 475 U.S. 66, 74, 106 S.Ct. 938, 943, 89 L.Ed .2d 50 (1986). Citing Williams, the Court has indicated that the " Statutory prohibition against making a false declaration before a Grand jury " exemplifies one of the " few clear rules " intended to protect the integrity of the Grand Jury's functions. United States v. Greer, 137 F.3d 247, 251 (5th Cir. 1988). See Also, United States v. Sullivan, 578 F.2d 121, 124 (5th Cir. 1978); United States v. Cathey, 591 F.2d 268, 271-72(1979) (suggesting that witness perjury could provide a basis for investigating a Grand jury indictment ). Other Circuits have also suggested that perjury before a Grand jury, even without Prosecutorial knowledge, can provide a basis for dismissing indictments returned by the Grand Jury in reliance on the perjured testimony. See e.g., United States v. Hyder, 732 F.2d 841, 845 (11th Cir. 1984). Reversals of convictions under the Court's supervisory power must be approached cautiously; United States v. Payner, 447 U.S. 727, 734 (1980), but that step is fully warranted here by the combination of Judicial error, prosecutorial misconduct and criminal violations committed by the prosecution and their " witnesses ". See United States v. Ornelas-Rodriguez, 12 F.3d 1339, 1349 (5th Cir. 1994) ( Court can exercise supervisory power to " deter further illegal conduct.") The " Underlying purpose(s) of inherent supervisory powers " include (1) remedying a violation of a recognized right, and (2) preserving judicial integrity by ensuring the conviction rests on appropriate evidence validly before the jury. Both of those purposes would be served by exercising that authority here. Fields is innocent and had the prosecution not procured law enforcement officers to lie

13

in the grand jury, the grand Jury likely would not have indicted Fields in light of their skeptism about Scroggins testimony; This issue was both " obvious " and " clearly stronger " than issues that Counsel presented; Sanders v. Cotton; Supra. Yet Counsel neglected to present the issue.

(J). The Courts denied petitioners § 2255 by claiming that " Fields can't show that false testimony was used against him." But the true facts show that the case is replete with false testimony; (i.e) There was no blood found in the car because the car " looked detailed or wiped down "; " There was no fingerprints or nothing, this thing was clean "; Tanesha Hilliard said that Fields became " Angry " and/or " irate " when he came into contact with the victim "; Fields confessed to " jailhouse snitches "; " Outley did not receive a deal for his testimony "; " Scroggins never threatened the victim "; " Outley and Scroggins was in a BLUE Jaguar when Coleman was murdered "; Plaintiff can go on and on pointing out the obvious and false testimony, and while all lies " pollutes trials and make it hard for jurors to see the truth," United States v. Roger LaPage, 231 F.3d 488(2000), the most significant lie that the evidence disputes is that " Fields killed Coleman ", because the evidence that Outley and Scroggins killed Coleman is overwhelming; The evidence show that Scroggins threatened Coleman numerous times preceding her death; Then Outley and Scroggins gave conflicting alibi's for the time of the murder, hid the car that they were in so the car wouldn't be subjected to forensics testing; And Outley and Scroggins was telling people information about the murder that they wouldn't have known if they didn't do it.

The evidence that Law enforcement framed Fields is equally overwhelming, Yet the Courts Unconstitutionally denied Fields' § 2255 claiming that petitioner can't show that false evidence was used against him; " A Court abuses it's discretion if it applies an incorrect legal standard, follow improper procedures in making the determination, or make findings of fact that is clearly erroneous." Chicago Tribune Co., v. Bridgestone/Firestone Inc., 263 F.3d 1304, 1309 (11th Cir. 2001 ). " The Supreme Court has repeatedly held that a conviction obtained by and through the use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the testimony could have affected the judgment of the jury; United States v. Agurs, 472 U.S. 97, 103, 49 L.Ed .2d 342, 96 S.Ct. 2392(1976). When the

14

Court denied § 2255 claiming that Fields can't show that false testimony was used against him Petitioners lawyer should have challenged/appealed the issue, yet counsel neglected to do so; See Dunnigan, 507 U.S. at 94, 113 S.Ct. at 1116 (applying definition of perjury from 18 U.S.C. § 1621, the criminal perjury statute to 3c1.1)

---

Fields filed his § 2241 over two years ago in the Southern District of Indiana and since § 2255 Counsel Unconstitutionally " took over " the § 2241 petitioner have tried numerous times, to no avail, to amend the petition with these IAC claims, but have been restricted from doing so by the Court. ( See App. 1    ). As a direct result an innocent man is in danger of being murdered by the government via execution.

## PETITIONER FIELDS IS ACTUALLY AND FACTUALLY INNOCENT.

This case originated in 2001, Petitioner Fields was in jail for shooting a Hit Man that was hired to kill Petitioner, when the State of Texas realized that they wouldn't be able to convict Fields for shooting the Hit Man, the State of Texas pushed the Federal Government to charge Fields with being a Felon in possession of a firearm for a gun that Law Enforcement found under a mattress in a home where Fields was arrested. When the Prosecution refused to drop the charges Petitioner offered a jailor $5,000 for a key to a door, and on November 6, 2001 Petitioner used that key and walked away from the jail.

Four months prior to this a young woman that petitioner used to date named Shalaykea " Lakie Scroggins threatened to kill another young woman that petitioner was dating named Suncerey " Shining Star " Coleman. ( See App.   23   ). Then a week before Fields walked away from the jail

15

Scroggins approached Ms. Coleman at an apartment complex and an argument ensued that almost turned physical. ( See App. 24    ).

Shalaykea Scroggins was even stalking the Petitioner while Petitioner Fields was in jail, Scroggins got Fields' social security number and got an illegal phone turned on in Fields name. Scroggins immediately started calling Ms. Coleman threatening her. The day before Petitioner walked away from the jail, Petitioner and Ms. Coleman called the phone company together. Petitioner informed the phone company that Scroggins DID NOT have his permission to get the phone in his name. Coleman told the phone company that Scroggins was calling her house threatening her. The phone company cut the phone off. ( See App. 22    ).

The next day Petitioner walked away from the jail and that night Scroggin shot and killed Coleman. It should have been an open and shut case, but Law Enforcement was so mad at Fields for walking away from the jail  they set out to frame Fields for Coleman's murder.

## LAW ENFORCEMENT KNEW ALL ALONG WHO THE REAL MURDERER(S) WERE.

Following Coleman's murder Shalaykea " Lakie " Scroggins and the guy that assisted her with the murder, Edward Lee " Treyboy " Outley, they both gave conflicting Alibi's for the time of the murder. Scroggins first claimed that she was " at the store around the corner from her house, buying something to drink and a box  of Black  and mild cigars ", while Outley " went looking for Fields."( See App. 30    ).

However two months later when Scroggins found out that the store was closed at that time she changed her story and claimed that she " went straight to her sisters house and went to sleep," while Outley " went home with her sister Na-Na." ( See App. 31    ). Outley contradicted both of Scroggins' Alibi's, Outley said that he was " Out selling drugs." ( See App.  32    ).

Outley and Scroggins then conspired with each other to hide the car that they were in when they killed Coleman so that their DNA wouldn't be found in the car intertwined with Coleman's blood. Outley

16

lied and said that they were in a BLUE Jaguar. ( See App. 33    ).
Scroggins also lied and said that they were in a BLUE Jaguar. ( See
App.  34.   ). The prosecution knew that they were lying because
two months prior to trial investigators found the owner of the car
and he told them that on the night of the murder he rented Outley his
GOLD Jaguar. ( See App.  35.    ). The prosecution ignored this very
important fact and intentionally and willfully violated Napue v.
Illinois by trying to make the jury  believe that Outley and Scroggins
was indeed in a BLUE Jaguar that the prosecution knew all along didn't even
exist. ( See App.  36    ).


## LAW ENFORCEMENT KNOWINGLY, WILLFULLY INTENTIONALLY, WITH MALICE AFORETHOUGHT FRAMED FIELDS FOR THE CRIMES OF CONVICTION.


There was no evidence tying Fields to Coleman's murder as one would
expect from an innocent man, so in order to " make Fields guilty " the
government went " seeking jailhouse testimony." ( See App. 37        ).
Next the prosecution conspired with the real murderers and attempted
to procure a false eyewitness, the government wanted Outley and/or
Scroggins to lie and say that they were " with " Fields. ( See App. 21   ).
" With Fields " could only mean that they wanted Outley and/or
Scroggins to lie and say that they witnessed Fields kill Coleman since
they were saying that Fields was the guilty party.

Also the government recruited a Chance Alexander to lie and say
that Fields confessed to him, but at the last minute Alexander admitted
that he don't even know Fields and he lied because he was promised
that he would be let out of jail. ( See App.    38      ).

On their quest to frame Fields for Coleman's  murder the prosecution
procured a Sheriff Detective Johnny Spillman to lie and say that when
Fields came into contact with the victim on the night of the murder
Fields became " Irate." ( See App. 25.        ). The prosecution also
procured a U.S. Marshal named Chris Casson to lie and say that Coleman's
cousin, Tanesha Hilliard, whom was present that night, said that Fields
became " angry ". ( See App. 26   ). This false testimony procured the
indictment.

Yet at trial, where Fields could thwart these lies, Tanesha Hilliard

17

maintained that Fields was never mad. ( See App. 27 ). And as a matter of fact, Fields and Coleman were " Hugging and kissing ".( See App. 28 ).

To further muddy the waters the government procured some lady whose husband had robbed an elderly couple and killed the woman. The lady, a Tammy Edwards claimed that when Fields was out he jacked her for her car.

Tammy Edwards first claimed that her car was jacked by an " Unknown black male." ( See App. 17 ). But two years later as she set out to sue Civigenics, the company over the jail that Fields walked away from she said that she " knew it was Fields all along." ( See App. 18 ) Then she said. " Oh he shot at me too. ( See App. 39 ). Now this was supposedly at shift change at a major hospital with people coming and going, amid " yelling and screaming ", " a struggle ", and a loud " gunshot ", yet no one saw or heard anything but Tammy Edwards? Impossible!


### THE GOVERNEMNT HAVE KNOWN ALL ALONG THAT PETITIONER FIELDS IS INNOCENT.


The car that Petitioner was driving when Coleman was killed was subjected to forensics testing and as one ould expect from a vehicle driven by an innocent man there was nothing linking Petitioner to the murder. ( See App. 40 ).

> (Remember, Outley and Scroggins hid the car that
>
> they were in so the car wouldn't be subjected
>
> to forensics testing.)


In any event the prosecution didn't call their forensics expert to the stand, instead the prosecution procured Sheriff Detective Morris Colyer, a guy with no forensics knowledge, to lie and say that the reason they didn't find blood in Petitioner's car is because the car " Looked detailed or wiped down." ( See App. 41 ), while knowing (1) The car was not clean; (2) Even if a vehicle is " detailed or wiped down " forensics have technology that would have still found blood; And (3) The prosecution willfully, deliberately, intentionally and knowingly,

18

with malice aforethought suppressed and withheld the Pre and Post forensics photo's that will show that the car was not clean.

The government used the same bogus and fraudulent argument to defeat Petitioner's innocence in regards to the alleged carjacking vehicle, the  government lied and willfully, knowingly, intentionally and deliberately defrauded the jury, with malice aforethought, telling the jury that " There was no fingerprints or nothing, this thing was clean." ( See App. 10       ). But there was indeed fingerprints, all of AFIS quality. ( See App. 11       ). The government knew all along that Petitioner was not the culprit. ( See App. 12       ).

## ARGUMENT

Even though Petitioner Fields was a segregated inmate in a cell all alone, in a cell right by the officer's desk and he had an " Observation Sheet " on his door that the officers had to sign every 15-minutes the government presented a strictly " jailhouse testimony " case to the jury with inmates, most of them Petitioner didn't even know and had never even seen before, all claiming that petitioner confessed to them at different intervals.

In closing the government summed up that " jailhouse testimony " arguing that it meant " Premeditation " and implored the jury to find Premeditation because of it. ( See App. 15       ).

The jury listened, weighed the testimony and found that it was not Premeditated, choosing not to believe the " jailhouse testimony." ( See App.   16       ).
The jury chose to find Petitioner guilty because they thought Petitioner had cleaned the car after Coleman's murder, as evidenced by the sole question that the jury had at guilt/innocence; They asked to see the forensics from the car that Petitioner was driving. ( See App. 42       ). The Judge denied that request. ( See App. 43   ). Thus all the jury had to go on was Detective Colyer's false testimony that the car " Looked clean," as referenced in (App. 41       ).

In petitioner's § 2241 in the Southern District of Indiana Petitioner filed a Brady issue Pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed .2d 215 (1963) seeking the Pre and post forensics

19

photo's of the car. The government responded along the same vein as their past method of deception claiming that there are " no photo's and it's just " conjecture " on Petitioner's part. ( See App.   44        ). But it's the governments own forensics report that state that the 35MM photo's are on file. ( See App. 40      ). Thus the government have inadvertently admitted that they did indeed violate Brady.

Petitioner Fields also presented the fingerprint evidence in his § 2241, yet the government didn't even address the fingerprints, instead they claim that the " jailhouse testimony " that they willfully sought, the crooks that they hired with malice aforethought, the fraudulent testimony that the jury DID NOT believe is " Overwhelming evidence " of Petitioner's guilt.

Given the true facts devoid of the governments deception no jury would/could have found Petitioner guilty. With Outley and Scroggins conspiring to hide the car that they were in that night, had the jury known that the car that Petitioner was in was NOT CLEAN and Detective Colyer and the Prosecution was misleading them Petitioner would have been exonerated. If the government had not violated Brady v. Maryland and suppressed the forensics photo's, Petitioner would have been able to put the photo's into evidence and the jury's sole question would have been resolved in Petitioner's favor and petitioner would have been exonerated; If the government had not violated Napue v. Illinois, 360 U.S. 264, 209, 3 L.Ed .2d 1217, 79 S.Ct. 1173 (1959), and had the government not procured Detective Colyer to lie and say that the car was clean Petitioner would have been exonerated. Thus the governments inadvertent admission that they did indeed violate Brady and in effect, Napue v. Illinois is iron clad proof of Petitioner's innocence.

Furthermore, it's a known fact that jurors view physical evidence favorably and had they known that there really was fingerprints where the government defrauded them to believe that there were none, especially in a case like this where the alleged victim lied about the identity of the alleged assailant, the jury would have found Petitioner NOT GUILTY, and the prosecution knew that that's why they lied and said that there were " No fingerprints ".

20

If the prosecution had not violated Napue v. Illinois and procured Detective January to lie and say that there was " no fingerprints," Fields would have been exonerated; And if the jury had seen the forensics reports showing that there are fingerprints and, (1) Those prints exonerate Fields; And (2) Detective January was lying, defrauding the Court and misleading them, Fields would have been exonerated.

The above as layed out by Fields establishes a " colorable showing of innocence "; Kuhlman v. Wilson, 477 U.S. at 454 & n.17, 106 S.Ct. at 2627 & n.17; Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed .2d 808, 115 S.Ct. 851 (1995). The governments actions violated and still violates Fields' Due process rights and due process prohibits the conviction of either a legally and/or factually innocent person; Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending, (5th Cir. 8/2/13). The evidence that the jury was permitted to hear was impermissible, materially inaccurate and demonstrably false. Duest v. Singletary, 967 F.2d 472, 482 (11th Cir. 1992), vacated on other grounds, 507 U.S. 113 S.Ct. 1940, 123 L.Ed .2d 647, (1993). And the lowest degree of confidence in a jury verdict " occurs when the jury has  heard a corrupted body of evidence "; In Re Davis, No. CV-409-130 (8/24/10). The evidence undoubtedly proves that the prosecution improperly suppressed and/or withheld evidence and used perjury to undermine the forensics that would have exonerated Fields. Mooney v. Holohan, 294 U.S. 103, 113 (1935), thus Fields is Actually and factually Innocent and forcing Fields or any innocent man to wait on the litigation of a " Johnson Issue " where it's clear that release should be immediate is violatile of the U.S. Constitution  and Constitutes Cruel and Unusual Punishment; In Re Kemmler  136 U.S. 436, 10 S.Ct. 930, 34 L.Ed 519, the intentional and malicious infliction of this wanton and unnecessary inhumane treatment forced upon Fields by rogue cops and prosecutors is Cruel and abusive; Cruel and unusual, barbaric in nature and it violates the United States Constitution. See U.S. Const. Amend. VIII; Bass v. Perrin, 170 F.3d 1312, 1316 (11th Cir. 1999) " The cruel and Unusual Standard applies to the conditions of a prisoner's confinement." Chandler v. Crosby, 379 F.3d 1278, 1288 (11th Cir. 2004). Thus there should be no greater cruelty than forcing an innocent man to " wait and suffer " when the evidence of his innocence is as clear as it is here in Fields' case. But specifically, " the Eighth Amendment prohibits punishments " which are incompatible with the evolving standards of decency that mark the progress  of a maturing society," or " which involve the unnecessary and wanton infliction of pain." Estelle v. Gamble , 429 U.S. 97, 102-103, 97 S.Ct. 285, 290, 50 L.Ed .2d 251, (1976); Making Fields " wait " for what should

21

be immediate release at this point is unnecessary and only further
serves to punish, inflict and cause wanton pain on an innocent man,
thus this Court should rectify this issue once and for all.
( Fields incorporates all issues herein that's in his original § 2241 at
Fields v. Warden USP Terre Haute, No. 2:16-cv-418-JMS-MJD)


## PETITIONER'S INCARCERATION VIOLATES
## THE FOURTEENTH AMENDMENT


(A). In Gardens v. Stephens, Sup. Ct. #13-546 (2013) cert. pending,
(5th Cir. 8/2/13) the Court held that " Due process of law prohibits
the conviction of either a legally and/or factually innocent person."
And in light of the " newly presented " evidence in Fields' case
and the governments inadvertent admittance of their violation of
Brady there should be no doubt that Fields' continued incarceration
violates the 14th Amendments Due Process clause.

(B). In Napue v. Illinois the Court held that it is a violation  of
Due Process to allow false testimony to go uncorrected. When the
prosecution lied and said that there were " no fingerprints or
nothing, this thing was clean," while knowing that that was not true,
and those fingerprints exonerate Fields it violated Fields' Due
Process rights under the 14th Amendment;

   And when the prosecution said that they didn't find blood in the
Grand Am because the car was cleaned, while knowing all along that
the car was " Not clean ", and they were suppressing and withholding
the photo's that proves that material fact, it violated Fields'
Due Process rights under the 14th Amendment.

## EQUAL PROTECTION OF THE LAW(S)


   Other Defendants with credible Napue v. Illinois violations and
Brady v. Maryland violations, just as petitioner presents to the Court
have had their conviction(s) and death sentences overturned and
failure to overturn Fields' conviction(s) and Death ssentence
violates the 14th  Amendments " Equal protection of the laws "
Clause.

22

## PETITIONER'S INCARCERATION VIOLATES
## THE EIGHTH AMENDMENT.

There is no greater cruelty than to incarcerate an innocent man...
( especially so when that innocent man is on Death Row and in danger of
being murdered by the government ) as petitioner Fields is. The stress,
the depression, the years lost, it's constant, it's endless, it's
cruel. Petitioner Fields have presented this Court with overwhelming
evidence that not only proves that he is indeed innocent, but also that
the prosecution knowingly, intentionally, deliberately and willfully
framed petitioner with malice aforethought, in violation of the
United States constitution  and petitioner Fields' Constitutional
rights. Fields' continued incarceration violates the 8th Amendments
ban on Cruel and Unusual punishment.

## THE SCHLUP GATEWAY

" The threshold requirement for applying the actual innocence
standard is new evidence supporting the petitioner's innocence. The
Supreme Court opinions addressing the actual innocence gateway do not
explicitly define " new evidence ", and circuit Courts are split on
whether the evidence must be newly discovered or whether it is sufficient
that the evidence was not presented to the fact-finder at trial. the
Court of appeaals for the eighth Circuit-the first to address the issue-
held that ' evidence is new only if it was not available at trial and
could not have been discovered earlier through the exercise of due
diligence. " Amrine v. Bowersox, 238 F.3d 1023, 1028 (8th Cir. 2001 )
( internal citaation and quotation marks omitted ). thereafter, the Courtsa
of Appeals for the Seventh and Ninth Circuits concluded otherwise:
Petitioners can satisfy the actual innocence standards new evidence
requirement by offering " newly presented " exculpatory evidence, meaning
evidence not presented to the jury at trial. See Gomez v. jaimet, 350

23

F.3d 673, 679-80 (7th Cir. 2003); Griffin v. Johnson, 350 F.3d 956, 963 (9th Cir. 2003). More recently, the Courts of Appeals for the First, Second and Sixth Circuits have similarly suggested that Actual Innocence can be shown by relying on newly presented-not just newly discovered-evidence of innocence. See Riva v. Ficco, 803 F.3d 77, 84 (1st Cir. 2015); Cleveland v. Bradshaw, 693 F.3d 626, 633 (6th Cir. 2012); Rivas v. Fischer, 687 F.3d 514, 543, 546-47 (2d Cir. 2012). The court of Appeals for the Fifth Circuit has acknowledged but not weighed in on the Circuit split. Fratta v. Davis, 889 F.3d 225, 232 (5th Cir. 2018); See also Rozzelle v. Sec'y, Fla dep't of Corr., 672 F.3d 1000, 1018 n.21 (11th Cir. 2012) (refraining from reaching issue of whether petitioner's evidence that was available at trial but was not presented should be considered " new " for purposes of Schlup).

Those Courts that define " new evidence " to include evidence not presented at trial finds support in Schlup v. Delo, 513 U.S. 298, 314-16, 130 L.Ed .2d 808, 115 S.Ct. 851 (1995). In announcing the standard for a gateway actual innocence claim, the Schlup Court stated that a federal habeas Court, after being presented with new, reliable exculpatory evidence, must then weigh " all of the evidence, including...evidence tenably claimed to have been wrongly excluded or to have become available only after trial " to determine whether no reasonable juror would have found the petitioner guilty. 513 U.S. at 327-28, 115 S.Ct. 851. The reference to " wrongly excluded " evidence suggests that the assessment of an actual innocence claim is not intended to be strictly limited to newly discovered evidence... The forensics photo's that the government withheld and suppressed are material because the jury only had one question during guilt/innocence; After detective Colyer lied about the car being " cleaned " the jury asked to see the " forensics from the car ", ( See App. 42 ). Judge Smith denied that request. ( See App.43 ). If the prosecution would have honored their duty to disclose and their duty of honesty to the Court Fields could have introduced the forensics photo's and the jury's sole question would have been resolved in Fields' favor, because the jury would have seen that the car " was not clean " and that Detective Colyer and the prosecution was lying to them and trying to trick them into " getting blood on their hands." And as a result Fields would have been exonerated, especially in light of the fact that Edward Lee " Treyboy " Outley lied and said that he was in a BLUE Jaguar when Coleman was murdered. ( See App. 33 ). Scroggins also lied

24

and said that the Jaguar was BLUE.( See App. 34    ). And although the Prosecution tried to make the jury believe that Outley and Scroggins was indeed in a BLUE Jaguar that didn't even exist. ( See App. 36    ), the jury never got to see this report ( App. 35    ), that would have shown the jury that the prosecution already knew that Outley and Scroggins was lying, and the prosecution knew that. As he stood before the jury trying to make them believe that Outley and Scroggins was in a BLUE Jaguar, the prosecution knew all along that the Jaguar was GOLD and Outley and Scroggins hid the car so forensics wouldn't find their DNA in the vehicle mixed with Coleman's blood.

The fingerprints in regards to the alleged carjacking is material as well; In closing the prosecution lied and told the jury that Tammy Edwards never said that she didn't know who the black male was that jacked her car.                    But as you can see in her handwritten statement, she did. ( App. 17    ). The prosecution knew that the jury would view the fact that those fingerprints don't match Fields as an exonerating factor because it was the only physical evidence in the case pertaining to that issue. " To be credible, " a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed .2d 728 (1998) ( quoting Schlup, 513 U.S. at 324, 115 S.Ct. 851). " The injustice that results from the conviction of an innocent person has long been at the core of our criminal justice system." Schlup, 513 U.S at 325, 115 S.Ct. 851. Indeed, " the conviction of an innocent person [is] perhaps the most greivous mistake our judicial system can commit," and thus, the contours of the actual innocence gateway must be determined with consideration for correcting " such an affront to liberty." Satterfield, v. Dist. Att'y Phila., 872 F.3d 152, 154 (3d Cir. 2017).

## THE ACTUAL INNOCENCE BAR IS
## POSSIBLY UNCONSTITUTIONAL.

Despite the " overwhelming evidence " of petitioners innocence the prosecution still claim that petitioner can't show that he's innocent. ( See App. 45    ). If that's true, ( petitioner don't believe that it's true, petitioner believes that  he has exceeded the bar on Actual Innocence ); But for the sake of argument, if what the prosecution say is true then the High bar on actual Innocence is Unconstitutional. Petitioner have

25

disputed and/or disproven every alleged " material fact " of the prosecutions case with clear and reliable new evidence, thus the prosecution cannot now demand that petitioner come up with some "invisible" evidence that don't exist in order to be exonerated. " Although the bar set by Schlup is a high one, it should not be raised so high that it becomes impossible to clear it. Nothing in Schlup should lead the Courts to conclude that the Schlup court intended the interests of justice advanced by that case to be illusory in all but the most outrageous and extreme cases or that the accused must be able to prove actual innocence to a near mathematical certainty. " See Reeves v. Fayette SCI, No. 17-1043 (2018) (" I do not suggest that evidence of actual innocence must always be as strong as we have on this record before relief is available under Schlup v. delo." ) In a case like Fields where the evidence is overwhelming that law enforcement set out to make the case into something that it wasn't so they could frame Fields, and u ultimately murder him via lethal injection, and where the District Judge and the 5th Circuit Court of appeals Judge was bias, and where it's clear that a COA was denied based on an unreasonable determination of the facts in the 5th Circuit, where the Supreme Court acknowledged that that Court has aa " troubling pattern " of denying COA's; See Buck v. davis, 137 S.Ct. 759, 777 (2017); And where the consequences of inaction have led to the murder of the innocent; See www.innocenceproject.org/content/ Cameron_Todd_Willingham_Posthumous_Pardon_Filing_Document.php... If in fact the prosecution is right and ( all of this newly presented evidence ) isn't enough to prove actual innocence, then the High bar on Actual Innocence is Unconstitutional.

## CONCLUSION

Petitioner asks that this Court relieve Counsel of their duty and decide petitioner9s) innocence petition; Or in the alternative relieve Counsel of their duty and send this petition back to the District Court as an addendum and Order that Court to decide the merits of Petitioners petition; This Court should ' consider the risk of injustice to petitioner "; See Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 863-864, 108 S.Ct. 2194, 100 L.Ed .2d 855, knowing that " failure to do so will result in an irreversable fundamental miscarriage of justice." See

26

Sawyer v. Whitley, 505 US 333, 120 L.Ed .2d 269, 112 S.Ct. 2514 (1992)

Sincerely/Respectfully
Sherman Lamont Fields
#15651-180
USP Terre Haute
P.O. Box 33
Terre Haute, Indiana
47808

27

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

SHERMAN LAMONT FIELDS, )
)
Petitioner, )
)
v. )   No. 2:16-cv-00418-JPH-MJD
)
WARDEN, )
)
Respondent. )

## ORDER REGARDING FILINGS FROM THE PETITIONER

The Court held an *ex parte* telephonic conference with the petitioner and his counsel on May 30, 2017, to discuss counsel's representation of the petitioner. Among other things, the Court ordered that counsel shall continue representing the petitioner and that "the petitioner shall not file material directly with the Court and material received directly from the petitioner, if submitted, shall be returned unfiled." Dkt. 22 at 1.

The Clerk's Office received material directly from the petitioner on February 28, 2019. The material includes a motion regarding his counsel and a document entitled "Writ of Actual Innocence." The petitioner is again reminded that all filings must be submitted by his counsel.

The Clerk is **ordered** to send this material, unfiled, to the petitioner's counsel with counsel's copy of this Order. Any material the petitioner may attempt to submit directly to the Court in the future will be sent, unfiled, to the petitioner's counsel. Any such material that is inadvertently filed will be stricken.

**SO ORDERED.**

Date: 3/6/2019

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

1

Distribution:

Jeffrey E. Ellis
LAW OFFICE OF ALSEPT & ELLIS
jeffreyerwinellis@gmail.com

Zachary Carl Richter
UNITED STATES ATTORNEY'S OFFICE
zachary.c.richter@usdoj.gov

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

Time: 6:58 A.M.
Date: September 2, 2010
Subject: Unfiled Issues


On the date of August 31 st, 2010, Counselor Edwards brought me the response to the governments brief that he'd received in the mail from my attorney, Jeff Ellis. I've spent the past couple of days reading and rereading the brief. Several months prior to filing I sent Mr. Ellis an 80-plus page addendum on the issue of actual innocence. A few days before filing Mr. Edwards asked me to send him another addendum that I'd written up on the issue; This one was 70-plus pages. It was my understanding that the issue would be incorporated in full. Upon receiving the brief, I noted that more than half of my issue was left out;Issues needed in order to prove the governments conspiracy to murder me. Now that the issue is filed, and my 2255 Habeas Petition is turn in, I don't know what can be done to rectify the issue. The trial transcripts doesn't reflect the complete story, therefore the record is not complete. I will be sending a copy of this letter out to the Federal Court for the Western District Of Texas, Waco Division, in hopes that I can get permission to supplement my brief.

-Sherman Lamont Fields

*Sherman Lamont Fields*

Notarized this 21st day of September 20 10
Duane T. Bedford, Notary Public
Vigo County, Indiana
Commission Expires June 30, 2011

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF TEXAS

## WACO DIVISION

| | | |
|---|---|---|
| SHERMAN LAMONT FIELDS,<br>Movant,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>Respondent. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL NO. W-09-CV-009<br><br>CRIMINAL NO. W-01-CR-164 (1) |

## O R D E R

Before the Court is Movant's letter that has been docketed as a Motion to Proceed Pro Se (Doc. 363). On September 25, 2012, the Court denied Fields's 28 U.S.C. § 2255 motion as amended, his motion for new trial as amended, as well as various motions seeking discovery, DNA testing, and funds for a trauma expert. The Court recently has denied Movant's various motions for reconsideration.

Movant informs the Court in his letter that he "will be proceeding to the 5th Circuit pro se." He complains that: (1) the prosecutors and their witnesses intentionally engaged in a criminal conspiracy; (2) his attorneys "have not taken the necessary steps to bring this to light"; and (3) the Court "knew all along what the prosecution and their cabal was up to [sic]." Movant, however, is represented by counsel in this case. Accordingly, his pro se motion (Doc. 363) is hereby **DENIED**.

SIGNED this 10th day of June, 2013.

WALTER S. SMITH, JR.
**United States District Judge**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

---

No. 13-70025

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

SHERMAN LAMONT FIELDS,

Defendant - Appellant

---

Appeal from the United States District Court for the
Western District of Texas, Waco

---

O R D E R:

IT IS ORDERED that appellant's motion to proceed pro se on appeal is
DENIED, relying on the representation of counsel that appellant does not
wish this court to remove counsel.

/s/CAROLYN DINEEN KING
CAROLYN DINEEN KING
UNITED STATES CIRCUIT JUDGE

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　　Respondent-Appellee,<br><br>　v.<br><br>SHERMAN L. FIELDS,<br>　　　　　　　Movant-Appellant. | No. 13-70025<br><br>RESPONSE TO AND<br>CLARIFICATION OF "MOTION<br>TO PROCEED PRO SE" FILED<br>BY SHERMAN FIELDS<br><br><br>*This is a Capital Case* |

## RESPONSE TO PRO SE MOTION

On September 26, 2013, Mr. Fields filed a pleading in this Court entitled *Motion to Proceed Pro Se.* Because the motion was not signed, it was returned to Mr. Fields for correction of that defect. In addition, this Court notified counsel "appellant has moved to relieve you as counsel" and proceed *pro se.* This Court called for counsel to respond to the motion within 14 days. The letter from the Court to counsel further states: "You should set forth any pertinent facts which might assist the court in ruling on the motion."

## FACTS

Although entitled *Motion to Proceed Pro Se*, Mr. Fields' motion never requests that counsel be removed. In fact, the motion states that at trial, Fields was "forced" to proceed *pro se* over his objection.

1

Instead, the only relief requested by Fields is for this Court to "enter an Order allowing Mr. Fields to file a Brief and corresponding Appendix" supporting certain claims he wants this Court to consider.

After receiving Mr. Fields' motion and this Court's letter requesting a response, undersigned counsel spoke with Mr. Fields about the motion. Mr. Fields authorized counsel to inform this Court of that conversation. In addition to filing this motion and serving it on opposing counsel, undersigned counsel has sent a copy to Mr. Fields.

Mr. Fields does not wish to proceed *pro se* in this Court. Mr. Fields did not intend to move this Court to permit him to proceed without counsel. He wishes to have the continued assistance of counsel.

Mr. Fields intended only to move this Court only for permission to file a supplemental brief. Mr. Fields seeks to file a *pro se* supplemental brief—in addition to the pleadings filed by counsel—in support of his motion for a certificate of appealability. He filed his motion seeking an order from this Court allowing him to do so.

**ARGUMENT**

Mr. Fields did not move this Court to proceed without counsel. Instead, he moved this Court for permission to file his own brief in addition to the pleadings filed by counsel. Undersigned counsel supports that request. See *United States v.*

*Gillis,* 773 F.2d 549 (4th Cir. 1985) (allowing petitioner to file a *pro se* supplemental brief "strikes an appropriate balance").

This Court should not order the removal of counsel because Mr. Fields does not seek that relief.

If, despite counsel's clarification, this Court treats Mr. Fields' motion as a request to remove counsel, then this Court should remand the motion for an evidentiary hearing to determine whether Mr. Fields' request is a voluntary and whether he is competent to represent himself. See *D. Ct. Dkt. No. 319-1,* Declaration of Dr. George Woods, p. 24 (opining, in part, that Fields was not competent to represent himself at trial).

## CONCLUSION

Mr. Fields has not moved this Court to remove counsel. Instead, he moved this Court for permission to file a pleading *in addition* to the pleadings that will be filed by counsel. This Court should grant that limited motion.

DATED this 7th day of October, 2013.

/s/ Jeffrey E. Ellis
Jeffrey E. Ellis
*Attorney for Mr. Fields*
Law Office of Alsept & Ellis
621 SW Morrison St., Ste 1025
206/218-7076 (ph)
JeffreyErwinEllis@gmail.com

3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| SHERMAN FIELDS, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 2:16-cv-00418-JMS-MJD |
| ) | |
| WARDEN, USP TERRE HAUTE, ) | |
| ) | |
| Respondent. ) | |

**Entry for Conference of May 30, 2017**

A telephonic conference was conducted on May 30, 2017. The petitioner participated in person and his counsel of record also participated. As previously determined, the conference was *ex parte* and *in camera*. The court reporter was Jean Knepley.

The question of the petitioner's representation was discussed. Having considered such matter, and being duly advised, the Court rules as follows:

1.    The representation of counsel of record for the petitioner shall **continue.**

2.    The petitioner's request that his desire to have the opportunity to submit a pro se supplemental brief dkt [15] is **granted in part**. The petitioner may submit his response, through counsel, who will attach it to the brief submitted by counsel. The Rule 11 consequences of such submission lie with the petitioner himself, not with his attorneys. The petitioner shall not file material directly with the Court and material received directly from the petitioner, if submitted, shall be returned unfiled.

3.     While the Court will allow this hybrid briefing approach, counsel's brief may augment, but not contradict, any argument made by petitioner.

4.     The petitioner shall have **through July 20, 2017** in which to submit the combined reply to the respondent's answer to the amended petition for writ of habeas corpus, mislabeled in docket item 21 as answer to amended complaint.

IT IS SO ORDERED.

Date: 5/31/2017

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

Jeffrey E. Ellis
LAW OFFICE OF ALSEPT & ELLIS
jeffreyerwinellis@gmail.com

James Robert Wood
UNITED STATES ATTORNEY'S OFFICE
bob.wood@usdoj.gov

Jennifer Freel
UNITED STATES ATTORNEY'S OFFICE
jennifer.freel@usdoj.gov

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

November 13, 2018

Before

MICHAEL S. KANNE, *Circuit Judge*

| No. 18-3389 | IN RE: SHERMAN L. FIELDS, Petitioner |
|---|---|
| **Petition for Writ of Mandamus** | |
| District Court No: 2:16-cv-00418-JMS-MJD District Judge Jane Magnus-Stinson | |

The following is before the court: **PETITION FOR A WRIT OF MANDAMUS**, filed on November 7, 2018, by pro se Petitioner.

**IT IS ORDERED** that counsel for petitioner Sherman Fields shall file a response to the petition by November 26, 2018. In addition to any other issues, counsel should address the current status of Fields's petition and any settlement negotiations in the district court.

form name: **c7_Order_3J**(form ID: **177**)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | |
|---|---|
| SHERMAN L. FIELDS,<br>　　　　　Petitioner,<br>　　v.<br><br>JANE MAGNUS-STINSON,<br>　　　　　Respondent. | No. 18-3389<br><br>RESPONSE TO MANDAMUS<br>PETITION BY COUNSEL<br>FOR PETITIONER<br><br><br><br>*THIS IS A CAPITAL CASE |

**RESPONSE**

Sherman Fields is a death sentenced inmate currently housed at USP Terre Haute. He has an on-going petition in the Southern District of Indiana, for post-conviction relief pursuant to 28 U.S.C. § 2241 (the "§ 2241 Petition") which raises two claims: (1) actual innocence; and (2) a challenge premised on the recent Supreme Court decisions in *Johnson v. United States*, 576 U.S. __ (2015), and *Sessions v. Dimaya,* 584 U.S. __ (2018). In addition to the Petition, Mr. Fields has made a *pro se* filing for a Writ of Mandamus in the captioned matter (the "Mandamus Petition").

In connection with the Mandamus Petition, This Court directed:

IT IS ORDERED that counsel for petitioner Sherman Fields shall file a response to the petition...In addition to any other issues, counsel

should address the current status of Fields's petition and any settlement negotiations in the district court. *See* November 13, 2018 Order.

Undersigned counsel, along with Peter Isajiw, a partner in the New York office of King & Spalding LLP, have represented Mr. Fields for over a decade now, including in his § 2255 proceedings, the § 2241 Petition, and the Mandamus Petition that is subject to Mr. Fields's current *pro se* motion, among other proceedings.

In response to the Court's Order, the § 2241 Petition below is still pending and has recently been transferred to Judge James Patrick Hanlon. Currently, the district court proceedings related to the § 2241 Petition are stayed so that the parties can attempt to negotiate an agreed resolution. Those negotiations are on-going and the parties are working to resolve differences. At this juncture, undersigned counsel seeks to continue to work toward an agreement. If it becomes clear that no agreement can be reached, counsel will immediately notify the district court and move to dissolve the stay on the § 2241 Petition.

Undersigned counsel recently met with Mr. Fields at USP Terre Haute. After meeting with Mr. Fields in person, Mr. Fields advised that he wishes counsel to continue to represent him. Regarding Mr. Fields's Mandamus Petition before this Court, Mr. Fields urges this Court to exercise its

supervisory power and either assume control or direct the district court to take steps to resolve his innocence claim. Undersigned counsel fully supports Mr. Fields's innocence claim. In addition, undersigned counsel agrees that if a settlement cannot be reached that Mr. Fields's innocence claim should be adjudicated without delay. However, at this juncture it appears premature to request that this Court exercise its supervisory power and issue a writ of mandamus. Instead, undersigned counsel respectfully requests that this matter remain pending in this Court until and unless the parties declare that they are unable to reach a settlement.

DATED this 6th day of December 2018.

/s/ Jeffrey E. Ellis
Jeffrey E. Ellis
*Attorney for Mr. Fields*
Law Office of Alsept & Ellis
621 SW Morrison St., Ste 1025
503.222.9830 (o)
JeffreyErwinEllis@gmail.com

CERTIFICATE OF SERVICE

I hereby certify that on December 6, 2018, a copy of the foregoing Status Report was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the court's electronic filing system. Parties may access this filing through the court's system.

December 6, 2018/Portland, OR                    s/Jeffrey Erwin Ellis

# UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Everett McKinley Dirksen United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604



Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

## ORDER

Submitted December 12, 2018
Decided December 14, 2018

Before

MICHAEL S. KANNE, *Circuit Judge*
AMY C. BARRETT, *Circuit Judge*
AMY J. ST. EVE, *Circuit Judge*

| No. 18-3389 | IN RE:<br>SHERMAN L. FIELDS,<br>Petitioner |
|---|---|
| **Petition for Writ of Mandamus** | |
| District Court No: 2:16-cv-00418-JMS-MJD<br>District Judge Jane Magnus-Stinson | |

The following are before the court:

1. **PETITION FOR WRIT OF MANDAMUS**, filed on November 7, 2018, by pro se Petitioner.

2. **MOTION TO PROCEED ON APPEAL IN FORMA PAUPERIS**, filed on November 7, 2018, by pro se Petitioner.

3. **LETTER REGARDING APPEAL**, filed on December 3, 2018, by pro se Petitioner.

4. **RESPONSE**, filed on December 6, 2018, by counsel for Petitioner Sherman L. Fields.

Review of the record and counsel's response shows that this court's involvement is not necessary at this time. Accordingly,

**IT IS ORDERED** that the petition for writ of mandamus is **DENIED**.

**IT IS FURTHER ORDERED** that no filing fee will be assessed for this petition.

form name: **c7_Order_3J**(form ID: **177**)

Direct Examination of Steve January by Mr. Snyder——1326

A.   Same -- same thing, fingerprinted, trace lifters, vacuuming.

Q.   And had it vacuumed and everything, correct?

A.   I believe they vacuumed it.  Yes.

Q.   And when you say vacuumed it, you're looking for trace evidence, correct?

A.   Yes.

Q.   Hairs, fibers, anything you can find?

A.   Yes.

Q.   And the results of that was this thing was clean, correct?

A.   That is correct.

Q.   Now, did you obtain a set of keys that were in evidence at the Waco Police Department?

A.   Yes.  I did.

Q.   And these keys were -- the keys had been found in the apartment on Ruby; is that correct?

A.   Yes.  It is.

Q.   And what did you do with these keys after you removed them from evidence?

A.   This particular car had -- I took the keys out of the property room is what I did.

Q.   Okay.

A.   It had an electronic chip in the key itself and -- which indicated it would only start one specific ignition.  And

```
===============================================================|===================================
                W A C O   P O L I C E   D E P A R T M E N T    |  SUPPLEMENT
                         WACO, TEXAS                           |  Report
===============================================================|===================================
                                         Case: 01-075644 (003) PAGE: 1 of 2
Reported Date: 11/15/01  Time: 07:35    Class: 030110
Code: 29.03 1F PC         Crime: AGG ROBBERY        Time: 07:30-07:35
Occurrence Date: 11/15/01-     Day: THURSDAY -
Status: AC  ACTIVE INVES        Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                           RD:  335
          PARKING LOT
```

========================= NARRATIVE ==============================

On 11/28/01 on coming to work, I found inside the Waco PD Laser Lab at 721 N. 4TH was a GRAY CHEVROLET LUMINA, 4DR, with TX tags D95MFG. I contacted ID TECH SANDERS, who put the vehicle in the lab and he told me DET. JANUARY found this vehicle which was used in an AGGRAVATED ROBBERY and requested printing of the vehicle to see if any prints could be found. On processing the outside of the vehicle, found a lot of water marks, some smudging, no good ridge detail on the inside. On dusting the inside of the trunk area, I found a set of plates that were F84KRK. On running the 28 on these plates, it came back to this 1999 CHEVROLET LUMINA. The plates that were on this vehicle were one rear plate being D95MFG. This also comes back to a 1999 CHEVROLET, but not with the same VIN# of this LUMINA. This one plate that did not belong to the vehicle was removed and printed. Results will be further in this report. The two plates that were found in the trunk area that belonged to this vehicle; one was put on the back and the other one was left in the sack in the trunk area. Also, there was a FORD key with a remote key ring on it. This will also be taken and placed in the property room as evidence. The inside of the vehicle, the windows and the mirrors were fingerprinted with the following results:

CARD # 1 - PRINTS FROM THE INSIDE DRIVER'S SIDE WINDOW

CARD # 2 - PRINTS FROM THE INSIDE DRIVER'S WINDOW, AFIS QUALITY

CARD # 3 - INSIDE BACK RIGHT PASSENGER WINDOW. APPEARS TO BE A PARTIAL
           PALM

CARD # 4 - AFIS QUALITY PRINTS FROM THE INSIDE DRIVER'S WINDOW

CARD # 5 - PRINT OVER PRINTS FROM INSIDE DRIVER'S WINDOW

CARD # 6 - PRINT OVER PRINTS. SOME OF THESE DO SHOW GOOD RIDGE DETAIL FROM
           THE INSIDE DRIVER'S WINDOW

CARD # 7 - VERY LIGHT PRINTING FROM THE INSIDE DRIVER'S WINDOW

CASRD # 8 - PRINT OVER PRINTS, SOME RIDGE DETAIL FROM THE INSIDE BACK
            PASSENGER WINDOW BEHIND DRIVER'S SEAT

CARD # 9 - TWO SMUDGE PRINTS FROM INSIDE BACK LEFT PASSENGER WINDOW BEHIND
           DRIVER

CARD #10 - LIGHT PRINTING AND SMUDGING FROM INSIDE BACK LEFT WINDOW

CARD #11 - PARTIAL PRINT FROM BACK OF LP# D95MFG

| | Continuation Page |
|---|---|

**W A C O   P O L I C E   D E P A R T M E N T**
WACO, TEXAS

Reported Date: 11/15/01   Time: 07:35           Case: 01-075644 (003) PAGE: 2 of 2
Code: 29.03 1F PC           Crime: AGG ROBBERY   Class: 030110

CARD #12 - PARTIAL PRINT FROM BACK OF LP # D95MFG

The other plates that belong to the vehicle also printed, F84KRK; however, only smudging could be detected and no prints were located. The LP D95MFG will be placed in the property room along with the FORD KEY and the 12 print cards will be given to JOANN in fingerprints.

I notified DET. JANUARY, who was going to contact the owner of this 1999 CHEVROLET LUMINA nad have them come retrieve their vehicle from the laser lab.

**W A C O   Police Department**                           Continuation Page

Reporting Officer: BLAIR J         Number: 000179   Date: 11/29/01   Time: 12:30
        Typed by: BROUSSARD        Number: 384      Date: 11/29/01   Time: 13:11
Approving Officer: BROUSSARD       Number: 000384   Date: 11/29/01   Time: 13:22

```
==========================================================================
        W A C O   P O L I C E   D E P A R T M E N T         | SUPPLEMENT
                    WACO, TEXAS                             | Report
==========================================================================
                                    Case: 01-075644 (006) PAGE: 1 of 1
Reported Date: 11/15/01  Time: 07:35
Code: 29.03 1F PC       Crime: AGG ROBBERY   Class: 030110
Occurrence Date: 11/15/01-           Day: THURSDAY -          Time: 07:30-07:35
Status: AC  ACTIVE INVES          Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                   RD:  335
           PARKING LOT
====================== NARRATIVE ==========================================
```

On 11-29-01 I received twelve latent fingerprint cards from Laser lab Officer Blair. On these cards there are twelve latent lifts. I find quality of print for AFIS submission. Prints are of good eye comparison quality. Fingerprints will be entered in AFIS and remain on file in the AFIS Lab until needed.

```
==========================================================================
W A C O   Police Department                              | First Page
==========================================================================
Reporting Officer: GUERCIO      Number: 000361  Date: 11/30/01  Time: 12:10
        Typed by: GUERCIO       Number: 361     Date: 11/30/01  Time: 12:02
Approving Officer: MCELYEA M     Number: 000387  Date: 12/03/01  Time: 08:17
```

```
==============================================================|=================
                  W A C O   POLICE   DEPARTMENT              | SUPPLEMENT
                      WACO, TEXAS                            | Report
==============================================================|=================
Reported Date: 11/15/01  Time: 07:35   Case: 01-075644 (007)    PAGE: 1 of 1
Code: 29.03 1F PC        Crime: AGG ROBBERY   Class: 030110   CAD#:      Hate:
Occurrence Date: 11/15/01-           Day: Thursday -          Time: 07:30-07:35
Status: CA   CLEAR ADU AR             Closing Officer: 000201 JANUARY S
Location: 3000 HERRING, WA                                   RD:  335  Beat:
          PARKING LOT
======================== NARRATIVE ============================================
```

On this case I was asked to do a comparison with subject, SHERMAN FIELDS, DOB 7/14/74, and CHRISTIAN CHAE WALKER, DOB 10/11/73. On the comparison there is no match. Latent prints remain on file in the AFIS Lab until needed.

```
===============================================================================
W A C O   Police Department                                 First Page
===============================================================================
Reporting Officer: GUERCIO         Number: 000361  Date: 12/11/03  Time:
        Typed by: HUBBARD          Number: 321     Date: 12/16/03  Time: 11:05
Approving Officer: HUBBARD,BETTY    Number: 000321  Date: 12/16/03  Time: 11:07
```

A.   Did I say that?

Q.   Let me show you.

A.   I'm not sure why I said that.  I certainly don't know that to be a fact.

Q.   It may be because that was the last page of a very long questionnaire.

A.   Could be.

Q.   Okay.  If you don't know that to be a fact, Ms. Williams, then I assume that's not an attitude or opinion you have that would cause you any difficulty in viewing or weighing the evidence?

A.   No.

Q.   All right.  In a couple of other questions you were asked about your impression of prosecutors in general and you said they do the people's work and the criminal defense attorneys in general you said they're doing what's required.  I think those are perfectly reasonable answers myself. Prosecutors represent the government.  They present evidence when a grand jury returns an indictment.  They vigorously represent the government and seek convictions.  By the same token, their job is to see that justice is done, and I can assure you that either of these attorneys, if they think something has happened that someone's rights are not being protected, they will go so far as to dismiss the case rather than pursue it.

trial court had no duty to inform Movant of his right to testify and Movant effectively waived that right, Movant is not entitled to § 2255 relief as to Ground Fourteen.

### 8.    Ground Fifteen

Movant claims in Ground Fifteen that his convictions and death sentence violated his constitutional rights because he is innocent. Movant states that his claim is based on both a lack of proper forensic testing as well as a close examination of "the many contradictions and inconsistencies in the testimony presented by the Government." (Doc. 318 at 124-25). Specifically, Movant contends that: (1) the forensic evidence establishes his innocence; (2) Ms. Scroggins and Mr. Outley provided false testimony; (3) jail-house informants also gave false testimony; and (4) the government should have been aware of other false accusations made against Movant. (*Id.* at 125-32).

Movant does not assert his actual innocence claim in Ground Fifteen as a "gateway" to obtain review of an otherwise barred claim. *See Herrera v. Collins,* 506 U.S. 390, 404 (1993) (recognizing that a claim of actual innocence is "a gateway through which a habeas petitioner must pass to have his otherwise [procedurally] barred constitutional claim considered on the merits"); *Dowthitt v. Johnson,* 230 F.3d 733, 741 (5th Cir. 2000) (same). A petitioner seeking to surmount a procedural default through a showing of "actual innocence" must support his allegations with new, reliable evidence that was not presented at trial and must show that it was more likely than not that, in light of the new evidence, no juror, acting reasonably,

65

would have voted to find the petitioner guilty beyond a reasonable doubt. *Schlup v. Delo,* 513 U.S. 298, 326–27 (1995).

Thus, the question becomes whether a stand-alone claim of actual innocence is cognizable in a federal habeas petition. In *Herrera,* the Supreme Court explained:

> We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim. But because of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be extraordinarily high.

*Herrera,* 506 U.S. at 417. The Fifth Circuit has read *Herrera* as not allowing any freestanding claims of actual innocence. *Dowthitt,* 230 F.3d at 741-42.

In revisiting the issue of actual innocence, the Supreme Court specifically declined to resolve the question of whether freestanding actual innocence claims are to be recognized in federal habeas proceedings. *House v. Bell,* 547 U.S. 518, 554-55 (2006). The Fifth Circuit, in the wake of *House,* has reaffirmed its refusal to recognize a freestanding actual innocence claim in federal habeas proceedings. *See Foster v. Thaler,* 369 Fed. Appx. 598, 601 n.3 (5th Cir. 2010); *Moore v. Quarterman,* 534 F.3d 454, 465 n.19 (5th Cir. 2008); *Foster v. Quarterman,* 466 F.3d 359, 367–68 (5th Cir. 2006).

66

The Court finds that Movant's freestanding actual innocence claim in Ground Fifteen fails because it is not cognizable. Even assuming that such a claim could be cognizable, Movant fails to meet the more stringent standard of proof needed to establish it under *Herrera*. As discussed above, the Supreme Court has described the threshold for any "hypothetical freestanding innocence claim" as "extraordinarily high." *House,* 547 U.S. at 555; *Herrera,* 506 U.S. at 417. Such a showing would require "more convincing proof of innocence" than the gateway standard for overcoming a procedural bar found in *Schlup. House,* 547 U.S. at 555 (comparing the *Schlup* and *Herrera* standards).

Movant has failed to establish the extraordinarily high standard of proof for any possible actual innocence claim. Indeed, he fails to support his actual evidence claim with any new reliable evidence. Movant fails to show how any new DNA or forensic evidence testing would constitute direct evidence of his innocence. Movant further provides no corroborating evidence to support his allegations that various government witnesses gave false testimony at trial. Movant, therefore, falls short of satisfying the threshold discussed in *Herrera* and *House*. Accordingly, Movant is not entitled to § 2255 relief with respect to his actual innocence claim in Ground Fifteen.

### 9.    Ground Sixteen

Movant claims in Ground Sixteen that his rights were violated when the Government presented evidence and testimony that it knew or should have known was false. Movant contends that "the prosecutions' case against [Movant] relied

almost exclusively on the testimony of individuals with motives to lie and manipulate their testimony in any manner to protect their self-interests."  (Doc. 318 at 136). Furthermore, according to Movant, "much of the testimony against [Movant] was unsubstantiated, inconsistent with the facts alleged, inconsistent with the testimony of other witnesses, and often inconsistent with the statements of the witnesses themselves." (*Id.*). acknowleges that false testimony must fail

The Supreme Court has long acknowledged that convictions obtained by the knowing use of perjured testimony are fundamentally unfair. *See United States v. Agurs,* 427 U.S. 97, 103 (1976); *Napue v. Illinois,* 360 U.S. 264, 269 (1959) (holding that "a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment"). Because such cases "involve a corruption of the truth-seeking function of the trial process," the Court has repeatedly held that defendants' convictions "must be set aside if there is *any reasonable likelihood* that the false testimony could have affected the judgment of the jury." *Agurs,* 427 U.S. at 103–04.  "To establish a due process violation based on the government's use of false or misleading testimony, [a movant] must show that (1) the testimony in question was actually false; (2) the testimony was material; and (3) the prosecution had knowledge that the testimony was false." *United States v. Webster,* 392 F.3d 787, 801 (5th Cir. 2004).

Movant's claim in Ground Sixteen appears predicated on the following purported false testimony of various witnesses:

(1)     Ms. Scroggins testified regarding her whereabouts on the night of the murder, the circumstances regarding how Movant told her about the crime, her knowledge on November 7 that the murder victim was missing, whether Movant possessed a .32 pistol, and whether Movant in fact called her on November 15 to detail the murder.

(2)     Edward Outley testified with respect to a .32 gun, his own activities on the night of the murder, and the circumstances regarding Movant's confession as to the murder.[8]

(3)     Inmate witness Jerry Reed testified regarding the circumstances surrounding Movant's confession to murder.

(4)     Christian Walker testified regarding the circumstances surrounding Movant's confession.

(5)     Dominique Tubbs and Christopher Quigley, friends who shared the same jail cell with Movant, testified regarding the circumstances surrounding Movant's threats to kill Ms. Coleman.

(6)     Homero DeLeon made false claims in a letter dated February 12, 2003, and changed his story substantially at trial in testifying against Movant.

(7)     Ms. Edwards testified as to whether Movant attempted to kidnap her at gunpoint in the hospital park, whether Movant had shot at her, and whether Movant had choked her.

(8)     Ex-U.S. Marshal McNamara testified that Movant had disclosed the location of a .22 gun at the time of Movant's arrest.

(Doc. 318 at 127-33). While pointing out inconsistencies in the testimonies of many

of these government witnesses, Movant has failed to establish that the testimony in

---

[8]  Movant also contends that Mr. Outley falsely testified regarding whether he had been given immunity from any charge for his testimony. (Doc. 318 at 129). The Court will address all issues surrounding this contention in connection with its discussion of Grounds Eighteen and Nineteen.

question was actually false. Furthermore, even if any of the witnesses cited above had provided false or misleading testimony, Movant provides nothing to convince the Court that the Government knowingly used any such false or perjured testimony to obtain a guilty verdict on any of the charges brought against Movant.

The record reflects that Movant had ample opportunity to cross-examine all of the witnesses in order to discredit their respective testimony.  It is within the province of the jury to decide the relative credibility of each witnesses' testimony. *Davis v. Alaska*, 415 U.S. 308, 317 (1974).  The Court concludes, based on a careful review of the trial testimony, that Movant's due process rights were not violated based on the testimony of the various Government witnesses.  Accordingly, Movant is not entitled to § 2255 relief with respect to his claim in Ground Sixteen.

### 10.   Ground Seventeen

Movant claims in Ground Seventeen that his rights were violated because counsel failed to conduct a competent and reasonable investigation into the facts of the charged homicide.  Movant contends that, during the two years before trial, appointed counsel failed to interview several key witnesses and that counsel only interviewed fewer than 7% of the government witnesses.  (Doc. 318 at 137). Movant further contends that counsel failed to make any formal discovery requests and otherwise did not conduct an adequate investigation into the 120 witnesses identified against Movant.  (*Id.*).

### No. 13-70025

demonstrating that the government "directed or otherwise knowingly exploited" DeLeon to act as a government agent. Accordingly, jurists of reason would not debate the district court's rejection of Fields's *Massiah* claim. *See United States v. Cutno*, 431 F. App'x 275, 280 (5th Cir. 2011) (rejecting *Massiah* claim where the "district court found no evidence to demonstrate that [witness] was acting at the Government's behest at the time that [defendant] made his confession to [witness]").

### E. Actual Innocence

Fields argues that he has "set forth specific factual allegations supporting his actual innocence of the murder of Suncerey Coleman." He contends that: forensic evidence could establish his innocence, and seeks additional DNA testing; Scroggins and Outley "offered patently false testimony at trial"; and the testimony of jailhouse informants was false and unreliable. The district court rejected each of Fields's contentions. Because we conclude that reasonable jurists would not debate the district court's holding, we deny a COA.

#### 1. Applicable Law

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Rather, Rule 6(a) of the Rules Governing § 2255 Cases permits discovery "for good cause." Rule 6 of the Rules Governing 28 U.S.C. § 2255; *see also Bracy*, 520 U.S. at 904 (discussing Rule 6 of the Rules Governing 28 U.S.C. § 2254).[18] A petitioner demonstrates "good cause" under Rule 6(a) "where specific allegations before the court show reason to believe

---

[18] Because Rule 6 of the Rules Governing § 2254 Cases is nearly identical to Rule 6 of the Rules Governing § 2255 Cases, and both use the same "good cause" standard, courts have looked to cases interpreting the former when applying the latter. *See, e.g., Lafuente v. United States*, 617 F.3d 944, 947 (7th Cir. 2010); *Pizzuti v. United States*, 809 F. Supp. 2d 164, 175–76 (S.D.N.Y. 2011).

No. 13-70025

that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09 (internal quotation marks omitted). We have noted that Rule 6 of the Rules Governing § 2254 petitions "does not authorize fishing expeditions." *Ward v. Whitley*, 21 F.3d 1355, 1367 (5th Cir. 1994). "[T]he district court's decision regarding the availability of discovery is . . . committed to the sound discretion of the district court, and is reviewed under the abuse of discretion standard." *Clark v. Johnson*, 202 F.3d 760, 765–66 (5th Cir. 2000).

"'Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" *Dowthitt v. Johnson*, 230 F.3d 733, 741 (5th Cir. 2000) (quoting *Herrera v. Collins*, 506 U.S. 390, 400 (1993)); *see also Moore*, 534 F.3d at 465 n.19. "Rather, a claim of actual innocence is a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Dowthitt*, 230 F.3d at 741 (internal quotation marks omitted). For a petitioner to obtain relief, "the evidence must establish *substantial* doubt about his guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." *Id.* (internal quotation marks omitted).

2. Analysis

We conclude that reasonable jurists would not debate the district court's rejection of Fields's actual innocence claim, and deny a COA. Initially, we note that our caselaw does not recognize freestanding actual innocence claims. *Dowthitt*, 230 F.3d at 741; *Moore*, 534 F.3d at 465. The district court rejected Fields's claim, finding it not cognizable. To the extent Fields makes a

52

## No. 13-70025

freestanding claim that he is entitled to habeas relief because he is actually innocent, reasonable jurists would not debate the district court's holding.[19]

### a. Forensic evidence

Fields contends that his § 2255 petition "established that no physical evidence was presented at trial that connected him to the murder of Suncery Coleman." He offers several "examples of situations where the forensic evidence he specifically requested in his DNA Motion could establish his innocence by contradicting the unreliable testimony upon which he was convicted."[20] The district court rejected Fields's argument, noting "there is no requirement that [Fields] be linked to the murder through a positive DNA

---

[19] We also note that in Fields's brief, he only provides record cites to his habeas petitions in the district court (which, in turn, rely on earlier petitions), and at no point directs the court to evidence in the record or trial transcript that supports his claims. As a result, he may have waived his arguments by failing to adequately brief them. *See* Fed. R. App. P. 28(a)(8)(A); *United States v. Lopez*, 426 F. App'x 260, 263 (5th Cir. 2011) (unpublished); *see also United States v. Scroggins*, 599 F.3d 433, 446–47 (5th Cir. 2010).

[20] Fields offers the following examples:

- Scroggins "testified that Fields had blood on his clothes and shoes the night of Coleman's death," but the red Pontiac Grand Am that Fields drove that evening "was forensically examined and tested, [and] produced no inculpatory evidence linking Fields to the crime."
- "The area where Coleman's body was located was covered in huge thorns that would have left cuts on anyone in that area, yet Fields, who was wearing shorts that night, was uninjured."
- "The blue Jaguar that the Government told the jury Edward Outley III and Scroggins were driving the evening of the murder actually had been wrecked and totaled in 1998."
- "The gold Jaguar that Outley and Scroggins were actually driving the evening of the murder was never forensically tested because Outley and Scroggins conspired to hide the car by falsely telling investigators that they were in a blue, rather than a gold vehicle."
- "The detective who took buccal swabs and a blood sample from Fields the night he was arrested falsely claimed to have found Fields'[s] blood on a .22 caliber gun (which was not alleged to be the murder weapon), but Fields had no injuries that would have left his blood on that weapon that night."

No. 13-70025

test," and concluding that, "even assuming that the outcome of any DNA test would be favorable to [Fields], he has not established that such outcome would raise a reasonable probability of his actual innocence."

Fields argues that the district court ignored his factual allegations and erred in denying him relief. We conclude that reasonable jurists would not debate the district court's holding, because Fields's allegations are speculative and conclusory, they do not give "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief," *Bracy*, 520 U.S. at 908–09, and they therefore do not show "good cause" as required under Rule 6(a).

Fields's first "example," his observation that the red Pontiac Grand Am he drove the evening of Coleman's murder "was forensically examined and tested, [and] produced no inculpatory evidence linking Fields to the crime," does not support his argument that he is entitled to discovery. Fields cannot show that his claim is debatable simply by pointing to a lack of physical evidence on one issue; this is not the type of "specific allegation[]" that would give us "reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 908–09. This is particularly true, we note, when there was compelling evidence of guilt presented at trial. Moreover, Fields does not acknowledge that at trial, there was testimony that the Grand Am "looked like it had been detailed [and] wiped down." When the investigating team submitted the car for examination, they did not expect anything to be found, "given how clean the car" was. *See also* January 29, 2004 Trial Transcript (testimony of James Blair) (stating that the car had "suspicious stains that could possibly be blood").

Fields's observation that the "[t]he area where Coleman's body was located was covered in huge thorns that would have left cuts on anyone in that area, yet Fields, who was wearing shorts that night, was uninjured," is

54

## No. 13-70025

similarly unhelpful. Again, Fields cannot establish that the district court's rejection of his discovery claim is debatable simply by noting the absence of a particular piece of evidence he asserts should exist—here, cuts on Fields's legs—without any "specific allegations." *See Bracy*, 520 U.S. at 908–09. Fields provides no factual or record support for his conclusory statement that he was uninjured. (Additionally, Fields offers no explanation for the logical response that he could have cut his legs on thorns during the November 6th murder of Coleman, and that those cuts could have healed by his November 24th capture, more than two weeks later.)

Fields's remaining examples amount to conclusory assertions, with no specificity; he does not indicate how these assertions would establish his entitlement to discovery. He also provides no support for his contention that "[t]he detective who took buccal swabs" from him "falsely claimed to have found Fields'[s] blood on a .22 caliber gun." Accordingly, Fields's "examples" fail to cause reasonable jurists to debate the district court's rejection of Fields's claim.

b. DNA testing

The district court rejected Fields's argument that he was entitled to DNA testing, holding that Fields "fails to show how any new DNA or forensic evidence testing would constitute direct evidence of his innocence." The court explained that, "[g]iven the compelling evidence of guilt presented at trial, the Court does not conclude that any DNA testing would raise a reasonable probability of [Fields]'s actual innocence."

We conclude that reasonable jurists would not debate the district court's holding, because we are not persuaded by Fields's arguments that additional DNA testing should be performed on hairs found on Coleman's clothing, a fingernail clipping from Coleman, and Coleman's body and clothing. Fields fails to argue that he satisfies the requirements of 18 U.S.C. § 3600. "To secure court ordered testing of DNA an applicant must satisfy each of the ten

55

1917

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA      *
                              *
                              *
VS.                           * CRIMINAL ACTION NO. W-01-CR-164
                              *
SHERMAN LAMONT FIELDS         *      January 29, 2004

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
                    TRIAL PROCEEDINGS
                       VOLUME 13

APPEARANCES:

For the Government:          Greg Gloff, Esq.
                            Steven Lloyd Snyder, Esq.
                            Assistant United States Attorneys
                            PO Box 828
                            Waco, Texas   76701

For the Defendant:          Pro Se

Standby Counsel:            J. Scott Peterson, Esq.
                            1701 Austin Avenue
                            Waco, Texas   76701
                            - and -
                            Robert T. Swanton, Jr., Esq.
                            Norwest Plaza
                            1105 Wooded Acres, Suite 630
                            Waco, Texas   76710

Court Reporter:             Kristie M. Davis
                            United States District Court
                            PO Box 20994
                            Waco, Texas   76702-0994


       Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

1992

(Jury instructions were further read by the Court).

THE COURT: The last two pages of the charge, ladies and gentlemen, I'll read to you after the final summations have been made, as those deal with the manner in which you should go about your deliberations.

Mr. Gloff, whenever you're ready.

OPENING ARGUMENT ON BEHALF OF THE GOVERNMENT

MR. GLOFF: Ladies and gentlemen, this is -- this is not a game. It's not TV. It's not an event. This is real life. And the reason we're here is because this defendant killed, murdered Suncerey Coleman. That's why we're here. And we're here because the defendant wanted to control Ms. Coleman. And because the defendant wanted to control and have the ultimate act of control over Ms. Coleman, there's a mother who doesn't have a daughter anymore. And there's a sister that doesn't have a sister anymore, and there's three kids that don't have a mother anymore. And that's why we're here.

So what did the government have to prove to you and what did the government prove to you? Now, I want you to understand what I'm saying. Every charge in this indictment that the government brought forth I submit to you has been proven. I also submit to you that it's an important charge. But I'm going to sit here and look you in the eye and say the most important count and the most important charge in this indictment is Count Three. It's the murder charge, but I want

1993

to talk to you about a couple of the other charges first before I start talking about Count Three.

Count One. Part of the things that I'm going to talk to you about the Judge just read you all these instructions and all these definitions. I'm going to try in my limited way to make a little sense of it and show you a little road map through some of those things. So that's what I want to do first.

Number one, the government in Count One had to prove to you that there was a conspiracy involving the defendant, Sherman Lamont Fields, Benny Garrett, the guard that testified, and others both known and unknown to the grand jury to do two things: To violate two rules or two statutes. Number one was to provide contraband to prisoners. That was the testimony you heard from Benny Garrett about the marijuana and the liquor and the cigarettes and the key to get out. Obviously a key is a prohibited object if it enables a prisoner to get out.

Number two, the government had to prove to you that there was a conspiracy between Benny Donnell Garrett, the defendant and others, unknown or known, to escape. Now, I submit to you that both of those crimes in Count One were proven.

THE COURT: Mr. Gloff, I'm sorry to interrupt. Did you want me to give you a warning after any time? I forgot to ask.

MR. GLOFF: Could you give me a warning after I've used 20 minutes, Your Honor, please?

1994

THE COURT:  Yes, sir.

MR. GLOFF:  Thank you.

But I submit to you that it makes sense to go to the agreement or conspiracy to escape.  Did the government prove an overt act with respect to that?  You heard Benny Donnell Garrett testify.  He went through the keys, found the one that opened the fire escape door.  He then took the key to Sherman Lamont Fields.  Sherman Lamont Fields then used the key and gained his freedom.  I submit the government's proven that and the defendant's not contesting that.

One of the things that you have to remember about escape that the Judge told you -- two things, actually.  Number one, it's a crime of violence.  Why is escape a crime of violence?  Because bad things happen when desperate men are on the run from the law and have guns.  They can intimidate people.  They can kill people.  They can rob people.  They can shoot people.  Bad things happen.  That's why it's a violent offense.

Number two, it's a continuing offense.  What does that mean?  That means that while the defendant is out on his escape status, if you will, he is covered just like if you go out in the wintertime and you put on a coat.  As long as you've got that coat on, you're covered.  When you come back in the house, you take the coat off, you're not covered anymore.  It's the same thing with escape.  As long as you leave, escape, as long as you're out, every minute, every day, every hour, you're

1995

violating the law of escape. That's why it's a continuing offense because of the continuing danger that an escapee poses to people. So that's Count One.

Count Two is simply the conspiracy to violate the law, and remember the Judge said -- and all a conspiracy is, folks, is it's an agreement between two or more people to do something illegal. That's all conspiracy means. It's just that simple. Count Two is the escape itself. And like I said and like you've heard, Mr. Fields is not contesting the fact that he escaped. You're either there or you're not and he wasn't there.

Count Four is the carjacking count. Ladies and gentlemen, did the government prove to you that the defendant on a morning at Hillcrest Hospital walked up to Tammy Edwards, grabbed her by the throat, pulled up a gun at her, didn't say, "Give me the keys." He said, "Get back in the car." She was one of the lucky ones. She saw it coming and she was able to fight him off. And she positively identified the defendant as stealing her car, taking her car. We proved to you that he took the car.

We put Joe Hunter on the stand to testify as to that car that it moved in interstate commerce, which is an element we have to prove. It was made in Canada. So it had to travel across state lines, national boundaries, if you will.

Did he intend to do her serious bodily harm or injury?

What else would you call it if you grab a helpless person by the throat and pull a gun, trying to put a gun and say, "Get in the car"? What else are you going to call it?

How else do you know that the defendant is the one that carjacked her? Because when he was arrested at Tiemika Simmons' apartment on November the 24th, the keys to her car, to Tammy Edwards' car, were there. And you heard how the officer found the keys, gave it to Detective January. He went out, found the car and started the car. We proved the carjacking case to you.

Count Five has to do simply with his use of that gun during that episode of carjacking. The Judge instructed you that carjacking is a violent crime. And when he used that gun in that violent crime to further that crime to make sure she gave him the keys. Thank goodness she didn't get in the car. That's what Count Five is.

Count Six is the felon in possession. Did we prove that to you? When he was arrested on November the 24th in that apartment, what did Parnell McNamara say to you that he said? He gave him his Miranda warnings. And he said, "Do you have any firearms with you?" "Yeah. I've got a 22-caliber in the apartment under the rug." The defendant told him where it was. Tiemika Simmons said she'd seen him with a gun the day before when he was over there. So what happens? Bubba Colyer goes in. He finds the gun where the defendant said it was going to

1997

be.  What was it?  A 22-caliber just like the defendant said. And there was even DNA evidence on the gun that pointed to the defendant.  We also had to prove to you through the testimony of Doug Kunze that that gun traveled in interstate commerce. It was manufactured in Connecticut, traveled to Texas.  That satisfies that element.  Also we had to prove to you that the defendant knowingly possessed it.  I submit to you that the evidence is overwhelming in the case that he possessed that gun.

Now, the last count, Count Seven, has to do with him possessing that .22 during his crime of escape.  Just like possessing the gun, using a gun during the carjacking, he possessed and used the .22 to further his crime of escape.  How did he do that?  He was on the run.  When you're on the run and you're an escaped convict and you're looking not to get caught, your tool of the trade is going to be your gun, and that's what he was doing.  He had that gun for his protection.  If he needed to shoot somebody, if he needed to rob somebody, if he needed to steal from somebody, that's why he had that gun.

Now, I want to go to Count Three.  Mr. Snyder told you on Monday that the evidence would tell a story.  And at first you may think, well, the story started on November 6th, 2001. That's what the government's been saying over and over, but I want to tell you it started a little bit before that.  It started when the defendant had a relationship with Suncerey

1998

Coleman and Shalaykea Scroggins. And part of the defendant's interest was controlling those women. He wanted to control Suncerey Coleman, the victim in this case, and he was having trouble. Why? Because he was in jail and he couldn't keep tabs on her. How do we know that that's what was in his mind that he wanted to control her? Because you have November the 1st to November the 6th, 200 phone calls from the jailhouse cell that the defendant was making to her. "Where are you?" "What's going on?" "What are you doing?" "Who are you going with?" Control.

How do we know what was on his mind when he got ready to escape? You heard Quigley and Tubbs testify they heard him on the phone. I guess so if there's over 200 phone calls in a six-day period. They had heard him on the phone fighting with her. They had heard the defendant talking to her saying, "If you're with somebody else, I'm going to kill you. I'm going to smoke you. I'm going to spray you." Trying to control, trying to keep the grasp, trying to control what she was doing.

When he was sitting in that jail cell and he was planning on how to talk Benny Garrett into giving him a key for the promise of $5,000 so he could get out, he was thinking about what he was going to do to Suncerey Coleman and Shalaykea Scroggins, as well. Do you know what you call that? You call that premeditation. You call it sitting around planning what you're going to do when you get your chance.

1999

What did he do?  He escapes on November the 6th.  He's a free man.  What would you think most free men after being in jail locked up all that time -- he didn't want a pizza.  He didn't want to get a bus ticket out of town.  He didn't want to go and just have some good food somewhere.  He wanted a gun and a car.  That's what he wanted.  So he gets a gun, a 32-caliber from his buddy Trey Boy and he gets a car.

What's one of the next things that he does in this?  At 8:00 o'clock he calls Hillcrest Hospital and he talks to Suncerey Coleman.  Do you know what you call that?  Getting the gun, getting the car, making the phone call?  You call that premeditation.  Then he gets in the car and he drives over to Hillcrest Hospital and he sees her.  And do you remember the testimony of Tanesha Hilliard?  He wasn't acting mad.  He wasn't in a rage.

Do you remember Quigley or Tubbs when they said that Mr. Fields liked to say "The mouthpiece is a masterpiece?"  When he showed up at the hospital, the mouthpiece was the masterpiece.  It's okay.  Everything's fine.  Hugging and kissing, putting her off, controlling her with the fact that he was acting as if everything was okay.

So what did he do next?  Everything's fine.  I've got to go do a few things.  I'll see you later.  What's the next thing he goes and does?  He goes and picks up Laykea.  Shalaykea Scroggins.  Takes her out to the country.  You heard her

2000

testify that he told her, "I was going to kill you, too."  Do you know what you call that?  Premeditation.

He decides not to kill her.  He brings her back.  They want to meet up with Trey Boy and his girlfriend, but he needs a place at New Road Inn.  How do we know that those events took place?  Because you heard the testimony about how she stopped -- they stopped and she called to check on whether or not they had the room from the pay phone out in Downsville not too far from where Ms. Coleman's body was found.  And then she made another phone call at the pay phone at New Road Inn.

Then they all meet up at the motel.  They talk a little bit.  Edward Lee Outley, Trey Boy, told you he gave him the gun, the 32-caliber.  He described it to you.  The 32-caliber.  Do you know what you call that when he got that gun?  That's called premeditation.  Laykea says she saw the gun.  He was playing with the bullets saying, "One of these bullets has your name on it."  He's got it at the motel with him.

So they leave and get separated and then he's unaccounted for for the next few hours.  Do we know what he did in the next few minutes?  No.  Do we know how many different cars he was in during that time?  No.  But we do know this:  He went back to the hospital.  Do you know what you call that?  You call that premeditation.

And he went up to the room and you have two witnesses, Tanesha Hilliard and Nathan Lloyd, who both saw him.  And he

2001

goes in the room and he makes that statement about the baby's father.  He looks at the cell phone and he says, "I need to talk to you.  It's okay.  I just need to talk to you."

And do you remember what Tanesha Hilliard said when we asked her the question, did she ever -- "Did she leave with him?"  "Yeah.  She left with him.  I followed down and got my money."

"Did you see what kind of car they were in?"  "No.  I didn't see what kind of car they were in."

"Did you ever see her alive again?"  "No."

"Did she ever come back for her baby?"  "No."

He was the last one with her.

So what happened next?  How do we know what happened next?  Because the testimony of the witnesses of what the defendant told them.  Why did he tell all these people this?  You know, it's not reasonable that he would say all these things to anybody.  It is if that's the way that you control people.  If you want people to be scared of you and fear you or think that you do these things and you're not to be messed with, then you tell people.  You also tell your friends and your close associates that you're involved with.

Do you know what he was doing when he went up there and he picked her up the second time?  That's called premeditation.

Do you know what you call it -- and make no mistake about it.  The government, nobody knows which route he took out to

2003

real.  The description of how Sherman Lamont Fields drove the woman that he said he loved out on a lonely country road.  It was a November night on the 6th of November 2001.  Maybe it was a little bit chilly, and sometimes in November how the stars are real bright in the sky because of the cold crisp of cool air, and as they left the pavement, you can almost imagine the sound of the tires on the gravel just like you've heard before if you've been going down a gravel road with the windows down, how it sounds and you can only imagine what's going on through Suncerey Coleman's mind and the fear that she must have been feeling.  "Why are we going out here?"  "What are we going to do?"  "I don't want to be here."  "I'm scared."

And then the car pulls off.  And according to Chae Walker, Sherman Fields said that he had sex with her.

THE COURT:  You've used 20 minutes, Mr. Gloff.

MR. GLOFF:  Thank you, Your Honor.

And then said, "Put your clothes back on."  "Get out of the car."  What do you think was going through her mind at that point?

And he gets her out of the car and he shoves her down on the ground and she's crying and she's begging and she's pleading for her life.  "I want to go back to where my baby is.  I don't want to be here."  And in the night air you hear the sobs and the cries and then, pop, pop, pierces the night air.  Fall to the ground.  And then he drags her and leaves her in a

2004

dump. Premeditation. Nobody deserves that. She didn't deserve that. And the saddest thing about it is it was so unnecessary. All he wanted to do was to control her. And he had the ultimate act of control because he killed her. And he left her there, and as the car's pulling off and he's not there anymore, you can only imagine what the sounds in that lonely, desolate underneath those trees in the cold November night air maybe the last few gasps of breath. Dr. Urban said she couldn't say for sure how long she might have lived. Did she realize at any point "I'm not going to make it"? But maybe the last sounds were just the sounds of life going out of her because he had to have control.

I'm going to ask you to return a verdict of guilty on all counts. I'm going to ask you to go straight to the verdict form. There is absolutely no evidence whatsoever of second degree murder or voluntary manslaughter. I want you to go to 3A. It's first degree murder because he did it on purpose, because he premeditated it and he planned it and it was all about control. And when you get back there in the jury room, I want you to think about the testimony. I want you to look at the evidence. I want you to read those letters that he wrote to those two girls. One of them he even signed to one of his friends "Waco's most wanted." It's time for him to lose his control. Find him guilty. Thank you.

THE COURT: Mr. Fields?

## II. PART TWO - STATUTORY AGGRAVATING FACTORS

**Instructions**: For each of the following, answer "YES" if you, the jury, unanimously find that the government has established the existence of that statutory aggravating factor **beyond a reasonable doubt**; answer "NO" if you do not so find:

(A)   The defendant, Sherman Lamont Fields, committed the offense after substantial planning and premeditation to cause the death of the victim, Suncerey Coleman.

Unanimously      YES _____

                 NO   ✓

(B)   The death , or the injury resulting in death, of the victim, Suncerey Coleman, occurred during the commission or attempted commission of an offense, that is, escape.

Unanimously      YES   ✓

                 NO   _____

(C)   The defendant, Sherman Lamont Fields, has previously been convicted of a federal or state offense punishable by a term of imprisonment of more than one year involving the use or the attempted or threatened use of a firearm against another person.

Unanimously      YES   ✓

                 NO   _____

4

143

Page: 1 of 1     Case Number: 81-75644

STATEMENT OF:

On 11-15-01 I had pulled into the Hilcrest hospital parking lot and started to get out of my car, when I saw a Black male approach me at my driver's side door. The Black male then told me to get back into my car, I kept getting out of my car and pushed him back away from me, he then grabbed me with his left hand around the throat and pulled out a gun with his right hand and tried to point it at me. I grabbed the gun with my left hand and tried to push it away from me, and used my right to try to fight him off, I was screaming and yelling for help the entire time. I was able to get away from his hold and run towards the back of my car, towards the hospital. The Black male then got in my car, backed up and drove off. The male drove through the back of the parking lot then up to the exit at 30th. He then drove South 30th towards Pine then turned east on Pine. I did not know who the Black male was, then one of the hospital security guards showed me a picture of a Black male and I said that was him, he said this is Sherman Fields. Officer Carriales also showed me a pic of another Black male, and I said that was the same person the guard showed me. Officer Carriales told me this pic of a man named Sherman Fields. I will assist the WACO P.D., with the prosecution of this case.

I will assist the WACO POLICE DEPARTMENT IN THE INVESTIGATION AND PROSECUTION of this case. I have been given the opportunity, before signing this statement, to make any additions or deletions I desire in order that this statement be accurate. I have stated all the above is true and correct and happened in WACO, MCLENNAN COUNTY, TEXAS.

Signed this 15th day of November, 2001.

Jimmy Edwards

Tammy Edwards deposition.

A.   He was probably about three car lengths away.

Q.   Okay.

A.   And he started walking towards me and I started looking at him and looking at him closer and then once he got all the way close to me --

Q.   Okay. Let me stop you there.  While he was walking that three car lengths, what were you doing?

A.   I had both of my feet on the ground.

Q.   Were you just sitting there watching him or were you actually continuing to get out of the car?

A.   Actually, I was sitting there waiting for him to just pass so I could get out of my car.

Q.   Was there another car next to you or was it open?

A.   No, there was another car next to me.

Q.   Okay.

A.   And I was sitting there waiting for him to pass so that I could get up and go to work and he just came closer to me and closer.  And then for a moment before he even got all the way up on me, I thought he was just going to ask me the time at first.

Then when he got close to me, it went off in my head like an alarm that that was Sherman Fields.  We've had his picture posted all over Hillcrest. That was Sherman Fields.  So I stood up, just abruptly just stood up.

# No. 13-70025

IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

- against -

SHERMAN LAMONT FIELDS,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION (W-09-CV-009, W-01-CR-164)

# DEFENDANT-APPELLANT
# SHERMAN LAMONT FIELDS' MOTION TO RECUSE THE
# HONORABLE EDITH H. JONES

## THIS IS A CAPITAL CASE

JEFFREY ELLIS
OREGON CAPITAL RESOURCE CENTER
621 SW Morrison St., Suite 1025
Portland, OR  97205
(206) 218-7076

PETER J. ISAJIW
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, NY  10281
(212) 504-6000

*Attorneys for Defendant-Appellant
Sherman Lamont Fields*

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rule 28.2.1, the undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.    APPELLANT: Sherman Lamont Fields

2.    APPELLANT'S ATTORNEY: Jeffrey Ellis, Oregon Capital Resource Center, 621 SW Morrison Street, Suite 1025, Portland, OR 97025

3.    APPELLANT'S PRO BONO ATTORNEY: Peter J. Isajiw, Cadwalader, Wickersham & Taft LLP, One World Financial Center, New York, NY 10281

4.    APPELLEE: United States of America

5.    APPELLEE'S ATTORNEY: Joseph H. Gay, Jr., United States Attorney, Western District of Texas, 601 N.W. Loop 410, Suite 600, San Antonio, TX 78216

6.    APPELLEE'S ATTORNEY: Jennifer Sheffield Freel, United States Attorney, Western District of Texas, 816 Congress Avenue, Suite 1000, Austin, TX 78701

/s/ Jeffrey Ellis
Jeffrey Ellis
Peter J. Isajiw
*Attorneys of Record for Mr. Fields*

-i-

Defendant-Appellant SHERMAN LAMONT FIELDS, through his undersigned counsel, hereby moves to recuse Hon. Edith H. Jones, Circuit Judge, from any further participation in this appeal pursuant to 28 U.S.C. § 455, the Fifth Amendment to the U.S. Constitution, and Canon 3C of the Code of Conduct for United States Judges as incorporated in this Court's local rules.

## PRELIMINARY STATEMENT

Defendant-Appellant Sherman Lamont Fields ("Fields") brings this motion for recusal based on facts set forth in a complaint for judicial misconduct concerning remarks by Circuit Judge Jones during a public lecture entitled "Federal Death Penalty Review" at the University of Pennsylvania School of Law on February 20, 2013, which was supported by several sworn affidavits by witnesses in attendance during that lecture and filed by thirteen separate complainants, including representatives of the Mexican Capital Legal Assistance Program, the NAACP, and several distinguished legal ethics professors, among others ("Complaint"). Ex. A.[1] The allegations in the Complaint, if true, undermine Judge Jones' ability to impartially determine Fields' appeal should she be assigned to any further proceedings in this matter.

In the Complaint, Judge Jones is alleged to have made public remarks which demonstrate personal biases against racial minorities and the mentally disabled. Her alleged comments evince her insensitivity toward the justification

---

[1] All references to "Ex." herein refer to the Exhibits to the Declaration of Jeffrey Ellis In Support of Defendant-Appellant Sherman Lamont Fields' Motion to Recuse the Honorable Edith H. Jones, dated February 25, 2014.

and administration of capital punishment and, specifically, cast doubt on her ability to impartially apply controlling legal precedent with respect to constitutional claims brought by those on death row who have challenged their convictions and death sentences on grounds of actual innocence or mental disability – like Fields has done. The Complaint's allegations, substantiated by detailed affidavits sworn by disinterested witnesses, create the appearance of partiality, if not outright bias, against Fields, an African American defendant challenging his conviction and death sentence based on claims of actual innocence and mental illness.

## STATEMENT OF FACTS

### A.    Procedural History

In January 2004, Fields was convicted of escape and murder, among other counts, and was subsequently sentenced to death. Brief for Defendant-Appellant Sherman Lamont Fields, No. 13-70025 (Dkt. No. 00512440612) ("Br.")[2], at 4. In January 2009, Fields filed a motion for a new trial and to vacate his conviction and death sentence pursuant to 28 U.S.C. § 2255, and amended his motion in April 2010. *Id.* at 5. The District Court denied Fields' motion and also denied a subsequent motion for reconsideration. *Id.* at 6.

On August 1, 2013, Fields timely filed a notice of appeal of the District Court's denial of Fields' § 2255 motion to this Court. Br. at 6; Dkt. No. 00512335473. On November 13, 2013, Fields filed a motion seeking a Certificate of Appealability and a brief in support thereof. Dkt. Nos. 00512440609 (Motion),

---

[2]    All "Br. at ___" references are to the physical pages of the brief, not the sequential pagination assigned by the ECF system.

00512440612 (Brief). This motion is still pending and has not been fully briefed. While Fields does not know whether Circuit Judge Jones will be assigned to the panel that will decide Fields' appeal, Judge Jones has already participated in these proceedings. *See* Dkt. No. 512499350 (Jan. 14, 2014 Order).

## B. Fields' Background and Relevant Social History

Fields has been on death row since his conviction in 2004. He is African American and was born into a poor family in Waco, Texas. Br. at 7. His family had been victimized by racial intimidation and animus for generations, enduring brutal mistreatment during a period of intense racial violence in central Texas. *Id.* at 7-9. Fields' upbringing was characterized by shocking loss, including the violent deaths of several close friends and family members. *Id.* at 9-12. Complicating his profoundly tragic upbringing, and likely as a result of it, Fields was diagnosed with severe Posttraumatic Stress Disorder ("PTSD") and atypical bipolar disorder as a teenager, and is prone to paranoia and delusions. *Id.* at 11-12. Fields has suffered from these conditions throughout his adult life, including during his trial and subsequent proceedings. *Id.* Fields' § 2255 motion and present appeal asserts, *inter alia,* that he was denied his constitutional right to a fair trial because the District Court permitted Fields to represent himself despite his incompetence resulting from his mental illness. *Id.* at 12-14. Additionally, Fields contests his conviction on the ground that he is actually innocent of the crimes for which he was convicted. *Id.* at 121-30.

C.    **The Complaint For Judicial Misconduct Alleged Against Circuit Judge Jones**

As alleged in the Complaint, on February 20, 2013, Judge Jones gave a public lecture at the University of Pennsylvania School of Law entitled "Federal Death Penalty Review", which was ostensibly an opportunity to "discuss federal death penalty review through the perspective of a federal judge." Ex. A at 1 n.2; Ex. A, Bookman Aff. ¶ 3. Judge Jones's lecture discussed several topics reflecting a bias against certain racial groups. Judge Jones allegedly stated:

> "[C]ertain racial groups like African Americans and Hispanics are predisposed to crime" and "'prone' to commit acts of violence." She made "generalized and stereotypical comments about racial groups and their 'criminal tendencies.'" Judge Jones stated that "race" was merely a "red herring" "thrown up by opponents of capital punishment," and that no case had ever been made for "systemic racism." She also asserted that "certain systemic classes of crimes" exist and that "certain racial groups commit more of these crimes than others." She said that "sadly some groups seem to commit more heinous crimes than others." When asked to explain her remarks, she stated that there was "no arguing" that "Blacks and Hispanics" outnumber "Anglos" on death row and "sadly" it was a "statistical fact" that people "from these racial groups get involved in more violent crime." By way of example, she asserted as a "fact" that "a lot of Hispanic people are involved in drug trafficking," which itself "involved a lot of violent crime." She "dismissed race as a legitimate concern in how the death penalty was administered". . . . During the question-answer portion of the program, Judge Jones "lost her composure" to an extent that "the host of the program ended the program abruptly". . . .

Ex. A at 3 (citations omitted).

-4-

In addition to these racially charged remarks, Judge Jones allegedly made certain derogatory comments which demonstrated her lack of partiality with respect to capital defendants who claim they were unlawfully convicted as a result of mental disabilities. According to the Complaint, Judge Jones

> characterized capital defendants' assertions of "mental retardation" as "red herrings." She stated that she believes it is a disservice to the "mentally retarded" to exempt them from the death sentence, and "expressed disgust at the use of mental retardation as a defense in capital cases." She consistently asserted that the manner in which these defendants committed their crimes ... proved that they were not "mentally retarded." As one audience member stated, "in describing ... what Judge Jones said about these cases, I am not able to capture the complete outrage she expressed over the crimes or the disgust she evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded".... Judge Jones's disgust at how these defendants were "using mental retardation" was very evident and very disconcerting.

*Id.* at 5 (citations & footnotes omitted). Judge Jones also criticized the U.S. Supreme Court's death penalty jurisprudence, specifically its decision in *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that it was unconstitutional to execute the mentally retarded. *Id.* at 1, 5 n.11.

Judge Jones allegedly doubted that innocent defendants would ever be sentenced to death, and, therefore, convicted defendants who claim innocence were likely lying. *See* Ex. A at 6. According to the Complaint, Judge Jones was "very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death." *Id.* "'[R]eversals of those who

-5-

were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted).

Moreover, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. According to the Complaint, she stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* (citation omitted). According to Judge Jones, she was inspired to adopt this philosophy after reading an online article called "Hanging Concentrates the Mind," in a Catholic magazine titled *Crisis*. *Id.* That article, which purports to summarize the Vatican's position on capital punishment, concludes by observing that "'the coercive power of legitimate human authority' has its roots in 'the *sources of revelation and traditional doctrine*' ... [which] have 'a general and abiding validity.'" Ex. B at 3 (citation omitted).

The Complaint alleges that Judge Jones violated Canons 1 through 4 of the Code of Conduct for United States Judges, which, among other things, require judges to "'uphold the integrity and independence of the judiciary'" (Canon 1), "'avoid impropriety and the appearance of impropriety in all activities'", "'act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary'" (Canon 2), be "'patient, dignified, respectful, and courteous'" and avoid comments on "'pending or impending'" matters (Canon 3), and avoid participating "'in extrajudicial activities that detract from the dignity of

the judge's office or reflect adversely on the judge's impartiality . . .'" (Canon 4). Ex. A at 7-10 (*citing* Code of Conduct for United States Judges, Canons 1-4).[3] These allegations are supported by affidavits of legal ethics experts, who concluded that Judge Jones violated the canons of judicial conduct, including Canon 3. *See* Ex. A, McCormack Aff. ¶ 17 ("[I]t is my opinion that Judge Jones violated the ethical standards applicable to federal judges under the Code of Conduct for United States Judges); *see also* Ex. A, Hardwick Aff. ¶¶ 12-55 (concluding that Judge Jones would be sanctioned for violations of Texas rules of judicial and professional ethics).

The Chief Judge of the Fifth Circuit requested a transfer of the proceedings against Judge Jones, and on or around June 12, 2013, Chief Justice John Roberts granted this request and transferred the proceedings to the Judicial Council of the District of Columbia Circuit. *See* Ex. C. To the best of Fields' and his undersigned counsel's knowledge, the allegations against Judge Jones are pending and no findings of fact have issued.

Judge Jones' remarks and the allegations set forth in the Complaint were widely reported by respected news organizations. The *New York Times* quoted a prominent legal ethics expert who opined that "'[i]f I were a parent of a black with borderline IQ accused in a capital case, would I be distressed in knowing that Judge Jones was sitting on my case? . . . Yes, I would. She seems to have made up her mind on these issues. *She is slanted. That is the whole point of*

---

[3]    http://www.uscourts.gov/RulesAndPolicies/CodesOfConduct/CodeConduct United States Judges.aspx.

*the impartiality requirement.*'" Ex. D (citation omitted; emphasis added). In the same article, another respected legal ethics expert suggested that if Judge Jones "really did say that death penalties serve the condemned by forcing them to face God . . . 'during sentencing, that sentence would be vacated . . . . *It suggests that she believes she is helping the accused by giving a death sentence.* That is totally inappropriate.'" *Id.* (citation omitted; emphasis added); *see also* Ex. E; Ex. F.

## ARGUMENT

A judge must recuse herself "in any proceeding in which [the judge's] impartiality might reasonably be questioned,"[4] 28 U.S.C. § 455(a), or if the judge "has a personal bias or prejudice concerning a party. . . ." 28 U.S.C. § 455(b)(1). Section 455(a) is interpreted under an objective standard, and a judge must recuse herself if "a reasonable and objective person, knowing all of the facts would harbor doubts concerning the judge's partiality." *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995); *see Liljeberg v. Health Servs. Acq. Corp.*, 486 U.S. 847, 860 (1988) ("'The goal of section 455(a) is to avoid even the appearance of partiality'") (citation omitted); *United States v. Cooley*, 1 F.3d 985, 995 (10th Cir. 1993)

---

[4]   Canon 3C of the Code of Conduct for United States Judges, as adopted by the Judicial Conference of the United States, incorporates § 455. In the "Other Internal Operating Procedures" of this Court's local rules, the "Recusal or Disqualification of Judges" subsection (a) states, in relevant part, "Judges must disqualify themselves under circumstances set forth in 28 U.S.C. § 455 or in accordance with Canon 3C, Code of Conduct for United States Judges as adopted by the Judicial Conference of the United States." Rules and Internal Operating Procedures of the United States Court of Appeals for the Fifth Circuit, Other Internal Operating Procedures, http://www.ca5.uscourts.gov/clerk/docs/5thcir-iop.pdf. As such, a violation of Canon 3C is a separate ground for recusal. A legal ethics expert who submitted an affidavit in support of the Complaint concluded that Judge Jones violated Canon 3. Ex. A, McCormack Aff. ¶ 17.

-8-

(requiring recusal as a result of judge's public remarks, because the judge "deliberately ma[de] the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him", creating the appearance of bias). Recusal "must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the facts and circumstances of the particular claim." *United States v. Bremers*, 195 F.3d 221, 226 (5th Cir. 1999). If close, the balance must tip in favor of removal. *See Patterson v. Mobil Oil Corp.*, 335 F.3d 476, 484-85 (5th Cir. 2003).

A criminal defendant's right to an impartial judiciary is embedded in the Due Process Clause of the Fifth Amendment to the U.S. Constitution, which mandates a "fair trial in a fair tribunal" for every defendant. *In re Murchison*, 349 U.S. 133, 136 (1955). A judge violates a defendant's due process rights if she is biased against the defendant. *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997). And even if a judge has no actual bias, but a bias may be apparent, a judge must recuse to avoid offending due process. *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 825 (1986); *United States v. Couch*, 896 F.2d 78, 82 (5th Cir. 1990) (Due process "requires a judge to step aside when a reasonable judge would find it necessary to do so").

Circuit Judge Jones must recuse herself because her impartiality might reasonably be questioned as a result of her alleged public remarks. These actual or apparent biases bear directly on the circumstances of Fields' case.

First, Judge Jones' comments suggest that she lacks partiality with respect to matters of race. Specifically, she made derogatory statements

-9-

concerning African Americans and Hispanics by making the unfounded and offensive generalization that such racial groups were "'predisposed to crime'" and "''prone'' to commit acts of violence.'" Ex. A at 3 (citation omitted). Judge Jones further opined that "'some groups seem to commit more heinous crimes than others,'" and "'dismissed race as a legitimate concern in how the death penalty was administered.'" *Id.* (citation omitted). Fields is an African American whose family has long been victimized by racial antagonism and violence, and Fields claims that this victimization and racial violence, among many other factors, contributed to his mental illness and inability to competently represent himself during the guilt phase of trial. Br. at 7-12, 94-107. Fields also claims that he did not commit the violent crimes for which he was convicted and sentenced to death and that his trial counsel failed to effectively challenge critical pseudo-scientific "expert" testimony concerning Fields' risk of "future dangerousness." *Id.* at 121-44. Should Judge Jones participate in this appeal, her comments that members of certain racial groups – including African Americans such as Fields – are prone to violence would, at the very least, create the appearance of partiality on matters of race and future dangerousness which require recusal.

Second, if her remarks as alleged are true, Judge Jones appears to hold a bias against death row inmates who have challenged their convictions on the basis of mental disabilities. Judge Jones "stated that she believes it is a disservice to the 'mentally retarded' to exempt them from the death sentence, and 'expressed disgust at the use of mental retardation as a defense in capital cases.'" Ex. A at 5 (citation omitted). She insisted that "the manner in which these defendants committed their crimes" proved that they were not, in fact, mentally disabled. *Id.*

Those in the audience at Judge Jones' lecture described "'the disgust [Judge Jones] evinced over the defenses raised, particularly by the defendants who claimed to be mentally retarded.'" *Id.* These alleged biases plainly bear on Fields' present appeal. In his motion for a Certificate of Appealability, Fields argues that he was deprived of his constitutional rights as a result of the District Court's decision to allow Fields to represent himself at trial despite his debilitating mental illnesses. Br. at 94-107. Fields is bipolar and suffers from severe paranoid delusions and PTSD. *Id.* at 11. These conditions prohibited Fields from adequately representing himself at trial, and thus the District Court committed reversible error in allowing Fields to proceed *pro se. Id.* at 94-107. Judge Jones' well-documented skepticism of death row inmates who have challenged their convictions and sentences as a result of mental deficiencies therefore disqualifies her from participating in any further proceedings relating to Fields' appeal.

Third, the Complaint alleges that Judge Jones was "'very dismissive of claims of innocence. She did not take seriously the possibility that innocent people had been sentenced to death.'" Ex. A at 6. Further, Judge Jones "'said that reversals of those who were allegedly innocent were really based on "technicalities", not innocence.'" *Id.* (citation omitted). Effectively, Judge Jones has already passed judgment on Fields because in his § 2255 motion and his present appeal, Fields vigorously argues that he is actually innocent of the crimes for which he was convicted, a position he has consistently maintained since his trial. Br. at 121-30. Thus, Judge Jones could not impartially render judgment on Fields' appeal.

-11-

Fourth, Judge Jones allegedly "advocated her personal religious views as a basis for justifying the death penalty." Ex. A at 7. She is alleged to have stated that "'a killer is only likely to make peace with God and the victim's family in that moment when the killer faces imminent execution, recognizing that he or she is about to face God's judgment.'" *Id.* Judge Jones allegedly "'talked about how the imminent prospect of execution forced the criminal to confront his deed, and she said this as justification for the death penalty." *Id.* This apparent appeal to religious authority for a judicial matter as serious as the federal government's attempt to take the life of one of its citizens clearly creates a situation where Judge Jones' impartiality could reasonably be questioned.

Fifth, Judge Jones sharply criticized the Supreme Court's death penalty jurisprudence, observing that the Court's decision in *Atkins* – in which the Court held that it was unconstitutional to execute the mentally retarded – was "ill-advised" and created a "'slippery slope'" by which a defendant's intelligence must be considered under certain circumstances. Ex. A at 1; Ex. A, Bookman Aff. ¶¶ 20-21. According to Judge Jones, the Supreme Court has "micromanaged" capital punishment, and she speculated that "the Supreme Court's next attempt at meddling with the death penalty will come by 'back-dooring' through the *Martinez* case the right to counsel in post-conviction proceedings. [Judge Jones] seemed to think that this would be a travesty."[5] Ex. A, Bookman Aff. ¶ 21. These views do not comport with the fair administration of capital punishment under the Constitution, which affords, among other things, certain procedural protections to

---

[5]   *See Martinez v. Ryan*, 132 S. Ct. 1309 (2012); *Trevino v. Thaler*, 133 S. Ct. 1911 (2013).

-12-

the accused as well as a right to a fair determination of punishment for the convicted. However, according to Judge Jones, the imposition and effectiveness of the death penalty is justified through extralegal means – her personal religious philosophy. *See* Ex. A at 7. Judge Jones' disdain for the Supreme Court's capital punishment jurisprudence raises doubts that she could impartially apply controlling authority. Fields challenges both his conviction and sentence pursuant to bedrock principles of Constitutional law. Judge Jones' participation in Fields' appeal would result in an unconstitutionally biased determination and undermine public confidence in the judiciary.

Judge Jones' public comments demonstrate a judicial bias against Fields and those similarly situated. Judge Jones' impartiality "might reasonably be questioned" and it is reasonable to infer her bias against Fields here. *See Cooley*, 1 F.3d at 992, 994. Judge Jones' participation in Fields' appeal would deprive him of his Fifth Amendment rights to a fair proceeding. Accordingly, Judge Jones should be recused from any further proceedings in connection with Fields' appeal.

## CONCLUSION

For the foregoing reasons, Fields respectfully requests that this Court grant his motion to recuse the Honorable Edith H. Jones.

Dated:    February 25, 2014

Respectfully Submitted.

By: /s/ Jeffrey Ellis
    Jeffrey Ellis

Oregon Capital Resource Center
621 SW Morrison St., Suite 1025
Portland, OR  97205
Telephone:  (206) 218-7076
Email:        JeffreyErwinEllis@gmail.com

Peter J. Isajiw
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666
E-mail:     Peter.Isajiw@cwt.com

*Attorneys for Mr. Fields*

-14-

## CERTIFICATE OF CONFERENCE

I hereby certify that on February 18, 2014, counsel for the Government advised me that the Government opposes the relief requested in this Motion.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
Jeffrey Ellis
Peter J. Isajiw

*Attorneys for Mr. Fields*

## CERTIFICATE FOR ECF PLEADINGS

I hereby certify that: (1) required privacy redactions have been made pursuant to 5th Cir. R. 25.2.13; (2) the electronic submission is an exact copy of the paper document pursuant to 5th Cir. R. 25.2.1; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

Dated:    February 25, 2014

/s/ Jeffrey Ellis
Jeffrey Ellis

1 correct?

A.    That's one of the tests that we do. Yes.

Q.    Did you find any blood?

A.    I can't -- I found suspicious stains that could possibly be blood. So they were collected.

Q.    But were they blood? Was it blood?

A.    I do not know the results of those tests.

Q.    Mr. Blair, you're aware that if blood were in the car and somebody tried to wipe it off, isn't it true that there's some type of technology or something that could still tell that it was blood there?

A.    Yes, sir. That's correct.

MR. FIELDS:    Pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.    Sir, how long have you been in this business?

A.    I've been an investigator for the police department for 31 years.

Q.    How long does it take to process a car?

A.    An average of six to eight hours.

Q.    And, sir, is -- what you're looking for inside a vehicle is essentially what's called trace evidence, correct?

A.    That's correct.

Q.    And the reason it's called trace evidence, it's not visible to the naked eye most times?

$IR. EDWARD LEE OUTLEY III "TRAYBOY"

MR. SCOTT PETERSON

RE: IN SUPORT OF SHERMAN FEELOS. AS TO ANY UNKNOWN STATEMENTS THAT YOU HAVE. UPOSELY BEN WRITEN BY ME. "$IR. EDWARD LEE OUTLEY III "TRAY BOY" * * *

DEAR SCOTT,

I AM WRITING YOU TODAY CONCERNING THESE UNKNOWN STATEMENTS. THAT YOU HAVE AND I SUPOSELY HAVE WRITEN. SHERMAN FEELOS IS TELLING ME THAT YOU HAVE SOME STATEMENTS THAT I WROTE. I HAVE NOT WROTE ONE STATEMENT ON SHERMAN FEELOS. I WROTE A STATEMENT CLEARING MY NAME FROM ANY AND ALL CHARGES PENDING ME. I DID NOT DO NO WRONG. AND I WAS NOT GONE SIT BACK AND NOT CLEAR MYSELF. THEY SAID THAT I GAVE SHERMAN A FIREARM. BUT THATS A LIE THAT I REFUSED TO TESTIFY TO. I DID NOT GIVE SHERMAN ANY THING. SHERMAN ALSO WANTED YOU TO GET A COPY OF SHALALIKEA SCROGGIN'S LETTER FROM ME. IT'S A LETTER THAT'S IN MY FILE STATING THAT THEY WANT ONE OF US TO SAY WE WAS WITH SHERMAN. MR. SCOTT, I WAS NOT WITH SHERMAN, I DID NOT GIVE SHERMAN ANY THING. AND THEY GAVE ME EIGHT YEARS BECAUSE I WOULD NOT LIE SAYING THAT I DID. I COULD HAVE GOT A SKI BUT I DIDN'T GIVE SHERMAN ANY THING AND DON'T NEED NO TIME CUT. I'M NOT SURE REATHER ARE NOT I'LL HAVE TO TESTIFY AT SHERMAN'S TRIAL. BUT I DO KNOW THAT ALL THE STATEMENT YOU HAVE. WERE NOT WRITEN BY ME, AND I'M NOT GONE LIE ON SHERMAN. * * *

CC: 10/20/02

SINCERELY,
$IR. Edward Lee Outley III "TrayBoy"
$IR. EDWARD LEE OUTLEY III "TRAY BOY"
$IR. Edward Lee Outley III

SHERMAN L. FEELOS

10-21-02

JEREMY GLOER
NOTARY-PUBLIC
State of Texas
Comm. Exp: 05-08-2006

Cross-Examination of Shaylakea Scroggins by Mr. Fields-1626

MR. SNYDER: Your Honor, I object to that question unless he can show some basis on how this witness would know what someone else did.

THE COURT: Sustain the objection.

(Conference between Mr. Peterson and Mr. Fields)

BY MR. FIELDS:

Q.   Do you recall on November the 5th, 2001 the phone company calling you while me and Shining Star was on the other end of the line?

A.   Yes.

Q.   And isn't it true that Star told the phone company that you, whom was my ex-girlfriend, went and got your phone cut on in my name and you calling her house threatening her?

MR. SNYDER: Your Honor, Your Honor, I object. First of all, this is hearsay, and, second of all, he's simply testifying under the guise of asking a question.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q.   Ms. Scroggins, did the phone company cut your phone off?

A.   No, sir. They didn't.

Q.   They didn't?

A.   No.

Q.   On November the 5th?

A.   No. They didn't.

APP -18

2002 15:48    2547755781    EXECUTIVE SUITES    PAGE 17

Song: I don't mean i L
Artist: R. kelly

Hey Sweetie,                              7-7-02
            By the time my notation arrives
I hope you are in the very best of health.
Before I even get into this letter. I know
I tripped out. I really didn't think I would
fuck the shit up for real. Baby, I'm sorry I hope
you can forgive me. Baby it's just that.
Now that were back together, I'm not taking
any chances on someone trying to take you
from me. I've been through this twice. I will
not let it happen to me again. So please
understand why I don't want you talking to
anyone. Sherron finds... I LOVE you baby.
I do. I really don't want to lose you. I hope
that this time its just me & you. Baby
Please don't go talk to anyone because
I did that. When you get your and
call me, I'm not going to mess it up. Baby
these 2 days I've missed your voice. I really
feel bad for what I did. Baby, I'm
sorry. I love you baby. I hope we can work
this out. I know you still love and g.A.
I can't why you didn't take the call me.
Anyway, Baby, I was real upset, Because
I saw myself loosing you again. I ...
I ... T ...

002  15:48   2547765781        EXECUTIVE SUITES              PAGE  13

happen again I told you I'm killing bitches. So, I hope your ready for it. to be me & you baby. Thats the way it should be. I love you. I did know if you love me like I love you. We need to try to regain that life. I really want to be with you fucking long. I think of you constantly, now and I th& hurt you. Its killing me on the inside. I know I need to hear your voice. Baby I need you. I'm not going to give up until I have you. Sherman, You are my world baby. It's always been like that. I stop being with you because, the way you was handling things. When I seen that someone get over you I was glad that it wasn't too late for us. See baby, its just the beginning for us. When we brought it was the end. I love you baby, with all my heart & soul. Whatever it takes to make things up with you I'm willing to do. I'm getting ready to go with Ostarted Monday. 3-11pm. So when you can call, call before 3pm. Please don't be mad baby. I Love you baby more than anything in the world. I will I meant you a letter from. I'm want going

82   16:49    253/7567BL                    EXECUTIVE SUITES                    PAGE   19

to write you. I miss your voice. Baby,
I promise to do things better than I was.
I Just have to trust you again. It's hard.
when I've betrayed me before I've been
trying before all this happen, it wasn't that
hard to trust you. I am trying baby. I do
love you baby. I miss you with all my heart.
know and forever baby I will always

- Your

— Me: Shadalloo.
Tickles.

Song: I don't mean it
Artist: R-Kelly

Hey Sweetie,                                    7-7-01

By the time my notation arrives I hope you are in the very best of health. Before I even get into this letter, I know I tripped out. I really didn't think I would fuck the card up forreal. Baby, I'm sorry. I hope you can forgive me. Baby it's just that now that we're back together, I'm not taking any chances on someone trying to take you from me. I've been through that once. I will not let it happen to me again. So please understand why I don't want you talking to anyone. Sherman Fields...I love you baby. I do. I really don't want to lose you. I hope that this time it's just me and you. Baby please don't go talk to anyone because I did that. When you get your card call me. I'm not going to mess it up. Baby these two days I've missed your voice. I really feel bad for what I did. Baby, I'm sorry. I love you baby. I hope we can work this out. I know you still call that girl. I don't know why you didn't have her call me. Anyway, baby, I was real upset because I saw myself losing you again. I let it happen the First time, I'm not going to let it happen again. I told you, I'm killing bitches. So I hope you're ready for it to be me and you baby. That's the way it should be. I love you. I don't know if you love me like I love you. We need to try to regain that love. I really want to be with you. All day long I think of you constantly. Now that I've hurt you, it's killing me on the inside. I know I need to hear your voice. Baby I need you. I'm not going to give up until I have you. Sherman, you are my world baby. It's always been like that. I stop being with you because of the way you were handling things. Then I seen that I couldn't get over you. I was glad that it wasn't too late for us. See baby, it's

just the beginning for us, when we thought it was the end. I love you baby with all my heart and soul. Whatever it take to make things up with you I'm willing to do. I'm getting ready to go to work. I started Monday 3-11 pm. So when you do call, call before 3 pm. Please don't be mad baby. I love you baby. More than anything in the world. I'm mad I haven't got a letter from you. I wasn't going to write you. I missed your voice. Baby, I promise to do things better than I was. I just have to trust you again. It's hard when you betrayed me before. I've been trying, before all this happened it wasn't that hard to trust you. I am trying baby. I do love you baby. I miss you with all my heart. Know that Forever baby, I will always.

Love,

Mrs. Shalaykea

Fields.

Mg. Incomplete
Artist Signo

Hey my precious prince!    7-9-03

I'm glad to hear you calmed
down. I know I said some pretty fple snit the
other day. Something I know I but you. I didn't mean
it baby. I was relieved to get this letter from you.
I was glad to receive it. You made me feel so
better on the inside. I was so afraid of you doing
something to get back at me. I am sorry. You better call
me. I'm not going to fuck off my money! Baby, I
did trip out starting that same shit again I promise
I'm not going to fuck with anyone I haven't even been
to kitchen. From now on, I'm not going to telling
more lies. You say you through and you better be.
You need to find somebody to get that shit off
you. I'm going to get your name on my neck when
I get paid. Next Monday. So you need to make some-
arrangement for that. You are going to be my husband-
I'm getting your name ASAP. On my neck. Mrs Sherman,
Abella. So if you doing with me stop I don't want
to make any more mistakes. I already told you like
some body get you over. but never again will
I. I love you with all my heart + soul. So
Please baby let's do this, me + you. I miss you baby,
I know I had to control my temper. But I love
so much. Shit. Stop by me, not knowing about.
it. That not going to happen again. Everybody
say I'm stupid behind You going to be whole
girl. But I hope we make them out of liar.
I want you. I tell you "And I'm stopped it" You
know it's like addiction. You haven't seen nothing
yet I can begin to explain how crazy I love you.
Baby now, I haven't been doing anything but trying

! Always 3 Days

Sherman + Shabrika Abella

but trying to see how we gone do this. I know a lot of people. You have my all. Should not <u>not fuck over me Sherman</u>, we are so much friend within that last year. All I have been is good. Because a few misdemeanor was mistake. I never cheated on you. Not once. So baby please take this & run with it. I will show you a better person. I love you. I don't like fighting Either. We need to start working on the future. What we can do to make things better. I was tripping baby. I'm ready now. I know where my heart is. I will be waiting for you <u>Faithfully</u>. Everything I've done, I told you. That's also real. <u>I just hope I hope you love me & want to be with me like you say. I will be so heart broken. So please don't fuck over me.</u> Baby today is thursday I can't wait to talk to you in the morning. So I can tell you how sorry I am, How much I will you tried to stop being so damn insecure. It hard. <u>You got Tatas & shit.</u> Baby that hurts me. & I see that I will break down. How could you do that to me. I really don't want to get your name I because you hurt me. That's why. You never tried it off. Real soon. You have to act something. <u>Baby, I want to marry you.</u> I'm ready to be Mrs. Ticlas. On my <u>work badge I say Erika Ticlas. I like them I was married</u>. Baby you are my everything. We've been through so much Still. I'm glad it is over. Now we can relax. Would on getting there faithfully. When you come home I will make it all up to you I promise you that I will be the best mother to my kids. One great wife to you. We will do things

a little different than the rest. I love you always Sherman. loves the hell out of you, baby. I hope to see you real soon. Call me back. Until next time. Stay strong. Everest. You will be in all my prayers. Signed.

Your wife

Shalayea Taylor

I love you

Shalayea
Hugs & kisses

I love you

Sherman

Forever and always
Until again as
we apart

Bye- Bye
Baby

P.S. I love you, I could never tell you too much. I love you. I miss you so so much. Hurry up and come home baby. I need you.

Song: Incomplete
Artist: Sisqo

Hey my precious prince!                                    7-9-01

        I'm glad to hear you calmed down. I know I said
some pretty file shit the other day. Somethings I know I hurt you. I didn't
mean it baby. I was relieved to get this letter from you. [I was glad to
receive it]. You made me feel so better on the inside. I was so afraid of
you doing something to get back at me. I am sorry. You better call me. I'm
not going to fuck off my money! Baby, I did tripout starting that same
shit again. I promise I'm not going to fuck with anyone. I haven't even
been to Killeen. From now on I'm not going to tell no more lies. You say
you through and you better be. You need to find somebody to get that shit
off you. I'm going to get your name on my neck when I get paid. Next
Monday. So you need to make some arrangement for that. You are going to
be my husband. I'm getting your name ASAP on my neck, Mrs. Sherman Fields.
So if you playing with me, stop. I don't want to make any more mistakes.
I already told you, I let somebody get you once, but never again will I.
I love you with all my heart and soul. So please baby, let's do this, me and
you. I miss you baby. I know I need to control my temper. But I let so
much shit slip by me, not knowing about it. It's not going to happen
again. Everybody say I'm stupid because you going to be with ole girl.
But I hope we make them out of a lie. I want you. I have you. " Ain't
no stopping it!" Yea, I know it's like obsession. You haven't seen
nothing yet. I can't begin to explain how deeply I love you. Baby now,
I haven't been doing anything but trying but trying to see how we gone
do this. I know as of today you have my all. That's real. Don't fuck over
me Sherman. I've done so much for you within this last year. All I have
been is good. Besides a few misdemeanor ass mistakes. I never cheated
on you. Not once. So baby please take this and run with it. I will show
you a better person. I love you. I don't like fighting either. We need

to start working on the future. What we can do to make things better.
I was tripping baby. I'm ready now. I know where my heart is. I will be
waiting for you <u>Faithfully</u>. Everything I've done, I told you. That's also
real. I just hope hope you love me & want to be with me like you say. I'll
be so heartbroken. So please don't fuck over me. Baby today is Thursday
I can't wait to talk to you in the morning. So I can tell you how sorry I
am, How much I love you. I need to stop being so damn insecure. It's
hard. You got tatoos & shit. Baby that hurts me. If I see that I will
break down. How could you do that to me. I really don't want to get your
name because you have that. That's why you need that off. Real soon. You
have to do something. Baby I need to marry you. I'm ready to be Mrs.
Fields. On my work badge it say Lakie Fields, I told them I was married.
Baby you are my everything. We've been through so much shit. I'm glad
it's over. Now we can relax. Wait on each other Faithfully. When you
come home I will make it all up to you. I promise you that. I will be
the best mother to our kids, the best wife to you. We will do things a
little different than the last. I love you always Sherman. I miss the
hell out of you, baby. I hope to see you real soon. Call me boo! Until
next time stay strong & sweet. You will be in all my prayers sweetie.

Your Wife

Shalaykea Fields



Love You

Shalaykea

Hugs & kisses &

Lots of
Love

Sherman

Forever and always
until death do
us apart

Bye-Bye

Baby

P.S. I love you, I can't never tell you to much. I love you
I miss you so so so much. Hurry up and come home baby I need you.

knew that that was done then.

And the other question concerns what the Court would require in the way of information to issue a writ of attachment or a material witness warrant for a witness that -- I've been advised by -- Mr. Youngblood, who's in the courtroom, has told him one story and the government gave the name of this witness as Brady material and said that she knew something exculpatory. He went back to her. She then admitted to the investigator she told him a lie and that the truth was she didn't have exculpatory information. She told him that, but then she said, "I'm not talking to you. I'm not going to accept any subpoenas. I'm not coming to court." And he's tried to serve her now four or five times. And we just need to know what the Court would need in order to issue a writ of attachment for that witness if we're unable to get her in otherwise.

THE COURT: Can you enlighten me somewhat on what her testimony might be?

MR. PETERSON: Yes, sir. Her testimony is going to be that one of the star government witnesses in this case, Shalaykea Scroggins, had a heated exchange in words and a motive to have done harm to the victim in this case. And the defense -- one of the defenses in this case is -- or in Mr. Fields' defense if he represents himself and part of our defense is going to be that he did not commit the murder that he's been alleged of but Shalaykea Scroggins did do so because

of the motive of the ill will she bore towards the victim because they were competitors for Mr. Fields' attention or affection.

THE COURT: Okay. Is her location something that should be -- could she be readily located by the marshals?

MR. PETERSON: If I may ask Mr. Youngblood to respond to that.

THE COURT: Sure.

MR. PETERSON: Mr. Youngblood, if you'd step forward.

MR. YOUNGBLOOD: Your Honor, she has a current City of Waco address, 2513 South 26th Street. I've made contact with her in the past at that location. I talked to a black male at that residence yesterday who indicated that that was her residence and she contacted me as per a business card I gave her. Also I spoke with her mother last night at that location indicating that she did live there but she was not going to be there yesterday evening.

THE COURT: So you've spoken to her on the telephone but not in person?

MR. YOUNGBLOOD: Not in person at this time.

MR. PETERSON: In the past he has.

MR. YOUNGBLOOD: In the past I've spoken to her in person.

THE COURT: Well, I don't understand why you don't think that she could be served with a subpoena at some point between now and the time she'd be needed, which wouldn't be next week,

I wouldn't think.

MR. YOUNGBLOOD: Well, the only thing she's indicated she's not going to be here and she's not going to accept and she's going to be --

THE COURT: Well, I don't know what you mean by "accept."

MR. YOUNGBLOOD: Well --

THE COURT: If she's served with a subpoena, she's served with a subpoena. She doesn't have an option to accept it or not, if I'm correct.

MR. YOUNGBLOOD: That's true, sir, but her appearance --

THE COURT: So you're saying she's not going to comply with it?

MR. YOUNGBLOOD: That's my belief that she will not comply with it.

MR. PETERSON: Your Honor, if I may.

THE COURT: Thank you, Mr. Youngblood.

MR. YOUNGBLOOD: Okay.

MR. PETERSON: Our intent was to ask Mr. Youngblood to continue to serve her. Then after she's served if she didn't appear as instructed in the subpoena that then we would then come to the Court and request the writ of attachment and I wanted to bring this to the Court's attention that it was an issue.

THE COURT: Well, doing it in that course of events would be completely normal. If somebody doesn't comply with a

present at the time and also a gentleman that was asleep named Cream which was the actual father of the child that Suncerey had just had.

Q.  And that child was premature and was in the hospital?

A.  Yes, sir, and she was taking -- she was there taking classes for post-natal care for -- for a premature child --

Q.  Okay.

A.  -- and he came in.  He picks up Cream's cell phone -- cellular phone and starting scrolling through the numbers and -- and at this time became very irate told her that he needed to talk to her outside, which she did leave with him.  At this time Taniesha Hillard also realized that Suncerey had money that belonged to her that was in -- in her pocket, and she wanted it back.

Q.  In Suncerey's pocket?

A.  Yes, sir, so she went down in -- into the lobby and -- and called them, and she was able to get her money back, and at this time Suncerey and -- and Fields left in the red Grand Am.

During this time my -- my agency -- several agencies was -- was already notified of the escape.  The original -- actual original report was

phone call to the room. He comes back and enters the hospital and goes into the actual room where they are in the IC -- neonatal ward, I think, on the third floor.

In the room is the father of this infant. He is asleep on the bed in the hospital. It's one of these rooms where families can stay. Also in the room is a lady by the name of Taniesha Hillard. She is a relative of Fields, third or fourth cousin down the line. She, coincidentally, also is an employee of the Civogenics jail, the downtown detention facility, who according to her report to us was on maternity leave at if time. She's in the room, and then, of course, you have Suncerey Coleman, a/k/a "Shining Star," in the room.

The father of the baby, a/k/a -- his nick -- his street name is "Cream." I believe his first -- oh, God, I forgot his first name now. Anyway, he is on the bed asleep. Sherman Fields goes into the room, looks at his cell phone, apparently sees numbers on the man's cell phone that he recognizes, becomes apparently, according to -- according to Ms. Hillard, angry. He and Suncerey Coleman leave the room to get --

Q. Mr. Fields and --

Cross-Examination of Tanesha Hilliard by Mr. Fields—1350

A. No.

Q. Have you ever known me to act violent towards Shining Star?

A. No.

Q. Was I upset when I came to the hospital either the first time or the second time?

A. No.

Q. Have you ever heard me say that I thought Star's baby was mine?

A. No.

Q. Isn't it true that I knew Star's baby was by Cream?

A. Yes.

Q. Ms. Hilliard, do you know why Star's baby was born premature?

A. No.

Q. Isn't it true that Star drunk liquor and vinegar in an attempt to abort --

MR. GLOFF: I'm going to object to that. That's irrelevant. She said she didn't know.

THE COURT: Sustained.

BY MR. FIELDS:

Q. Ms. Hilliard, isn't it true that Star and I made jokes about the issue -- the whole issue of her and Cream?

A. I don't know.

Q. Do you remember Star making a statement, quote, "I

A   Uh-huh.

Q   You said in your grand jury statement first when I came to the hospital me and Shining Star was -- well, I'm going to quote you.  You say, first him and Suncerey was talking.  She sat --

MR. GLOFF:  Your Honor, I object to him reading from a document.  Is he trying to impeach the witness?

THE COURT:  Sustain the objection.

You can't read from a document that's not in evidence, Mr. Fields.

BY MR. FIELDS:

Q   Isn't it true that Star and I was hugging and kissing in the car?

A   Yeah.

MR. FIELDS:  I have no further questions, Your Honor.

MR. GLOFF:  I have just a couple of questions.

REDIRECT EXAMINATION

BY MR. GLOFF:

Q   Number one, you just said that in response to one of Mr. Fields' questions that he was playing a game between them.  Explain to the jury what kind of game he was playing with them.

A   He would like -- okay.  He'll tell Suncerey that he don't talk to Shalaykea or he'll tell Shalaykea he don't talk to Suncerey, but then they both -- on his visiting list they both go see him.  I mean, that's a game to me.  Talking to both

of him and not calling the police right away?

THE WITNESS:  I can't tell you what went through her head.

GRAND JUROR:  I don't understand, I guess.

GRAND JUROR:  Yeah, that's the same with "Lakie."  "Lakie" says he sits there and tells her in the motel room that one of the bullets is for her, and then he goes back and picks her up, and she spends the night with him.  It doesn't make a whole lot of sense.

THE GRAND JURY FOREMAN:  And the first time he came to kill her and then backed out.

GRAND JUROR:  "If he can escape from a federal prison, he can get to me and kill me."

MR. GLOFF:  And there's -- there's --

Q.   (BY MR. GLOFF)  Did Tanesha Hilliard make any type of claim that she made any type of phone calls to try and find out whether or not he had actually escaped or whether or not he was on -- out on bond or something like that?

A.   Yes.  She did make calls down to CiviGenics, she said, to see because she couldn't believe it herself when she saw him at the hospital.

Q.   And did she get any kind of straight answer?

A.   No, at the time.

THE REPORTER:  I -- I need paper.

MR. GLOFF:  Oh, go ahead.

CASE# 01-8754
DATE 11-26-01    PAGE 2 OF 5

STATEMENT OF:

Sherman was becoming impaitent. So He had me call Trayboy again. I called and told Trayboy that Sherman said to hurry. Trayboy said, to tell Sherman He was getting him some food becaus He thought he might be hungry. So I hung up. I told Sherman. About 5 minutes later Tray boy pulled up with Renee Hampton in the car with him. They had McDonalds sacks in there hand. We all went into the room. I noticed Sherman had a change of clothing in his hand + a small silver hand gun. He was messing with the bullets. I told him I was ready to go. He said O.K. As soon As Trayboy take him to get another car He would come back and get me. So me + Sherman got back in the car. Trayboy + Renee got back in theres. We was sappose to follow them to renee's apartment in the villages on 12th street. Instead Sherman let me out on 9th + he left. about 3 minutes after that Trayboy pulled up + ask where was Sherman. I replied "I don't know I though he was with you. Tray boy said, I'm going to see if I can find him, I will call you later. I went into my sisters house. She had told me that she was glad to see me. I walked to the store around the corner

WITNESS: _____          Shalaykea Scoggins
WITNESS: _____                    SIGNATURE

FIELDS 014216

CASE# 01-8754
DATE 11-24-01          PAGE 3 OF 9

STATEMENT OF:

To get something to drink + a box of Black & mils. When I came back my sister told me. Trayboy called and said he couldn't find Sherman. He hope he didn't do what he said he was going to do. My sister (Snekie) said that Sherman told Trayboy He was going to fuck Shining star off. Trayboy didn't want her too tell me. So I didn't ask him about it. About 1:30 a.m Sherman called me from the motel we were at earlier. I asked him where had he been, he said just riding. While we were talking I heard him or something scraping. I ask what it was, but he said he don't know what I was talking about. He told me he was going to go get Trayboy so He can drop us back off at the room. So about 20 minutes later they picked me up. I noticed Sherman was dressed different. He had on a different shirt pants. The same orange & white shoes. When we got out. Trayboy named Sherman #50. That was to check in the room again the next day. So we went in the room. He took a shower and Got in the bed. He ask me if I would put those shoes in the trash. The orange shoes. He had some more. some black ones. I threw them away + dubie sacked the clothes he had put in the trash. left them siding where the room service lady would get them.

WITNESS: _____          Shabouljea Scraggins
WITNESS: _____                    SIGNATURE

FIELDS 014217

Case: 19-1708    Document: 1-1    Filed: 04/15/2019    Pages: 155

Q.  And where did he tell you he was going?

A.  He was supposed to follow behind --

Q.  To trade cars?

A.  -- Trey Boy.  Yeah, I was just getting out. You know, he was still following, and I told him to go ahead and let me out and --

Q.  Now about what -- what time is this taking place?

A.  This about --

Q.  Are we at eleven o'clock yet?

A.  Yeah, right at 11:00.

Q.  Okay.

A.  Probably right at 11:00.

Q.  So he dropped you off, and where do you go?

A.  And I went to my apartment --

Q.  Okay.

A.  -- and I stayed there for about five minutes and -- no, probably about ten, and Trey Boy came and knocked on my door.  He asked me, "Where did Sherman go," and I said, "I don't know where he went; he was supposed to follow behind you."  He was like, "Well, I don't know where he at," and I was like, "Well, I don't know where he at because" -- you know, and I was like -- so he told me that he was going to go over to his house -- to his apartment with my sister, and if I

Shalaykea Scroggins Grand Jury testimony.

heard from him or if he came by to call him and let him know --

Q. Okay.

A. -- so this is like 11:00, and I -- I went to my sister's apartment, and I --

Q. To Sheekie's?

A. Yeah, to Sheekie's, and I went to sleep. I got a phone call. It was Sherman about probably 1:00, maybe 2:00. I'm not exact of the time.

Q. Sometime between 1:00 and 2:00 in the morning?

A. Between 1:00 and 2:00, and he called from the New Road Inn, and he asked me what was I doing, and, you know, I was like, "What are you doing," and he was scraping on something in the background. I don't know what it was, but I just keep hearing a scraping sound, and I asked myself, "What is you doing, are you scraping on" -- "it sounds like you're scraping something." He was like, "Girl, I don't know what you're taking about; I'm not scraping nothing, so it must be on your" -- "your phone line," and I was like, "No, you're scraping something, or you're bothering something." He didn't say nothing, and I was like, "Well, where have you been," and he say he rode around -- he had to go hit a lick. He hit a lick. That's how he used it.

A.    Yes.    That was right after he got out.    As soon as we left Alberta's apartment, he called Suncerey Coleman, Shining Star, on my cell phone when we was on our way to Proctor to tell her that he would be out there in about ten minutes, for her to come outside.    He'll be out there to pick her up and talk to her in about ten minutes.

Q.    Did you go to the hospital?

A.    No, sir.

Q.    Not only then, but any time that night did you go to the Hillcrest Hospital?

A.    No, sir.

Q.    Let's go back to the motel for a minute.    After you left the motel, who was in the car and who was following whom?

A.    After we left the motel, we wasn't really following one another then.    I got in the Jaguar.    Me and Alberta Hampton got in the Jaguar and left and him and Shalaykea had got in the Grand AM and left.

Q.    And where did you go?

A.    I went and took Alberta back to the house and basically was working off my phone going to some of my customers selling crack bites.

Q.    You were selling crack?

A.    Yes, sir.

Q.    And also, sir, is -- you also work, if you will, with

# :LENNAN COUNTY SHERIFF'S OFFICE
# )LLOW-UP REPORT

| | | |
|---|---|---|
| Case No. | 01-8754 | |
| Report No. | 01-8754.28 | |
| :eport Date: | 11/29/01 | |

MCLENNAN COUNTY
SHERIFF'S OFFICE
219 N 6TH
WACO, TX 76701
254 757-5108

**1**

Page 1 of 1

| | | | | |
|---|---|---|---|---|
| Subject: | HOMICIDE | | | |
| Case Report Status | I - IN PROCESS | Date Entered | 11/29/01 9:27:59 AM | Reporting Officer |
| | | Entered By | 0023 - WILLIS, TAMMA | 1826 COLYER, MORRIS |
| Occurred On (and Between) | 11/21/01 5:22:00 PM | Date Verified Verified By | | |
| | | Date Approved | | |
| Location | JERICHO LANE (BETWEEN HILLIARD LN & ESTELLA LN) | Approved By | | Assisted By |
| Census/Geo Grid | G4 - GRID 4 | Connecting Cases Disposition | ACTIVE | |
| Call Source | OFFICE | Clearance Reason Date of Clearance | | |
| Vehicle Activity | | Reporting Agency | MCLENNAN COUNTY SHERIFF'S OFFICE | |
| Vehicle Traveling Cross Street | | Division Notified | CID | |
| Means | | | | |
| Other Means | | | | |
| Motive | | | | |
| Other Motives | | | | |

Report Narrative

ON 11-27-01, MYSELF AND DET. SPILLMAN DID GO TO HWY 6 JAIL TO SPEAK WITH EDWARD OUTLEY III, AKA TREY BOY. DET. SPILLMAN DID READ OUTLEY HIS MIRANDA WARNINGS AND WE DID BEGIN TO DISCUSS SHERMAN FIELDS.

DURING THE COURSE OF OUR DISCUSSION OUTLEY DID TELL US THAT HE RENTED A RED GRAND AM BELONGING TO ROGER THOMISON ON THE SAME EVENING FIELDS BROKE OUT OF THE CIVIGENICS JAIL AND ON THAT SAME EVENING OUTLEY TOLD US HE SAW FIELDS A COUPLE OF TIMES. OUTLEY SAID HE SAW FIELDS AT THE NEW ROAD INN WITH SHALAYKEA SCROGGINS. OUTLEY ALSO TOLD ME THAT WHEN THE RENT TIME WAS UP ON THE GRAND AM HE RENTED A BLUE JAGUAR AND GAVE THE KEYS TO THE GRAND AM TO ALVIN FIELDS, AKA BIRD, B/M, DOB 5-13-82.

AT THAT POINT I ASKED TREY BOY IF RENTED THE CAR FOR FIELDS AND HE SAID THAT WHEN HE GAVE THE KEYS TO BIRD HE KNEW THAT SHERMAN WOULD TAKE POSSESSION OF THE CAR AND THAT IS THE REASON HE GAVE THE KEYS TO BIRD.

I HAVE NO FURTHER INFORMATION.

## iffense Detail: 0911 - HOMICIDE - WILLFUL

| | | | | | |
|---|---|---|---|---|---|
| Offense Description | 0911 - HOMICIDE - WILLFUL | | | | |
| IBR Code | 09A - MURDER AND NONNEGLIGENT MANSLAUGHTER | Location | 13 - HIGHWAY/ROAD/ALLEY | | |
| IBR Group | A | Offense Completed? | YES | No. Prem. Entered | |
| Crime Against | PE | Hate/Bias | 88 - NONE (NO BIAS) | Entry Method | |
| Using | | Domestic Violence | NO | Type Security | |
| Criminal Activity | | | | Tools Used | |
| Weapons/Force | 95 - UNKNOWN | | | | |

Case 19-1708   Document 151   Filed 04/15/2019   Page 155

Ms. Scroggins, I'm not going to tell you again. When Mr. Snyder starts making an objection, you don't answer the question. You wait until I've ruled on it. Understand?

Go ahead, Mr. Fields.

BY MR. FIELDS:

Q. Ms. Scroggins, can we talk about this Jaguar for a moment? What color did you say it was?

A. Blue.

Q. It was blue?

A. Gray blue. Light blue.

Q. All right. Ms. Scroggins, how do you confuse blue with gold?

A. Gold?

Q. Yes, ma'am.

A. Where do gold come from?

Q. I'm just asking you, how do -- how do you confuse blue with gold?

MR. SNYDER: Your Honor, this -- this is not a proper question.

THE COURT: Sustain the objection.

BY MR. FIELDS:

Q. Ms. Scroggins, isn't it true that you, your sister and Outley conspired to intentionally change the color of the Jaguar because you knew if they found that Jaguar they would then find enough physical evidence to run forensic testing on?

| DEPARTMENT OF THE TREASURY<br>BUREAU OF ALCOHOL, TOBACCO AND FIREARMS<br>REPORT OF INVESTIGATION | Page 1 of 2 |
| --- | --- |

| ADDRESSED TO:<br>Special Agent in Charge<br>Houston Field Division | MONITORED INVESTIGATION INFORMATION:<br>Houston Field Division<br>FY-04<br>Report 020 |
| --- | --- |

**TITLE OF INVESTIGATION:**
FIELDS, Sherman Lamont

| CASE NUMBER:<br>782010-02-0042 | REPORT NUMBER:<br>20 |
| --- | --- |

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
| --- | --- | --- | --- |
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Douglas J. Kunze | SUBMITTED BY *(Title and Office)*<br>Special Agent, Waco Satellite Office | SUBMITTED BY *(Date)*<br>12/18/2003 |
| --- | --- | --- |
| REVIEWED BY *(Name)*<br>Mark W. Curtin | REVIEWED BY *(Title and Office)*<br>Resident Agent in Charge, Waco Satellite Office | REVIEWED BY *(Date)* |
| APPROVED BY *(Name)*<br>Donnie A. Carter | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Houston Field Division | APPROVED BY *(Date)* |

## DESCRIPTION OF ACTIVITY:

Interview of Lutrill Amos PAYNE.

## SYNOPSIS:

On October 28, 2003, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) Special Agent (S/A) Douglas J. Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, Texas in reference to this investigation.

## NARRATIVE:

1. On October 28, 2003, S/A Kunze interviewed Lutrill Amos PAYNE (DOB 9/14/70) at 6801 Sanger Avenue, Waco, TX.
2. S/A Kunze explained the reason for the interview with PAYNE was to determine if he owned a Jaguar vehicle and had rented it to anybody in the past. PAYNE was also asked if he remembered renting any motel rooms for an individual in the past.
3. PAYNE stated that he did remember an incident because that was the only time he remembered renting a motel room. It was either in the spring or fall between 1999 and 2001.
4. At the time, he was going to a house at 4th and Proctor in Waco. It was a drug house and the "house guy" (lived in the house) was named Walter Last Name Unknown (LNU). PAYNE described Walter as a black male, 40s to 50s, approximately 5'9" tall, weighing about 180 pounds with a mustache or goatee.
5. PAYNE believed Walter's last known address to be a house on 13th or 14th behind West Elementary School in Waco. Walter was the 'house man' there as PAYNE bought 'crack cocaine' there in the recent past.

TF EF 3120.2 (5-98)

| DEPARTMENT OF THE TREASURY BUREAU OF ALCOHOL, TOBACCO AND FIREARMS REPORT OF INVESTIGATION | Page 2 of 2 |
|---|---|

| DRESSED TO: ecial Agent in Charge uston Field Division | MONITORED INVESTIGATION INFORMATION: Houston Field Division FY-04 Report 020 |
|---|---|

TITLE OF INVESTIGATION:
FIELDS, Sherman Lamont

| CASE NUMBER: 782010-02-0042 | REPORT NUMBER: 20 |
|---|---|

6. When asked how recent, PAYNE stated that he did not want to answer that because he was on State probation and under a motion to revoke from Bell County, TX. PAYNE said he was on probation for burglary of vehicle in Killeen, TX.

7. PAYNE explained that the 'house man' was paid a small amount of money or drugs for allowing the drug dealers to use their house.

8. PAYNE stated that he remembered buying a large amount of 'crack' and renting his Gold Jaguar to a 'crack' dealer. He described the dealer as a black male, under 30 years of age, 5'8" to 6'0", medium afro hair, dark skin, weighing 175-180 pounds. He did not know the dealer's name or street name as he bought from whoever was dealing at the house at the time.

9. He said he never got anything for the car rental because the dealer was supposed to come by later and never showed up. The dealer asked if PAYNE would rent a motel room in his (PAYNE's) name. PAYNE stated that he went with the guy to a nicer, cheap motel on Interstate 35 in Waco. The guy gave PAYNE money for one (1) night and PAYNE rented the room in his name.

10. PAYNE went back to Proctor with the guy and let the guy take his Jaguar. PAYNE believed that an hour or so later another guy came up to him at the house on Proctor. PAYNE was not sure but the guy may have been Walter. The guy said to walk down two blocks to another house. He said another hour or so after that a black male brought his Jaguar back. PAYNE did not believe it was the same guy he originally rented the Jaguar to earlier.

11. S/A Kunze told PAYNE that this interview was related to the investigation of Sherman FIELDS. When asked if he had any further information about FIELDS, PAYNE said he had a conversation with a Marvin POWELL in the McLennan County Jail about September 2003.

12. POWELL told PAYNE that he saw FIELDS during the time he had escaped. POWELL supposedly gave FIELDS $100 and went for a ride with him. POWELL had a firearm in the car and FIELDS took the firearm when the Waco PD chased them.

ATF EF 3120.2 (5-98)

Direct Examination of Lutrill Payne by Mr. Fields——1936—

MR. GLOFF: Nothing further, Your Honor.

THE COURT: You may step down.

MR. FIELDS: The defense calls Mr. William Young.

(Conference between Mr. Fields and Mr. Swanton)

MR. FIELDS: Your Honor, can they stop him from getting that witness because one of our other witnesses is back.

THE COURT: Which one do you want?

MR. FIELDS: The one out there first.

THE COURT: Who's that?

MR. FIELDS: The defense calls Mr. Lutrill Payne.

(The witness was sworn)

DIRECT EXAMINATION

BY MR. FIELDS:

Q. Mr. Payne, would you state your name and spell it for the court reporter?

A. Lutrill Payne, L-u-t-r-i-l-l, Payne, P-a-y-n-e.

Q. Mr. Payne, I want to direct your attention to the night of November the 6th, 2001. Do you recall renting your car out to an individual?

A. Sir, at that particular time I was a drug user. A lot I don't recall. Particular nights are fuzzy with me.

Q. But you do rent your car out, correct?

A. I have done that before, sir.

Q. Mr. Payne, what color is your car?

A. It's a Jaguar, gold, sir.

Cross-Examination of Lutrill Payne by Mr. Snyder——1937—

Q.    It's a gold Jaguar?

MR. FIELDS:   I pass the witness, Your Honor.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.    Did your daddy used to have a Jaguar?

A.    Yes, sir.

Q.    What color was it?

A.    Blue.

MR. SNYDER:  Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, do you also rent your daddy's Jaguar out?

A.    Sir, my father was killed in 1998 in his Jaguar.

Q.    And the Jaguar was totaled or something?

A.    Sir, he was killed in that car and that car was totalled.

Q.    So on November 2001 you only had the gold Jaguar correct?

A.    Yes, sir.

MR. FIELDS:  I have no further questions.

RECROSS-EXAMINATION

BY MR. SNYDER:

Q.    But a lot of people knew and saw you in the blue Jaguar, right?

A.    No, sir.

Recross-Examination of Lutrill Payne by Mr. Snyder——1938

Q.    But people had seen it, correct?  You were living with your parents?

A.    Yes, sir.

Q.    And people had seen it?

A.    People may.  Sir, my father had the car for a short time before he was killed in it.

Q.    And, oh, by the way, is -- it was the government that tracked you down, correct, and first came and talked to you about this?

A.    Yes, sir.

MR. SNYDER:  Nothing further.

THE COURT:  You may step down, sir.

MR. FIELDS:  Your Honor, can I ask him one more question?

THE COURT:  All right.

FURTHER REDIRECT EXAMINATION

BY MR. FIELDS:

Q.    Mr. Payne, when the government tracked you down, wasn't it because they got your name off a ledger at a motel?

MR. SNYDER:  Your Honor, not only is that argumentative, but that is just blatantly false.

THE COURT:  It's argumentative.  Sustained.

MR. FIELDS:  I have no further questions, Your Honor.

THE COURT:  You may step down, sir.

THE WITNESS:  Thank you, sir.

MR. FIELDS:  The defense calls Mr. William Young.

SCOTT PETERSON
ATTORNEY AT LAW

BOARD CERTIFIED, CRIMINAL LAW
TEXAS BOARD OF LEGAL SPECIALIZATION
STATE BAR OF TEXAS

1701 AUSTIN AVENUE
WACO, TEXAS 76701-1741

TELEPHONE (254) 753-3100
TELEFAX (254) 753-5122

February 28, 2002

Sherman Lamont Fields
McLennan County Jail
3201 E. Highway 6
Waco, Texas 76705

RE:    State of Texas v. Sherman Lamont Fields
       Case No. 2002-0050-C

       U.S.A. vs. Sherman Lamont Fields
       Case No. W-01-CR-114

Dear Mr. Fields:

Enclosed is a copy of the state district court's notice that your aggravated assault case has been set for trial on *Monday, May 20, 2002 at 9:00 a.m.* I spoke with the prosecutor about this case to see if he still planned to take it to trial but he was non-committal. I have learned that LaDon King is in prison and they know he is not a very credible witness against you. I must, however, continue to treat the charges against you seriously as the state has other witnesses and the case is set for trial.

With regard to your federal charges, both the escape case and the felon in possession of ammunition and firearm cases are set for trial on *Monday, March 25, 2002 at 9:00 a.m.* The last time we spoke you indicated that you wanted a trail on each case so I have not requested that your cases be removed from the trial docket to the plea docket.

Please recall that both the state and federal prosecutors have mentioned to me that you may be indicted for carjacking and for murder or capital murder. They are unwilling to make any kind of deal on all of these cases at this time, but they are still interested in talking to you. They just are not willing to make any deals. I do not see how talking to them could help you if you intend to go to trial and are not interested in making a deal. I have recently learned from a local attorney that they prosecution is seeking "jailhouse testimony" from certain individuals who you may have shared a cell with in the past. I know you are now in isolation but please do not talk about your cases with anyone.

I will be out of town next week but plan to visit you personally the week of March 11th.

Sincerely,

Scott Peterson

SP/jsp
Enc.

Direct Examination of Chance Alexander by Mr. Fields 1930

DIRECT EXAMINATION

BY MR. FIELDS:

Q. Mr. Alexander, --

A. Yeah.

Q. -- would you please state your name and spell it for the court reporter?

A. Chance Alexander, C-h-a-n-c-e A-l-e-x-a-n-d-e-r.

Q. Mr. Alexander, first, do you know who I am?

A. No.

Q. Mr. Alexander, at one point you went to the -- to law enforcement and told them that you had knowledge about this murder; am I correct?

A. No. They came to me and asked me did I know of him.

Q. Oh, they came to you?

And at this time did you tell them anything specific?

A. I told them -- they told me somebody knew about it. Somebody told me about it, that I was there with you talking to you.

Q. And did you tell them that you'll cooperate or something for a deal or something?

A. No. It wasn't -- it wasn't just like that, but they told me they'll let me out of jail if I -- they get me out of jail if I told them about you.

Q.   I don't know you at all.

Q.   But did you tell them you know me?

A.   Yeah.

Q.   And your purpose for telling them that you knew me was so that you could get out of jail; am I correct?

A.   Yeah.

Q.   And you're on the government's witness list; am I correct?

A.   I don't even what that is.

(Conference between Mr. Fields and Mr. Swanton)

BY MR. FIELDS:

Q.   But, Mr. Alexander, for some reason you didn't testify; am I correct?

A.   Say that again.

Q.   For some reason you chose not to testify; am I correct?

A.   I don't even understand what you're trying to say.

Q.   I'm saying for some reason did you choose not to testify against me for the prosecutors?

A.   Yeah.  I've been -- told them that I made that up.

Q.   That you made it up?

A.   Yeah.

MR. FIELDS:  I pass the witness, Your Honor.

CROSS-EXAMINATION

hand raise and he raised his hand like that.

Q.   Okay.

A.   And I ducked.

Q.   Did you hear anything?

A.   I heard a gunshot.  And then I saw him sped away in my car and he almost hit this girl and that's when I got up and ran across the street and all the people in the world showed up then.  Nobody was there when I needed them.

And then when I got across the street, there was Darrell Hodges that works in the warehouse.  I ran up there and I knew him so I hugged him and I just started crying.

Q.   Okay.  Do you know -- if he shot at you, did it hit the -- did the bullet hit something?

A.   No.

Q.   Any car windows?

A.   I think it was just air but I don't know what it hit, no.

Q.   How full was the parking lot?

A.   There was a lot of cars there because it was seven o'clock.  It was seven o'clock shift, you know.  You relieve the night shift.

Q.   Okay.  And so you said you went -- when you ran toward the trunk of your car.  Right?  Did you cross over

W A C O   POLICE   DEPARTMENT | SUPPLEMENT
WACO, TEXAS | Report

===========================================================================

Reported Date: 11/08/01  Time: 15:15          Case: 01-074130 (004)  Page: 1
Code: 580000 NO          Crime: INFO ONLY      Class: 580000
Occurrence Date: 11/08/01-          Day: THURSDAY -          Time: 15:15-
Status: CL  CLOSED                  Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                              RD:   104
        ESTELLA MAXEY APT. COMPLEX

========================= NARRATIVE =======================================

11/14/01 I was contacted by ID TECH SANDERS. He told me a car driven by
Sheriff's Department being a RED PONTIAC GRAND AM 2 DR, bearing TX LP#
92KRT was brought down to the laser lab to be processed. I was told DET.
NUARY was handling a missing person case in which he suspected foul
play. A request was made to attempt to find blood inside the vehicle.

In first examining the vehicle, the crime scope was used at setting 475.
Both the trunk area and the inside of the vehicle were viewed through the
crime scope. Some dull staining could be seen on the back left floor board
behind the driver's seat. I tested this one stain with TMB solution and I
did not get an immediate reaction indicating this was blood. However, this
piece of carpet will be taken and placed as evidence.          .....  ......

After viewing the entire inside of the vehicle for possible blood stains,
it was then fingerprinted. A total of 15 print cards were obtained. Print
cards numbered 1 through 11 will be given to JOANN GUERCIO in fingerprints
to view these prints and see if any of them are of AFIS quality or can be
matched to the suspect. Prints #12 through 15 will be attached to the
laser request form. These prints show very little ridge detail that I could
see that could be used to make an identification.

A trace lift was done of the front passenger's seat, the driver's seat and
the rear seat. Also, a vacuum was done of all the floor mats and also the
trunk carpet was taken for possible trace evidence. The following items
that will be placed in the property room will be:
      ONE PIECE OF CARPET FROM THE BACK LEFT FLOOR BOARD
      THREE TRACE LIFTS
      ONE VACUUM CANISTER WITH TRACE EVIDENCE FIBER
      ONE SACK CONTAINING CARPET FROM THE TRUNK AREA OF THIS PONTIAC

35mm photographs were taken of the outside and the inside of the vehicle.
This 35 mm film will also be turned in to the photo lab for processing if
needed at a later date.

===========================================================================
W A C O   Police Department                              First Page
===========================================================================
Reporting Officer: BLAIR J       Number: 000179  Date: 11/15/01  Time: 09:00
      Typed by: BROUSSARD        Number: 384     Date: 11/16/01  Time: 16:25
Approving Officer: BROUSSARD      Number: 000384  Date: 11/16/01  Time: 16:35

W A C O   POLICE   DEPARTMENT | SUPPLEMENT
WACO   TEXAS | Report

Reported Date: 11/08/01  Time: 15:15          Case: 01-074130 (002)  Page: 1
Code: 580000 NO          Crime: INFO ONLY  Class: 580000
Occurrence Date: 11/08/01-           Day: THURSDAY -              Time: 15:15-
Status: CL  CLOSED          Closing Officer: 000740 SPECIAL CRIME
Location: 1034 DELANO, WA                                    RD:  104
        ESTELLA MAXEY APT. COMPLEX

================== NARRATIVE ==============================================

11-15-01 I received eleven latent fingerprint cards from Laser lab
Detective Blair. On these cards there are twelve latent lifts. I find
sufficient quality of print for AFIS submission. Prints are of very good
the comparison quality.  Fingerprints remain on file in the AFIS Lab
til needed.

C.O   Police Department
                                                        First Page
================================================================
rting Officer: GUERCIO        Number: 000361  Date: 11/16/01  Time: 10:45
     Typed by: GUERCIO        Number: 361     Date: 11/16/01  Time: 10:43
ving Officer: MCELYEA M       Number: 000387  Date: 11/17/01  Time: 14:49

WACO POLICE DEPARTMENT
WACO TEXAS

SUPPLEMENT
Report

Reported Date: 11/08/01    Time: 15:15          Case: 01-074130 (005)  Page: 1
ce: 580000 NO        Crime: INFO ONLY    Class: 580000
currence Date: 11/08/01                Day: THURSDAY              Time: 15:15
tatus: CL CLOSED                  Closing Officer: 000740 SPECIAL CRIME
cation: 1034 DELANO, WA                                           RD:    104
         ESTELLA MAXEY APT. COMPLEX
=================== NARRATIVE ===================

11-15-01 after moving this red PONTIAC 2DR and releasing it to MCLENNAN
NTY SO, it was found that a large amount of dirt had fallen from inside
 fender wells of this PONTIAC, bearing TX plate F02KRT.  A dirt sample
s taken and will be placed in the property room, along with the other
dence.

O    Police Department

rting Officer: BLAIR J                                          First Page
    Typed by: MAUER        Number: 000179   Date: 11/15/01   Time: 11:00
ing Officer: MAUER        Number: 365      Date: 11/16/01   Time: 16:43
                          Number: 000365   Date: 11/16/01   Time: 16:45

Cross-Examination of Morris Colyer by Mr. Snyder    1924

MR. FIELDS: I have no further questions.

CROSS-EXAMINATION

BY MR. SNYDER:

Q.    Sir, Mr. Outley later furnished the name of the person he got the Jaguar from, did he not?

A.    Yes. He did.

Q.    And if you would, sir, is -- did you also track down the red two door car that was being driven that evening that had been rented by Edward Outley on the evening of November the 6th?

A.    Yes.

Q.    And you found the person he rented it from with only the name Roger, correct?

A.    Right.

Q.    And that was Roger Thomison?

A.    That's correct.

Q.    And you went out and looked at the vehicle and caused it to be processed; is that correct?

A.    Yes.

Q.    And that would have been on or about November the 14th, I think?

A.    Possibly. Yes.

Q.    And when you looked at the vehicle, did any -- the interior of the vehicle, did anything immediately strike you about it?

A. Well, it struck me how clean it was.

Q. And when you say clean it was, is —

A. It looked like it had been detailed, wiped down, however.

Q. And did it appear as though everything, the upholstery, the carpet?

A. The upholstery, the trunk area.

Q. And you submitted it for trace evidence, correct?

A. Yes.

Q. When you did so, did you have any hope that there would be anything found, given how clean the car had been?

A. Not really.

MR. SNYDER: Nothing further.

REDIRECT EXAMINATION

BY MR. FIELDS:

Q. Mr. Colyer, --

A. Yes.

Q. -- you're not a forensic expert, are you?

A. No. I'm not.

Q. Are you aware of some of the procedures that they use in -- when they test cars for certain type evidence?

A. I really have not -- I'm no expert in that field. No. I'm not.

Q. So you're not aware that even if the car was wiped down, if blood had been in there, they got advanced

FILED

JAN 3 0 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA

vs.

SHERMAN LAMONT FIELDS, (01)

§
§
§
§
§

CRIMINAL ACTION W-01-CR-164

JURY NOTE NUMBER __4__

Request the testimony (or evidence, if it is available) of the results of DNA testing on the car. A summary of what the testing and results is acceptable.

_Tom Michaelis_
PRESIDING JUROR

_1/30/04_　　_1540 hours_
DATE and TIME

\* \* \* \* \* \* \* \* \* \*

COURT'S RESPONSE:

See Attachment

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

_____
DATE and TIME

179

463

**Attachment**

As I instructed right after you were sworn:

> Under normal circumstances, no written testimony of witnesses can be made available to you during your deliberations; nor, under normal circumstances, can all of any significant portion of a witness's testimony be read to you during your deliberations.

When a jury requests a specific question about a portion of a particular witness's testimony, then that can often be provided. It is, however, quite time consuming. First, the parties and I have to listen to the tape of that testimony, and determine which portion would answer your questions, and then the Court Reporter has to transcribe it. This can take several hours.

I cannot answer the type of question you have asked. However, if you have a specific question about a particular witness's testimony, please send me another note. If not, please continue your deliberations.

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

1/30/04        4:12 p.
DATE AND TIME

- Claim: Jail-house informants gave false testimony. Adjudicated by: Order denying § 2255 relief, Appendix A, p. 65 (rejecting actual innocence claim).

reover, on direct appeal, Fields did not challenge the sufficiency of the evidence nst him. *See Fields,* 483 F.3d at 347–62 (discussing alleged trial court errors). refore, many of the issues he now raises are procedurally barred.

The only claims Fields has not previously raised appear to be (1) that the trial e was somehow biased because of his relationship with an attorney who esented the Coleman family in a civil suit against the company providing security at McClennan County Detention Center and (2) that the government failed to disclose ographs of the Grand Am. (*Pro se* Petition at 7, 16). Neither of these claims suggest 55 is an inadequate remedy. The civil suit was a public record at the time of Fields's and the existence of undisclosed "photographs" is conjecture based on a motion discovery filed prior to trial. Nothing in the record suggests "undisclosed" ographs exist. As such, Fields cannot show that he is entitled to relief under § 2241, his court should dismiss his petition.

## B. This court should reject Fields's claims relating to his previous *pro se* filings.

Fields claims several issues remain "unadjudicated" because the Fifth Circuit t of Appeals did not consider his *pro se* filings. (*Pro se* petition at 1). Specifically, he s the following issues were never decided by a court: "Judicial Bias issues," "brady ions," "Actual Innocence claim," "criminal act(s) perpetrated against Fields by the cution," "The Criminal Act of Fraud On the Court(s)," "Fields' conviction and

15

*States*, 119 F.3d 468, 469 (7th Cir. 1997)) (emphasis added). Thus, in rejecting Fields's bid to file a successive § 2255 motion, the Fifth Circuit necessarily found his claim without merit. Fields's contention that the Fifth Circuit erred in doing so, *see* Reply 4-5 & n.3, ECF No. 25, is beside the point. "[A] claim of error in addressing the sort of constitutional theory that has long been appropriate for collateral review does not render § 2255 inadequate or ineffective." *Taylor*, 314 F.3d at 835.

Not only has § 2255 already afforded Fields the opportunity to present his constitutional argument about the validity of § 924(c)(3)(B), but he may have another opportunity if the Supreme Court ultimately addresses that question. As noted above, § 2255 allows post-conviction motions that rely on new, retroactive, constitutional rules. *See* § 2255(h)(2). Although no such rule currently invalidates § 924(c)(3)(B), "[i]f § 924(c)(3)(B) is ultimately held to be unconstitutional, that finding may open the door to future collateral challenges to sentences rendered under that statute." *United States v. Williams*, No. 16-20815, 2018 WL 3621979, at *2 (5th Cir. July 30, 2018). Accordingly, Fields has not identified the sort of "structural problem" in § 2255 that the Seventh Circuit has considered necessary to trigger the savings clause.

Fields also fails to meet the Seventh Circuit's third requirement for resort to the savings clause, that the error be so "grave" as "to be deemed a miscarriage of justice . . . such as one resulting in a conviction for a crime of which he was innocent," *Camacho*, 872 F.3d at 813 (internal quotation marks omitted). At best, Fields has a claim that a jury, rather than a judge, should have decided that his escape was a crime of violence. *See infra* pp. 11-25. That sort of claim does not trigger the savings clause. *See Prevatte*, 865 F.3d at 899-900 (finding no miscarriage of justice where the evidence overwhelmingly supported the a finding that should have been made by a jury rather than a court). For this additional reason, Fields cannot meet the Seventh Circuit's requirements for resorting to the savings clause.

Respondent's Supplemental Brief on *Sessions v. Dimaya*                                    6

Case: 19-1708     Document: 1-1     Filed: 04/15/2019     Pages: 155
HABEAS,CLOSED

# U.S. District Court
## Southern District of Indiana (Terre Haute)
## CIVIL DOCKET FOR CASE #: 2:16-cv-00418-JPH-MJD

FIELDS v. WARDEN
Assigned to: Judge James Patrick Hanlon
Referred to: Magistrate Judge Mark J. Dinsmore
Cause: 28:2241 Petition for Writ of Habeas Corpus (federal)

Date Filed: 10/26/2016
Date Terminated: 03/08/2019
Jury Demand: None
Nature of Suit: 535 Death Penalty - Habeas Corpus
Jurisdiction: U.S. Government Defendant

**Petitioner**

**SHERMAN LAMONT FIELDS**          represented by     **Jeffrey E. Ellis**
LAW OFFICE OF ALSEPT & ELLIS
621 SW Morrison St., Ste 1025
Portland, OR 97205
503-222-9830
Email: jeffreyerwinellis@gmail.com
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**WARDEN**                         represented by     **James Robert Wood**
*USP TERRE HAUTE*                                     UNITED STATES ATTORNEY'S
OFFICE
10 West Market Street
Suite 2100
Indianapolis, IN 46204
(317) 229-2462
Fax: (317) 226-6125
Email: bob.wood@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Zachary Carl Richter**
UNITED STATES ATTORNEY'S
OFFICE
816 Congress Ave.
Suite 1000
Austin, TX 78701
512-916-5858
Fax: 512-916-5854
Email: zachary.c.richter@usdoj.gov

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 10/26/2016 | [1](#) | PETITION for Writ of Habeas Corpus, filed by SHERMAN LAMONT FIELDS. (No fee paid with this filing) (DJH) (Additional attachment(s) added on 10/28/2016: # [1](#) Exhibit 1 letter, # [2](#) Exhibit 2 Western District of Texas order, # [3](#) Exhibit 3 Motion to Proceed Pro Se, # [4](#) Exhibit 4 letter from Court of Appeals, # [5](#) Exhibit 5 Freestanding Actual Innocence Brief, # [6](#) Exhibit 6 Motion to Seal Brief, # [7](#) Exhibit 7 Motion to Bar, # [8](#) Exhibit 8 Post Conviction Motion, # [9](#) Exhibit 9 Response to Pro Se Motion, # [10](#) Exhibit 10 Order from Court of Appeals, # [11](#) Exhibit 11 letter from Court of Appeals, # [12](#) Exhibit 12 letter from Court of Appeals, # [13](#) Exhibit 13 letter from Court of Appeals, # [14](#) Exhibit 14 Motion for Reconsideration, # [15](#) Exhibit 15 Motion to Reurge Filings) (DJH). (Additional attachment(s) added on 10/28/2016: # [16](#) Exhibit 16 letters from Court of Appeals, # [17](#) Exhibit 17 Motion Appealing Order from the Fifth Circuit, and Motion to United States Supreme Court, # [18](#) Exhibit 18 Motion Pursuant to Rule 60, # [19](#) Exhibit 19 letter from US Supreme Court, # [20](#) Exhibit 20 letter to Clerk, # [21](#) Exhibit 21 Page Nos. 51-55 from court document, # [22](#) Exhibit 22 Judgment from DC Circuit Court of Appeals, # [23](#) Exhibit 23 page of transcript for voir dire examination, # [24](#) Exhibit 24 pages of transcript, # [25](#) Exhibit 25 Examination of Ms. Scroggins by Mr. Fields, # [26](#) Exhibit 26 Shalaykea Scroggins Grand Jury testimony, # [27](#) Exhibit 27 Statement of Shalaykea Scroggins, # [28](#) Exhibit 28 Direct Examination of Edward Outley by Mr. Snyder, # [29](#) Exhibit 29 Cross-Examination at Shaylakea Scroggins by Mr. Fields, # [30](#) Exhibit 30 Douglas Kunze Grand Jury testimony) (DJH). (Additional attachment(s) added on 10/28/2016: # [31](#) Exhibit 31 Motion to Recuse the Hon. Edith Jones, # [32](#) Exhibit 32 Page 56 of court document, # [33](#) Exhibit 33 letters, # [34](#) Exhibit 34 pages of transcript, # [35](#) Exhibit 35 Cross Examination of Shaylakea Scroggins by Mr. Fields, # [36](#) Exhibit 36 Direct Examination of James Blair by Mr. Fields, # [37](#) Exhibit 37 Police Report, # [38](#) Exhibit 38 Cross-Examination of Steve January, # [39](#) Exhibit 39 letters, # [40](#) Exhibit 40 Officer Warning Statement, # [41](#) Exhibit 41 Cross-Examination by Christian Walker by Mr. Fields, # [42](#) Exhibit 42 Direct Examination of Edward Outley by Mr. Snyder, # [43](#) Exhibit 43 Page of Transcript, # [44](#) Exhibit 44 Re-Cross Examination of Edward Outley by Mr. Fields, # [45](#) Exhibit 45 Cross-Examination of Edward Outley by Mr. Fields, # [46](#) Exhibit 46 letter from Edward Lee Outley III "TreyBoy", # [47](#) Exhibit 47 Cross-Examination of Edward Outley by Mr. Fields, # [48](#) Exhibit 48 Motion for Discovery, Production, and Inspection of Evidence filed in Western District of Texas, # [49](#) Exhibit 49 Request by juror filed in Western District of Texas, # [50](#) Exhibit 50 judge response to juror request) (DJH). (Additional attachment(s) added on 10/28/2016: # [51](#) Exhibit 51 Johnny Spillman grand jury testimony, # [52](#) Exhibit 52 Chris Casson grand jury testimony, # [53](#) Exhibit 53 Cross-Examination of Tanesha Hilliard by Mr. Fields, # [54](#) Exhibit 54 Sheriff's Office follow-up report, # [55](#) Exhibit 55 Cross-Examination of Shaylakea Scroggins by Mr. Fields, # [56](#) Exhibit 56 Direct Examination of Lutrill Payne by Mr. Fields, # [57](#) Exhibit 57 Report of Investigation, # [58](#) Exhibit 58 letter from attorney, # [59](#) Exhibit 59 Direct Examination of Chance Alexander, # [60](#) Exhibit 60 Direct Examination of Edward Outley by Mr. Snyder, # [61](#) Exhibit 61 Interview conduct via telephone, # [62](#) Exhibit 62 |

Cross-Examination of William Young by Mr. Gloff, # 63 Exhibit 63 Cross-Examination of Douglas Kunze by Mr. Gloff, # 64 Exhibit 64 Direct Examination of William Young by Mr. Fields, # 65 Exhibit 65 Cross-Examination of Edward Outley by Mr. Fields, # 66 Exhibit 66 Statement of Danny Edwards, # 67 Exhibit 67 Tammy Edwards deposition, # 68 Exhibit 68 Tammy Edwards deposition, # 69 Exhibit 69 Direct Examination of Steve January by Mr. Snyder, # 70 Exhibit 70 police report, # 71 Exhibit 71 police report narrative, # 72 Exhibit 72 Statement of Christian Walker) (DJH). (Additional attachment(s) added on 10/28/2016: # 73 Exhibit 73 Statement of Christian Walker, # 74 Exhibit 74 Government's Motion for Downward Departure filed in Western District of Texas, # 75 Exhibit 75 Cross-Examination of Christian Walker by Mr. Fields, # 76 Exhibit 76 Chris Walker's grand jury testimony, # 77 Exhibit 77 letter to US Attorney from Homero DeLeon, # 78 Exhibit 78 Direct Examination of Homero DeLeon by Mr. Snyder, # 79 Exhibit 79 Cross Examination of Homero DeLeon by Fields, # 80 Exhibit 80 Report of Investigation, # 81 Exhibit 81 Direct Examination of Douglas Kunze by Mr. Gloff, # 82 Exhibit 82 letter from attorney Scott Peterson, # 83 Exhibit 83 Direct Examination of Parnell McNamara by Mr. Gloff, # 84 Exhibit 84 Hubert Steadman's grand jury testimony, # 85 Exhibit 85 Sheriff's Office follow-up report, # 86 Exhibit 86 jury findings on Statutory Aggravating Factors, # 87 Exhibit 87 page from court document, # 88 Envelope) (DJH). (Entered: 10/27/2016)

| | | |
|---|---|---|
| 10/26/2016 | 2 | MOTION for Leave to Proceed in forma pauperis, filed by Petitioner SHERMAN LAMONT FIELDS. (DJH) (Additional attachment(s) added on 10/28/2016: # 1 Envelope) (DJH). (Entered: 10/27/2016) |
| 10/26/2016 | 3 | MOTION for Writ of Conspiracy/Writ of Error Coram Nobis filed by Petitioner SHERMAN LAMONT FIELDS. (DJH) (Additional attachment(s) added on 10/28/2016: # 1 Envelope) (DJH). (Entered: 10/27/2016) |
| 10/27/2016 | 4 | MAGISTRATE JUDGE's NOTICE of Availability to Exercise Jurisdiction issued. (DJH) (Entered: 10/27/2016) |
| 11/29/2016 | 5 | Entry Concerning Selected Matters: The petitioner's custodian is the sole proper respondent and is now substituted for the official originally designated as respondent. 2.The request to proceed in forma pauperis [dkt 2 ] is granted. Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 11/29/2016. (DW) (Entered: 11/29/2016) |
| 12/07/2016 | 6 | Correspondence REQUESTING COPY of Case Docket Sheet, filed by Petitioner. Copy/Copies provided via US Mail. (Attachments: # 1 Copy of Docket Sheet, # 2 Envelope) (DW) (Entered: 12/08/2016) |
| 01/25/2017 | 7 | MOTION for deadlines, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(DW) (Entered: 01/26/2017) |
| 02/06/2017 | 8 | Entry Concerning Selected Matters - Therefore, his motion for a writ of conspiracy/writ of error coram nobis is premature. Being premature, the motion [dkt 3 ] is denied without prejudice. 2.A copy of the docket sheet shall be included with the petitioner's copy of this Entry. 3.An Order to Show Cause is being issued concurrent with this Entry. The petitioner's motion for deadlines is therefore denied as moot (SEE ENTRY). Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on |

| | | |
|---|---|---|
| | | 2/6/2017. (DW) (Entered: 02/06/2017) |
| 02/06/2017 | 9 | ENTRY and ORDER TO SHOW CAUSE - The respondent shall have through April 18, 2017 in which to answer the allegations of the habeas petition, and in doing so shall show cause why the relief sought by the petitioner should not be granted. The petitioner shall have thirty (30) days after service of the answer in which to reply (SEE ENTRY). Copy sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 2/6/2017.(DW) (Entered: 02/06/2017) |
| 04/04/2017 | 10 | NOTICE of Appearance and Motion for Extension of Time to Amend Petition by Jeffrey E. Ellis on behalf of Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) Modified on 4/5/2017 (DW). (Entered: 04/04/2017) |
| 04/06/2017 | 11 | ORDER granting 10 Motion for Extension of Time. The petitioner shall have through April 28, 2017 in which to file an amended petition for writ of habeas corpus. Signed by Judge Jane Magnus-Stinson on 4/6/2017. (DW) (Entered: 04/06/2017) |
| 04/07/2017 | 12 | NOTICE of Appearance by James Robert Wood on behalf of Respondent WARDEN. (Wood, James) (Entered: 04/07/2017) |
| 04/14/2017 | 13 | MOTION for Extension of Time to *FILE RESPONSE TO ANTICIPATED AMENDED PETITION FOR WRIT OF HABEAS CORPUS*, filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Wood, James) (Entered: 04/14/2017) |
| 04/18/2017 | 14 | ORDER granting 13 Motion for Extension of Time. The Respondent shall have thirty (30) days after the filing of the Petitioner's Amended Petition for Writ of Habeas Corpus to file his response to the amended petition. Signed by Judge Jane Magnus-Stinson on 4/18/2017. (DW) (Entered: 04/18/2017) |
| 04/19/2017 | 15 | NOTICE of intent to respond, filed by Petitioner SHERMAN LAMONT FIELDS (Attachments: # 1 Envelope) (DW) (Entered: 04/20/2017) |
| 04/26/2017 | 16 | AMENDED COMPLAINT *Petition for Writ of Habeas Corpus* against WARDEN, filed by SHERMAN LAMONT FIELDS. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Ellis, Jeffrey) (Entered: 04/26/2017) |
| 05/11/2017 | 17 | NOTICE OF EX PARTE TELEPHONIC CONFERENCE - A telephonic conference will be conducted on May 30, 2017 at 2:00 p.m., Eastern Time. Participants shall call 317-229-3670, from which they will be connected to the conference (SEE NOTICE). Signed by Judge Jane Magnus-Stinson on 5/11/2017.(DW) (Entered: 05/11/2017) |
| 05/16/2017 | 18 | ORDER TO MAKE PETITIONER AVAILABLE TO PARTICIPATE IN EX PARTE TELEPHONIC CONFERENCE - To: Warden (c/o Counselor Andrew Sutton) United States Penitentiary - Terre Haute. A telephonic conference has been set for May 30, 2017 at 2:00 o'clock p.m., Eastern Time. The petitioner will participate in the conference. You or your designee(s) are ORDERED to make Sherman Fields available to participate in the conference just described and to place a call to the Court at 317-229-3670 at the time set for the conference. (See Order.) Signed by Honorable Judge Jane Magnus Stinson on 5/16/2017.(RSF) Modified on 5/16/2017 (RSF). (Entered: 05/16/2017) |

| 05/17/2017 | 19 | NOTICE of Appearance by Jennifer Freel on behalf of Respondent WARDEN. (Freel, Jennifer) (Entered: 05/17/2017) |
|---|---|---|
| 05/18/2017 | 20 | Submission of Signature Requirement re 19 Notice of Appearance by WARDEN. (Freel, Jennifer) (Entered: 05/18/2017) |
| 05/26/2017 | 21 | ANSWER to 16 Amended Complaint, 1 Petition for Writ of Habeas Corpus , RESPONSE to 16 Amended Complaint, 1 Petition for Writ of Habeas Corpus , filed by LORETTA LYNCH, WARDEN. (Attachments: # 1 Appendix A: District Court Order Denying 2255 Relief, # 2 Appendix B: Docket Sheet, # 3 Appendix C: Letter to District Court, # 4 Appendix D: Motion to Proceed Pro Se, # 5 Appendix E: Response to Pro Se Motion, # 6 Appendix F: Order Denying Pro Se Motion, # 7 Appendix G: Response to Notice, # 8 Appendix H: Motion for Reconsideration, # 9 Appendix I: Order Denying Motion to Reconsider)(Freel, Jennifer) (Entered: 05/26/2017) |
| 05/31/2017 | 22 | MINUTE ENTRY for proceedings held before Judge Jane Magnus-Stinson: A telephonic conference was conducted on May 30, 2017. The petitioner participated in person and his counsel of record also participated. As previously determined, the conference was ex parte and in camera. The court reporter was Jean Knepley. The representation of counsel of record for the petitioner shall continue. The petitioner's request that his desire to have the opportunity to submit a pro se supplemental brief dkt 15 is granted in part. The petitioner shall have through July 20, 2017 in which to submit the combined reply to the respondent's answer to the amended petition for writ of habeas corpus, mislabeled in docket item 21 as answer to amended complaint. (See Entry.) Signed by Judge Jane Magnus-Stinson. (Court Reporter Jean Knepley.)(RSF) (Entered: 06/01/2017) |
| 05/31/2017 | 23 | ***STRICKEN PER 24 ENTRY and NOTICE*** Submission of Letter Regarding Claims, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(APD) Modified on 6/8/2017 (DW). (Entered: 06/01/2017) |
| 06/08/2017 | 24 | ENTRY AND NOTICE - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields' pro se filing of May 31, 2017 is stricken and shall be returned to his counsel of record with a copy of this Entry. Copy of filing and Entry sent to Attorney Jeffrey E. Ellis. Signed by Judge Jane Magnus-Stinson on 6/8/2017.(DW) (Entered: 06/08/2017) |
| 07/17/2017 | 25 | REPLY in Support of Motion re 3 MOTION for Writ , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 07/17/2017) |
| 07/20/2017 | 26 | ENTRY Discussing Pro Se Submission - The Court received a pro se submission directly from the petitioner in this action even though he is represented by counsel. The Court previously stated that "[t]he petitioner shall not file material directly with the Court and material received directly from the petitioner, if submitted, shall be returned unfiled." Filing No. 22 at 2. Accordingly, the clerk is directed to return the petitioner's submission to him unfiled. Copy of Entry and material sent to Petitioner via US Mail. Signed by Judge Jane Magnus-Stinson on 7/20/2017.(DW) (Entered: 07/20/2017) |
| 08/24/2017 | 27 | MOTION *for Immediate Relief*, filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 08/24/2017) |

| 08/25/2017 | 28 | ENTRY Directing Briefing Schedule - Presently before the Court is the petitioner's Motion for Immediate Release. The respondent have through September 8, 2017, in which to file a response brief. The petitioner shall have through September 15, 2017, in which to file a reply brief. Signed by Judge Jane Magnus-Stinson on 8/25/2017.(DW) (Entered: 08/25/2017) |
|---|---|---|
| 09/01/2017 | 29 | RESPONSE in Opposition re 27 MOTION *for Immediate Relief* . (Freel, Jennifer) (Entered: 09/01/2017) |
| 09/08/2017 | 30 | MOTION for Petitioner to Proceed prose again, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Envelope)(DW) (Entered: 09/11/2017) |
| 09/14/2017 | 31 | REPLY in Support of Motion re 27 MOTION *for Immediate Relief* , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 09/14/2017) |
| 09/15/2017 | 32 | Entry and Notice - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields's pro se filing of September 8, 2017, dkt. 30 , is stricken and shall be returned to his counsel of record with a copy of this Entry. The clerk is directed to terminate this filing as a pending motion on the docket. Signed by Judge Jane Magnus-Stinson on 9/15/2017. (DW) (Entered: 09/15/2017) |
| 10/02/2017 | 33 | Entry Denying Motion for Immediate Relief and Directing Further Proceedings - The petitioner filed this habeas action pursuant to 28 U.S.C. § 2241 challenging his death sentence imposed after being convicted of violating 18 U.S.C. § 924(c) in the United States District Court for the Western District of Texas. Presently pending is the petitioner's motion for immediate relief in light of the Seventh Circuit's recent decision. The petitioner's motion for immediate relief, dkt. 27 , is denied. The petitioner must file a brief regarding how the Supreme Court's decision in Dimaya impacts the issue in this case by no later than twenty-eight days after Dimaya is decided. The respondent has fourteen days after the petitioner's brief is filed to file a response. (See Entry.) Signed by Judge Jane Magnus-Stinson on 10/2/2017. (RSF) (Entered: 10/02/2017) |
| 10/25/2017 | 34 | ***STRICKEN PER 35 ENTRY*** MOTION for Immediate Relief, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(DW) (Additional attachment(s) added on 10/26/2017: # 5 Envelope) (DW). Modified on 11/1/2017 (DW). Modified on 11/1/2017 (DW). (Entered: 10/26/2017) |
| 11/01/2017 | 35 | Entry and Notice - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Mr. Fields's pro se filing of October 25, 2017, dkt. 34 , is stricken and his counsel is hereby notified of its filing. The clerk is directed to terminate this filing as a pending motion on the docket. Signed by Judge Jane Magnus-Stinson on 11/1/2017. (DW) (Entered: 11/01/2017) |
| 11/02/2017 | 36 | NOTICE of Withdrawal of Appearance by *Jennifer Freel* on behalf of All Defendants (Freel, Jennifer) (Entered: 11/02/2017) |
| 12/13/2017 | 37 | MOTION to Appoint Counsel , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 12/13/2017) |

| | | |
|---|---|---|
| 12/21/2017 | 38 | ORDER granting 37 Motion to Appoint Counsel. It is hereby ordered that Jeffrey Ellis of the Law Office of Alsept & Ellis, LLC is appointed as counsel for Petitioner, Sherman L. Fields, in the above-entitled matter. Payment is authorized pursuant to the CJA plan. It is counsel's responsibility to provide necessary documents to the Court's finance department in order establish a local account in Evoucher. Copy distributed pursuant to distribution list. Signed by Judge Jane Magnus-Stinson on 12/21/2017. (RSF) (Entered: 12/21/2017) |
| 12/21/2017 | 39 | NOTICE of Appearance by Zachary Carl Richter on behalf of Respondent WARDEN. (Richter, Zachary) (Entered: 12/21/2017) |
| 05/02/2018 | 40 | Unopposed MOTION for Extension of Time to 6/14/2018 in which to 33 Order on Motion *Re: Impact of Dimaya*, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Text of Proposed Order)(Ellis, Jeffrey) (Entered: 05/02/2018) |
| 05/03/2018 | 41 | ORDER granting 40 Motion for Extension of Time until June 14, 2018, to file his brief regarding the impact of Dimaya on this case. Respondent has fourteen days after the petitioner's brief is filed to file a response. Signed by Judge Jane Magnus-Stinson on 5/3/2018. (DW) (Entered: 05/03/2018) |
| 06/13/2018 | 42 | BRIEF/MEMORANDUM in Support *OF DEFENDANTS AMENDED PETITION FOR WRIT OF HABEAS CORPUS, REGARDING THE SUPREME COURTS HOLDING IN SESSIONS v. DIMAYA*, re 33 Order on Motion, filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 06/13/2018) |
| 06/18/2018 | 43 | Unopposed MOTION for Extension of Time to 8/6/18 in which to 42 Brief/Memorandum in Support , filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Richter, Zachary) (Entered: 06/18/2018) |
| 06/20/2018 | 44 | ORDER - For good cause shown, this Court grants Respondent an extension of time 43 until August 6, 2018, to file a response to Petitioner Sherman Fields's supplemental briefing on the effect of the decision in Sessions v. Dimaya, 138 S. Ct. 1204 (2018). Signed by Judge Jane Magnus-Stinson on 6/20/2018. (DW) (Entered: 06/20/2018) |
| 07/27/2018 | 48 | Unopposed MOTION for Extension of Time to 8/13/18 *for Supplemental Briefing*, filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Richter, Zachary) (Entered: 07/27/2018) |
| 08/02/2018 | 49 | ORDER GRANTING MOTION FOR EXTENSION OF TIME - This Court grants Respondent's motion for an extension of time, dkt. 48 , until August 13, 2018, to file a response to Petitioner Sherman Fields's supplemental briefing. (See Order.) Signed by Judge Jane Magnus-Stinson on 8/2/2018. (DMW) (Entered: 08/02/2018) |
| 08/13/2018 | 50 | BRIEF *Supplemental* on *Sessions v. Dimaya*, filed by Respondent WARDEN. (Richter, Zachary) Modified on 8/14/2018 (JD). (Entered: 08/13/2018) |
| 08/13/2018 | 51 | NOTICE of Filing *(Manual) of Attachment to Supplemental Brief* by WARDEN (Richter, Zachary) (Entered: 08/13/2018) |
| 08/14/2018 | 53 | Remark - One (1) DVD containing transcripts from the criminal trial re 51 NOTICE of Filing *(Manual) of Attachment to Supplemental Brief* by WARDEN (Richter, Zachary) (Attachments: # 1 Envelope) (DWH) (Entered: 08/15/2018) |

| | | |
|---|---|---|
| 08/15/2018 | 52 | Unopposed MOTION to Stay *Proceedings*, filed by Petitioner SHERMAN LAMONT FIELDS. (Attachments: # 1 Text of Proposed Order)(Ellis, Jeffrey) (Entered: 08/15/2018) |
| 08/16/2018 | 54 | ORDER STAYING PROCEEDINGS - This Court orders a stay of these proceedings to allow the parties to attempt to reach an agreed resolution 52 . Mr. Fields shall file a report every 30 days regarding the status of negotiations. If either party reports that an agreed settlement cannot be reached, this Court shall dissolve the stay. Signed by Judge Jane Magnus-Stinson on 8/16/2018. (DWH) (Entered: 08/16/2018) |
| 09/16/2018 | 55 | STATUS REPORT by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 09/16/2018) |
| 09/17/2018 | 56 | CERTIFICATE OF SERVICE by SHERMAN LAMONT FIELDS re 55 Status Report (Ellis, Jeffrey) (Entered: 09/17/2018) |
| 10/11/2018 | 58 | Entry Striking Pro Se Filing - Consistent with the Entry of May 31, 2017, issued following the conference of May 30, 2017, Petitioner Sherman Field's pro se filing of October 9, 2018, dkt. 57 , is stricken. The clerk is directed to add an ex parte restriction to this filing. Signed by Judge Jane Magnus-Stinson on 10/11/2018. (DMW) (Entered: 10/11/2018) |
| 10/15/2018 | 59 | STATUS REPORT *(Second)* by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 10/15/2018) |
| 11/07/2018 | 60 | Notice of Docketing from 7th Circuit Court of Appeals - Case No. 18-3389 assigned to Petition for Writ of Mandamus filed with the 7th Circuit by SHERMAN L. FIELDS. (LBT) (Entered: 11/07/2018) |
| 11/13/2018 | 63 | Reassignment of Case to Judge James Patrick Hanlon. Judge Jane Magnus-Stinson is no longer assigned to this case. Please include the new case number ( 2:16-cv-418-JPH-MJD), which includes the initials of the newly assigned judge, on all future filings in this matter. (CDad) (Entered: 11/13/2018) |
| 11/15/2018 | 64 | STATUS REPORT by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 11/15/2018) |
| 12/14/2018 | 65 | USCA Order (Certified) (USCA #18-3389) - IT IS ORDERED that the petition for writ of mandamus is DENIED. (MAT) (Entered: 12/14/2018) |
| 12/27/2018 | 66 | STATUS REPORT by SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 12/27/2018) |
| 01/10/2019 | 67 | MOTION to Modify *Stay*, filed by Respondent WARDEN. (Attachments: # 1 Text of Proposed Order)(Richter, Zachary) (Entered: 01/10/2019) |
| 01/22/2019 | 68 | RESPONSE in Opposition re 67 MOTION to Modify *Stay* , filed by Petitioner SHERMAN LAMONT FIELDS. (Ellis, Jeffrey) (Entered: 01/22/2019) |
| 01/29/2019 | 69 | REPLY in Support of Motion re 67 MOTION to Modify *Stay* , filed by Respondent WARDEN. (Richter, Zachary) (Entered: 01/29/2019) |

| | | |
|---|---|---|
| 03/06/2019 | 70 | ORDER REGARDING FILINGS FROM THE PETITIONER - The Clerk's Office received material directly from the petitioner on February 28, 2019. The material includes a motion regarding his counsel and a document entitled "Writ of Actual Innocence." The petitioner is again reminded that all filings must be submitted by his counsel. The Clerk is ordered to send this material, unfiled, to the petitioner's counsel with counsel's copy of this Order. Any material the petitioner may attempt to submit directly to the Court in the future will be sent, unfiled, to the petitioner's counsel. Any such material that is inadvertently filed will be stricken. Copy of Order and Plaintiff's submission mailed to counsel. Signed by Judge James Patrick Hanlon on 3/6/2019.(RSF) Modified on 3/6/2019 (RSF). (Entered: 03/06/2019) |
| 03/08/2019 | 71 | ORDER GRANTING MOTION TO MODIFY STAY - Respondent's motion to modify the stay, dkt. 67 , is granted. This action is stayed pending the Supreme Court's decision in United States v. Davis, No. 18-431. Respondent shall have fourteen days from the date the Supreme Court issues a decision in Davis to file a motion to lift the stay. The clerk is directed to administratively close this action on the docket. Once Respondent files a motion to lift the stay, the Court will administratively open this action and direct how this action will proceed to resolution. (See Order.) Signed by Judge James Patrick Hanlon on 3/8/2019. (DMW) (Entered: 03/08/2019) |

## Case #: 2:16-cv-00418-JPH-MJD

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/16/2019 16:36:10 | | | |
| **PACER Login:** | us4852us:5699723:0 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:16-cv-00418-JPH-MJD |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |